UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,          Case No. 3:22-CR-00274-JRK-3
                                   Court of Appeals No. 24-3887
        Plaintiff,
                                   Toledo, Ohio
     vs.
                                   **TUESDAY, OCTOBER 1, 2024**
ANITA GREEN,

        Defendant.


                         - - - - -

            TRANSCRIPT OF SENTENCING HEARING
        BEFORE THE HONORABLE JAMES R. KNEPP II
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        **ALISSA M. STERLING,**
                           **MICHELLE M. BAEPPLER***,*
                           *Assistant United States Attorneys*
                           Office of the U.S. Attorney
                           Northern District of Ohio


For Pretrial/Probation:    PAUL SKARUPA, *Deputy Chief*
                           CHRISTINA TRUESDELL, *Officer*


For the Defendant:         **IAN N. FRIEDMAN**, *Esquire*
                           **LUCAS D. TROTT**, *Esquire*
                           FRIEDMAN NEMECEK LONG & GRANT
                           1360 East 9th Street, Suite 650
                           Cleveland, Ohio 44114
                           216-928-7700


Official Court Reporter:   Diana M. Ziegelhofer, RPR, RCR
                           United States District Court
                           1716 Spielbusch Avenue, Suite 118
                           Toledo, Ohio  43604
                           (419) 213-5538


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

- - -


**INDEX**


**WITNESS**                                                    **PAGE**


**ANTHONY THEODOROU**
    DIRECT EXAMINATION BY MS. BAEPPLER:          23
    CROSS-EXAMINATION BY MR. FRIEDMAN:            78
    REDIRECT EXAMINATION BY MS. BAEPPLER:        115
    RECROSS EXAMINATION BY MR. FRIEDMAN:         125

**ANDREW EILERMAN**
    DIRECT EXAMINATION BY MS. STERLING:          131
    CROSS-EXAMINATION BY MR. FRIEDMAN:           145


- - -

```
 1                          - - -

 2                 TUESDAY, OCTOBER 1, 2024

 3       (Proceedings commenced in open court at 3:44 p.m.)

 4              THE COURT:  Good afternoon, ladies and

 5   gentlemen.  I apologize for us beginning a little late,

 6   but, in our defense, we've been working pretty hard

 7   straight through from about 9:00 this morning, and I think

 8   we paused for about a 30-minute lunch break; but otherwise,

 9   we've been at it pretty hard, and if nothing else, out of

10   self-preservation, I got to take care of Diana, the court

11   reporter, if nobody else, so she doesn't seize up on us

12   here, so we took a little break.

13              The next matter before the court is United

14   States of America versus Anita Green.  It's case number

15   3:22-cr-274.  The matter comes on this afternoon for a

16   sentencing.

17              Ms. Green is present in the courtroom.

18   She's joined at counsel table by her counsel, Attorney Eric

19   Nemecek.  And do you say -- it's Lucas, right?

20              MR. TROTT:  It's Lucas Trott, Your Honor,

21   and Ian Friedman to my left.

22              THE COURT:  I said the wrong name, I'm

23   sorry.

24              And, Lucas, tell me your last name one more

25   time.
```

1              MR. TROTT:  It's Trott, Your Honor,

2     T-R-O-T-T.

3              THE COURT:  Okay.  I'm sorry.

4              And, Ian, I know you are not Eric, so I

5     apologize.  You are both good-looking guys, but don't look

6     that much alike.

7              MR. FRIEDMAN:  I appreciate that.

8              THE COURT:  What's that?

9              MR. FRIEDMAN:  He would be unset with that,

10    but I'm okay with it.

11             THE COURT:  I got you, okay.

12             So we've got Mr. Friedman and Mr. Trott here

13    with Ms. Green.  We have, on behalf of the government,

14    AUSAs Sterling and Baeppler.

15             As I started to say, this case comes on for

16    sentencing.  It started with a complaint back in May of

17    '22, indicted later in May of '22.  There was an open plea

18    to the Indictment in October of '23, and here we come for

19    sentencing, which I think has been continued a couple of

20    times so that we could do it in a global fashion with a

21    couple of other co-defendants here, so that's where we

22    begin.

23             As far as the record for sentencing, let's

24    talk about what I have so that we can make sure that I have

25    what I should have.  And I didn't print out all of the -- I

didn't print out all of your letters.  I read them all,

counsel, but there was -- I decided to sacrifice or to save

a couple of trees, and I read them on my computer, but

let's just go through and talk about how many of them there

are, and there are a bunch of them there.  I think -- they

are all attached, obviously, to the pleading, but there's,

also, I think there is an itemization of them all in the

docket sheet, so let me get to that so we can make sure we

are all on the same page.

            So, in addition to the defendant's

sentencing memorandum, I have a progress letter from Ashley

Hinkle, I have a letter of support from Bonnie Greve, a

letter of support from Charlotte Schnippel, a letter of

support from Jeff Stachler, a letter of support from

Bernadette Lindquist, a letter of support from Michele

Carlson, a letter of support from Paul Weaver, a letter of

support from Dianne Weaver, a letter of support from Cheryl

Siegenthaler, a letter of support from Angie Butler, a

letter of support from Daniel Harpter, a letter of support

from Dennis Phillips, a letter of support from Joline

Shobe, a letter of support from Lou Brown, a letter of

support from Sharon Schultz, a letter of support from Linda

Shipp, a letter of support from Kim Henkener, a letter of

support from Melanie Henkener, a letter of support from

Janet Phillips, a letter of support from Daniel Kadel, a

1    letter of support from Dawn Heppard, a letter of support

2    from Luke and Madison Steinke, a letter of support from

3    Pamela Brown, a letter of support from Diane Fahncke, a

4    letter of support from Kelly Bermer, a letter of support

5    from Della Oksanen, a letter of support from Jane Steinke,

6    a letter of support from Rhonda Wildermuth, a letter of

7    support from James Steinke, a letter of support from

8    Michelle Steinke, a letter of support from Joe Altherr, a

9    letter of support from Alexis, Brennon, and Eden Webb, a

10   letter of support from Pamela Spencer, a letter of support

11   from Jerry Shipp, Paintings by Anita Green, a letter of

12   support from Christina Oakley, Redemption House

13   information.  Those were all attached to the defendant's

14   sentencing memorandum, which I received.

15             From the government, I received a sentencing

16   memorandum and a supplemental sentencing memorandum, and I

17   have received I think -- I think I counted was it 248 pages

18   of victim impact stuff that we talked about at

19   Ms. Hovanec's sentencing, a fair amount of which was

20   authored and assembled by I want to say Mrs. Hovanec, but I

21   know you use your maiden name, ma'am.  What's --

22             MS. SLOAN:  Sloan.

23             THE COURT:  Sloan.  Mrs. Sloan Hovanec, as

24   an attorney, and also as Tim Hovanec's mother assembled the

25   stuff and also a guardian at least a while for the kids.

1  And, also, there were other letters there from Tim's

2  siblings and others that we have heard from, so I've got a

3  mountain of victim impact statements, all of which I have

4  read every word of, been affected by.

5              I've received a Presentence Memorandum from

6  Officer Truesdell, who is here with us today as the officer

7  assigned to the case.  We've also got the Deputy Chief from

8  Cleveland here with us, Officer Skarupa, and we've got

9  Officer Winner here, who is a supervisor here in Toledo

10  from the Probation Office to assist us with today.

11              Ms. Sterling, is that everything you think I

12  ought to be looking at?

13              MS. STERLING:  Yes, Your Honor.

14              THE COURT:  Okay.

15              And, Mr. Friedman, does that sound like a

16  complete recitation of what you think I ought to be looking

17  at as we sit here today?

18              MR. FRIEDMAN:  It is, Your Honor.

19              THE COURT:  All right.

20              So, well, I'll scratch that off my list.

21              Let's turn now to that Presentence

22  Investigation Report, which Officer Truesdell compiled.

23  I'm assuming everybody has this.

24              Ms. Sterling, just looking at the facts in

25  the Presentence Investigation Report, does the government

1    take any exception or note any factual inaccuracies in this

2    report?

3                    MS. STERLING:  Your Honor, I'm just double

4    checking for the correction that I made.

5                    THE COURT:  Right.  About the time --

6                    MS. STERLING:  Yes.

7                    THE COURT:  -- the timing.  Is it in this

8    one, too?

9                    MS. STERLING:  It's still in this one in

10   paragraph 9.

11                   THE COURT:  Okay.  We'll fix that.

12                   MS. STERLING:  And I would just ask to --

13                   THE COURT:  Yeah.  So, counsel, in the

14   last -- in the last hearing, in paragraph 9 of the P.S.I.,

15   there's a -- it says -- well, this reads a little

16   differently.

17                   MS. STERLING:  Yeah.

18                   THE COURT:  Shoot.

19                   MS. STERLING:  Here, Judge, I can pull the

20   language from this morning and we can make a similar

21   change.

22                   THE COURT:  Why don't we just say the route,

23   when -- so law enforcement interviewed -- what they are

24   saying is they avoided I-75, but there are some specific

25   times in here which are not accurate, okay.  It was I think

1    when she picked up, when Amanda picked up or dropped off

2    the kids, she avoided I-75 for some reason.

3                    MS. STERLING:  No, that's not what we are

4    saying.

5                    THE COURT:  Okay.

6                    MS. STERLING:  But, Judge, to be clear, the

7    first sentence is correct.  The second sentence is also

8    correct.  We would ask that the third sentence be modified

9    to read as follows:  During their preliminary review, it

10   appeared that the route T.H. had taken after dropping the

11   children off avoided interstate 75.

12                   THE COURT:  That's right.  I'm sorry.

13                   MS. STERLING:  So we would ask that that

14   time reference in there be removed.

15                   MR. FRIEDMAN:  There is no objection to the

16   removal of that time reference.

17                   THE COURT:  Okay.

18                   Officer Truesdell, we'll fix that.

19                   Anything else, Ms. Sterling?  And my

20   apologies for trying to cement my cloudy recollection onto

21   your pristine recollection.

22                   MS. STERLING:  No, Your Honor.  Thank you.

23                   THE COURT:  So, same question, only the

24   other side of the V, Mr. Friedman.  Any factual

25   inaccuracies in the P.S.I?

```
 1              MR. FRIEDMAN:  No, Your Honor.

 2              THE COURT:  Okay.

 3              And, Ms. Green, I'm going to ask you, have

 4  you had a chance to review this Presentence Investigation?

 5              The green light should be on.  There you go.

 6              THE DEFENDANT:  Yes, I have, Your Honor.

 7              THE COURT:  Okay.  So it's really important,

 8  because this becomes the factual basis for our sentencing

 9  determination and it will be supplemented by what happens

10  here today, but sort of a canvas that we start our painting

11  on is the facts that are contained in this report, so it's

12  important.

13              Having reviewed it, is there anything in

14  there that you see that's not right?

15              THE DEFENDANT:  I had already submitted

16  those changes that had --

17              THE COURT:  And they fixed them, right, I

18  think?

19              THE DEFENDANT:  Yes, thank you.  They were

20  fixed.

21              THE COURT:  Okay.

22              So with those fixes, is everything okay in

23  here?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  Okay.
```

```
 1                    So, without objection, I will adopt --

 2                    Ms. Sterling, is everything okay?

 3                    MS. STERLING:  I was just checking with

 4  Ms. Truesdell.

 5                    THE COURT:  Yeah, there were some, I think

 6  between the initial disclosure and the final, there were

 7  some factual little wrinkles that were ironed out.

 8                    MS. STERLING:  I just want to be clear, and

 9  I know the Court intends this, so I just want the record to

10  be clear.  Again, we are agreeing about the factual issues.

11  There are a number of objections here, some of them to

12  facts.

13                    THE COURT:  Yes.

14                    MS. STERLING:  Not just enhancements, but to

15  facts that we responded to that we did not feel were

16  accurate.  Those were set forth.  I believe the report

17  remains unchanged in the substantive ways that we intend.

18  I just want to be clear.

19                    For example, I recall, off the top of my

20  head, there was an objection to the timing of a statement,

21  and we responded that it was not well-founded, factually,

22  and provided substantive explanation for that, and the

23  report remains unchanged by the probation department in

24  that regard, so I want to make sure that Ms. Green and her

25  counsel are clear about that.
```

1          THE COURT:  Well, we probably need to talk

2    about these things.

3          MR. FRIEDMAN:  Your Honor, the facts as set

4    forth within, we have our objections.  We don't waive any

5    objection, but the facts as set forth, we are accepting and

6    we have addressed those previously.

7          THE COURT:  Right.  But we probably need to

8    talk about them.  We probably need to talk about them now.

9          Okay.  Well, the first one, that doesn't --

10   that's not going anywhere, talking about the

11   characterization of her release, so that's overruled.

12         The second one, I guess where is objection

13   two?

14         MS. STERLING:  It's on page 30.  I'm sorry,

15   28, Judge.  PageID 2,100, page 18, my apologies.

16         THE COURT:  So I'm seeing objection three,

17   but I'm not seeing objection -- oh, I see it.  I see it.  I

18   see it.  Okay, so that's been made part -- your observation

19   has been made a part of that, so I'll deny that as moot at

20   this point.  Objection three, that's your observation is

21   made part of the facts, so I don't think there is anything

22   else for me to rule on there, either, so I'll deny that as

23   moot.

24         Now we get into offense level calculations,

25   so those aren't factual objections.

1          Are there any other factual objections in

2    here?

3              MS. STERLING:  Objection five, Your Honor,

4    on page 27.

5              And I believe that's it for factual

6    objections.

7              THE COURT:  So I will overrule that

8    objection as it's stated based upon probation's response to

9    that.

10             Okay.  So, with those, is that all of the

11   factual objections that we have to the PSR?

12             MR. FRIEDMAN:  It is, Your Honor.

13             THE COURT:  Okay.

14             So with those objections, I will otherwise

15   adopt the Presentence Investigation facts as the factual

16   basis for our sentencing determination today to be

17   supplemented, of course, by whatever happens here today.

18             I'm sorry, I had it in my head that all of

19   those factual objections had been resolved.

20             So my job in this case, Ms. Green, is to

21   figure out what is an appropriate sentence for the

22   statutory violation which you have pled guilty to.  As you

23   know, the punishment applicable to the count to which you

24   pled is --

25             MR. FRIEDMAN:  Your Honor?

```
 1                    THE COURT:  Yes?
 2                    MR. FRIEDMAN:  I'm sorry.  Ms. Green has
 3    difficulty hearing, and she just indicated she cannot hear
 4    what you are saying.
 5                    THE COURT:  Okay.  Well, we do have -- we do
 6    have a hearing assist she can have.
 7                    THE DEFENDANT:  That -- that helps.
 8                    THE COURT:  Or is it better if I just talk
 9    more like I should talk into the microphone?
10                    THE DEFENDANT:  That helped, Your Honor,
11    yes.
12                    THE COURT:  Well, I have a hearing assist
13    device if you want it, or are we okay like this?
14                    THE DEFENDANT:  If I have difficulty, I
15    would interrupt again.
16                    THE COURT:  Okay.  Thank you.
17                    THE DEFENDANT:  But that helped.
18                    THE COURT:  Okay.  So where I'm going with
19    this is the potential punishment here is 0 to 15 years, but
20    there is a statute to help me figure out where, between 0
21    and 15 years, the appropriate punishment is for this case.
22    There's also supervised release, probation, and fines and
23    restitution, as well as the special assessment of $100 that
24    has to be imposed.
25                    The statute which helps me determine what
```

1    sentences -- I'll turn my microphone up just a little bit,

2    also, to help you.  The statute that helps me determine

3    what is the right sentence is called 18 U.S.C.,

4    Section 3553(a), and it gives me several factors that I

5    have to look at in determining what is the appropriate

6    sentence for a particular crime.  The first thing we have

7    to look at is that the sentence has to reflect the

8    seriousness of the offense.

9               If conduct is deemed illegal by Congress,

10   they also typically affix a potential punishment for that.

11   If there's not punishment associated with a crime, it's

12   just inherently not serious.  So to cause people to respect

13   the law, when something becomes a crime, there is a

14   sanction associated with it.  We have to make sure, in

15   doing that, that the sanction we impose is significant

16   enough that folks respect the law.  So another way of

17   stating that is punishment.  There needs to be punishment

18   associated with a crime, and so we have to look at that.

19               We also have to look at deterrence.  And

20   deterrence, itself, is both inward facing and outward

21   facing.  When I say inward facing, what amount of

22   punishment will be sufficient, but not excessive, to cause

23   you to not commit further crimes, to teach you the lesson

24   to not break the law anymore.  That's inward-facing

25   deterrence.  There's also outward-facing deterrence.  What

1    amount of punishment do I need to impose on you so when

2    other members of the community see what happened to you,

3    they say I don't want that to happen to me, I'm not going

4    to break that law.  That's outward-facing deterrence.  So

5    deterrence is also punishment, but it's looking in two

6    different directions there.

7              There's also the concept of protecting the

8    public from further criminal conduct.  If I determine that

9    there's a high likelihood that a particular individual is

10   going to reoffend or commit more criminal conduct, one way

11   to break that cycle or stop that from happening again is to

12   remove that person from society for a period of time to

13   protect them from further -- to protect society, itself,

14   from further crimes of the defendant.

15             And then, finally, we have to look at

16   rehabilitative needs.  What can we do as part of a sentence

17   to provide you with any needed educational or vocational

18   training, medical care, or other correctional treatment in

19   the most effective manner possible.  That typically finds

20   its way, from my perspective, into the terms of

21   supervision, which I control.  I don't control so much what

22   the programming is when you are away at the Bureau of

23   Prisons.  They are very competent to do that and they don't

24   really even ask me what I think.  But when you are on --

25   when you return, typically, you will be working with my

1  probation officers and I will be supervising your

2  supervised release, ultimately, as the judge responsible,

3  through a probation officer, and we will do what we can to

4  help you succeed on your supervised release.

5              If we break that down another way, in each

6  instance, I have to figure out what is sufficient, but not

7  excessive, in terms of the punishment.  Enough, but not too

8  much.

9              The first thing we have to look at is the

10  crime.  What happened.  You know, the nature and

11  circumstances of the offense.  The next thing we have to

12  look at is who did it.  You know, what's the history and

13  character of the person who is before me as a defendant.

14              I have to look at all the kinds of sentences

15  which are available.  And those typically include

16  incarceration, but sometimes they include other things.

17  There are sometimes alternatives to incarceration.  There

18  are things that we can do other than incarceration, but

19  incarceration is there.  Then we have to look at supervised

20  release and the terms and conditions that we can put on

21  supervised release.  But I have to look at all the possible

22  different punishments, you know, probation, there are lots

23  of different things we can look at.

24              I have to look at what sentence is

25  recommended, what punishment is recommended by the

1    guidelines promulgated by the United States Sentencing

2    Commission.  And those are set forth in a book about that

3    thick that lists every federal crime.  It sort of codes it

4    with an offense level, and there are things that, you know,

5    control what the offense level is.  If it's like a

6    financial crime, it might specify, you know, if it's this

7    much money, it's this level, if it's this much money, it's

8    this level.  There's lots of things like that.  And

9    quantity of some drugs and things like that.  But it goes

10   through, and for every federal offense, it lists a base

11   level, and then there are things that can enhance that, in

12   other words, make it go up.  There are things that can

13   reduce that, make it go down.

14           We have to look at all of those things, then

15   we finally come up with a final offense level, and we take

16   that final offense level, and it becomes one of the axes on

17   a chart, and the criminal history becomes the other, and we

18   just go down and we look at an offense level and a criminal

19   history level, and it gives me a recommended sentence.

20           Coming out of the blocks in your case, I

21   believe the probation officer came up, you know, and we are

22   going to go through this in a little more detail, but she

23   came up with an offense level 27 and a Criminal History

24   Category I, which would have produced a recommended

25   guideline range of 70 to 87 months.  Just for example,

1    that's how that works, all right.

2              In addition to all of that stuff, we also

3    have to consider any pertinent policy statements from the

4    Sentencing Commission, which I always do.  We have to avoid

5    unwarranted sentencing disparities.  There could be

6    sentencing disparities, but they can't be unwarranted, or

7    at least we should try to avoid that.  So if a particular

8    individual sentence is markedly different than what other

9    folks have received for similar conduct, there should be an

10   explanation of why that is.

11             And, finally, we have to provide restitution

12   for any victims of the offense.

13             So that's my job here today.  That sounds

14   relatively simple.  It's not.  It's, frankly, kind of

15   complicated, and it's time-consuming, it's hard, but it's

16   part of what I took on when I took an oath to do this job.

17             So one of the factors that I just listed as

18   we went through this was the guideline computation.  So we

19   probably need to take a minute and go through that.  And

20   I'll begin by saying, even when we figure out what the

21   guideline computation is, it's not binding.  It's just the

22   starting point.  Once we figure out what the guideline

23   computation is, then I have to explain, applying all of

24   those factors, if that's the right sentence.  Is that

25   enough, but not too much.  If it's the right sentence, I

1  have to explain why it is.  If it's not enough, I have to

2  explain that.  If it's too much, I have to explain that.

3  So that's my job here today.

4           So let's turn to Officer Truesdell's report

5  to the guideline computation, which begins at page 7.  And

6  she, for this conduct, 18, U.S.C., Section 3, offenses are

7  found at guideline 2X3.1.  Pursuant to 2X3.1(a)(3)(A), the

8  base offense level for this offense shall not be more than

9  level 30.  The base offense level, pursuant to 2X3.1(a)(1),

10  would cross reference to 2D1.1(a)(2), resulting in a base

11  offense level of 38, as the offense of conviction

12  establishes that death resulted from the use of the

13  substance.  As such, because it would have otherwise been

14  38, this knocks it down to a 30, and we use a base offense

15  level of 30.

16           Right, Ms. Sterling?

17           MS. STERLING:  Yes, Your Honor.

18           THE COURT:  Right, Mr. Friedman?

19           MR. FRIEDMAN:  That's correct, Your Honor.

20           THE COURT:  Okay.

21           So now we have a base offense level of 30.

22           I suppose we are, right now, getting to

23  Mr. Friedman's objections for failing to include several

24  reductions here.  I don't know how much we want to talk

25  about those, but he's got an objection claiming minimal

1  role, claiming substantial assistance 5K1.1, claiming

2  duress and coercion, claiming diminished capacity, claiming

3  aberrant behavior, claiming safety valve a couple of times,

4  and claiming acceptance, which she's already gotten,

5  although I have reason to believe the government is going

6  to move to take that back.

7            How much do you want to talk about all of

8  these objections to not including reductions adjustments

9  here?

10           MR. FRIEDMAN:  Thank you, Your Honor.

11           Your Honor, knowing that the Court has read

12  every word of the sentencing memorandum that was filed on

13  behalf of Ms. Green, I would stand on the brief for those

14  objections.

15           THE COURT:  Okay.

16           Ms. Sterling?

17           MS. STERLING:  Thank you, Your Honor.

18           While we appreciate that, we do want to make

19  sure that we make an appropriate record in this matter, and

20  so, at this time, we would ask the Court permission to call

21  witnesses to present testimony.

22           THE COURT:  Yeah, that's probably

23  appropriate, and I'll just reserve my ruling on that.

24           Do you want to go ahead and put in play your

25  objection to the acceptance of responsibility and sort of

1    just deal with the same evidence for all of this?  That

2    would be my preference if you are okay with that.

3                    MS. STERLING:  I think that's appropriate,

4    Your Honor, yes.

5                    THE COURT:  Okay, Mr. Friedman?

6                    MR. FRIEDMAN:  That's fine.  And if we are

7    utilizing these witnesses for all of those, that's fine.

8                    THE COURT:  Yeah, I think rather than

9    calling them multiple times or parsing them out, I'd

10   rather, to quote the profit Benatar, let her "Hit Me With

11   Your Best Shot," and we'll go with it.

12                   MR. FRIEDMAN:  And, in essence, I think this

13   is almost a totality-type argument, so.

14                   THE COURT:  I agree.  If I'm going to take

15   away acceptance of responsibility, I am sure as heck not

16   going to find all the things you are asking me to find.

17   And, conversely, if I were to find the things you are

18   asking for, I'm probably going to stand on the acceptance

19   of responsibility.  So you said that more eloquently than

20   I, but I think we both got there.  Here I am quoting Pat

21   Benatar and there you are actually talking law.

22                   So Ms. Sterling, or Ms. Baeppler, I didn't

23   mean to exclude you.

24                   MS. BAEPPLER:  That's fine, Your Honor.

25                   THE COURT:  You can proceed.

```
 1              MS. BAEPPLER:  At this time, the United
 2   States calls Anthony Theodorou.
 3              THE COURT:  Okay.
 4              They're going to have to bring him in, I
 5   suspect.
 6                        - - -
 7              Thereupon, the Government, in order to maintain the
 8   issues on their part to be maintained, called as a witness,
 9                   ANTHONY THEODOROU,
10   who, having been duly sworn as provided by law, testified and
11   said as follows:
12                        - - -
13              THE COURT:  Ms. Baeppler, whenever you are
14   ready.
15              MS. BAEPPLER:  Thank you, Your Honor.
16                        - - -
17                   DIRECT EXAMINATION
18   BY MS. BAEPPLER:
19   Q        Good afternoon.  Could you please state your name
20   for our record and spell your first and last name.
21   A        It's Anthony Angelo Theodorou.  Anthony is
22   spelled A-N-T-H-O-N-Y, Theodorou, T-H-E-O-D-O-R-O-U.
23   Q        All right.  And, Mr. Theodorou, I see you are
24   wearing jail clothing; is that correct?
25   A        That's correct.
```

```
 1   Q        And I see you have been incarcerated since your
 2   arrest of April 27th of 2022; is that correct?
 3   A        That is correct.
 4   Q        All right.  And how old are you, Mr. Theodorou?
 5   A        Thirty-six.
 6   Q        All right.  I detect an accent, sir.  Where were
 7   you born?
 8   A        I was born and raised in South Africa.
 9   Q        And you are a South African citizen?
10   A        That is correct.
11   Q        And is it correct you also hold a dual
12   citizenship?
13   A        That is correct.
14   Q        And with what country do you hold a dual
15   citizenship?
16   A        Cyprus.
17   Q        And can you explain for the Court how you are
18   also a Cypriot national?
19   A        My heritage is Cypriot.  My mother was born in
20   Cyprus.  Both grandparents from either side of my parents
21   were both born in Cyprus.
22                THE COURT:  Ms. Baeppler, can I make --
23                Ms. Green, are you able to hear him okay or
24   do you want the hearing assist?
25                THE DEFENDANT:  Hearing assist is fine.
```

```
1                    THE COURT:  Okay.  This will take us just a
2     second.
3                    I thought you had it in your hand?
4                    COURTROOM DEPUTY:  Those are lecterns.
5                    THE COURT:  Oh, okay.
6                    I will tell you, when you get those, it's
7     reading, assuming the green light is on on that one up
8     there, and there is one behind you, one back there, and one
9     somewhere over here, so it's a line of sight thing, so if
10    it cuts out, make sure it's got an unobstructed view to one
11    of those black rectangles.
12                   Is it working?  Can you hear through it?
13         (Whereupon, a discussion is held off record.)
14                   THE COURT:  And, again, it needs to be able
15    to see one of those black rectangles to keep it working, so
16    it can see that somehow, okay.
17                   Go ahead, Ms. Baeppler.
18                   MS. BAEPPLER:  Thank you, Your Honor.
19    Q    (By Ms. Baeppler) Mr. Theodorou, are you married?
20    A         No.
21    Q         Do you have any children?
22    A         I do.  I have a daughter who resides in the
23    United Kingdom.
24    Q         And she is the product of a relationship with a
25    British national?
```

```
1    A        British-Cypriot national, that's correct.

2    Q        All right.  Can you tell the Judge a little bit

3    about your formal education.

4    A        I've got a high school degree with a

5    certification in a trade as an electrician.

6    Q        And have you, in fact, worked as an electrician?

7    A        I have.

8    Q        And when you left South Africa for the United

9    States on -- in April of 2022, what were you doing for

10   work?

11   A        I was involved in property administration.  It's

12   a family-run business.  I was managing with doing

13   maintenance on the side.

14   Q        All right.  Now on May 20th of this year, you

15   came before this court and admitted your guilt to certain

16   crimes; is that correct?

17   A        That is correct.

18   Q        And --

19            THE COURT:  Ms. Baeppler -- Ms. Green, are

20   you having trouble hearing?  Is it not working?

21            THE DEFENDANT:  I -- I can hear.

22            THE COURT:  Okay.  If you have trouble, let

23   me know.

24            THE DEFENDANT:  I'm nodding my head.  I'm

25   sorry.  I can hear.
```

1          THE COURT:  It's critically important that

2   you understand all of this, so if you are having trouble,

3   let me know.

4          Ms. Baeppler, I apologize for the

5   interruption.

6          MS. BAEPPLER:  That's no problem, Judge.

7   Q    (By Ms. Baeppler) Mr. Theodorou, can you pull the

8   microphone just a little bit closer to you just so we can

9   make sure Ms. Green can hear?

10  A       Yes.  Is that better?

11  Q       Yes, thank you.

12          On May 20th, 2024, it's correct you pled

13  guilty to conspiracy to import a controlled substance with

14  a death specification?

15  A       That's correct.

16  Q       You also pled guilty to importation of a

17  controlled substance with a death specification?

18  A       That's correct.

19  Q       You also pled guilty to conspiracy to possess

20  with intent to distribute a controlled substance with a

21  death specification?

22  A       That's correct.

23  Q       And, finally, you pled guilty to distribution of

24  a controlled substance with a death specification?

25  A       That's correct.

1    Q         And you were aware at that time that each of

2    those offenses to which you pled carried a term of

3    imprisonment, a mandatory minimum 20 years up to life

4    imprisonment; is that correct?

5    A         That is correct.

6    Q         Now, before your plea, it's fair to say that you

7    entered into a plea agreement with the United States?

8    A         That is correct.

9    Q         And as part of that plea agreement, you agreed to

10   provide truthful information to the United States,

11   assistance to the United States, and testimony, if

12   necessary?

13   A         That is correct.

14   Q         And it's fair to say that that is why you are

15   here today testifying, correct?

16   A         That's correct.

17   Q         And you entered into this agreement in the hopes

18   of sentencing consideration; is that fair?

19   A         That's fair to say.

20   Q         And that consideration you hoped to receive from

21   this Court is the sentence somewhere in the range of 210 to

22   240 months; is that correct?

23   A         That's correct.

24   Q         And at the time you entered the plea and at the

25   time you entered into these negotiations with the United

```
 1   States, it's fair to say you understood that there's no
 2   guarantee as to what your sentence will be; is that right?
 3   A        That is correct.
 4   Q        And it's fair to say that this judge could abide
 5   by that agreement or he could totally disregard is; is that
 6   correct?
 7   A        That is correct.
 8   Q        All right.
 9            Mr. Theodorou, do you have any criminal
10   history?
11   A        I do not.
12   Q        All right.
13            Let's start by talking about Amanda Hovanec.
14   You know a woman named Amanda Hovanec; is that right?
15   A        That is correct.
16   Q        Can you explain for the Court how and when you
17   first met her?
18   A        I met her in August of 2019 at a restaurant in
19   Pretoria.
20   Q        In Pretoria, South Africa?
21   A        In Pretoria, South Africa, that is correct.
22   Q        And when you first met her, paint the picture for
23   us.  Were you with friends, were you alone?  How did this
24   happen?
25   A        We were both with friends, mutual.  They decided
```

1  to join tables and that's actually how we met.  We started

2  conversing from there.

3  Q         And that first night, did the two of you exchange

4  phone numbers or contact information?

5  A         We did.

6  Q         And, initially, how would you characterize your

7  relationship with Ms. Hovanec?

8  A         I was more on a friend basis I guess.  We were

9  just getting to know each other.

10  Q         And how long did that go on?

11  A         I guess over the next three months, four months

12  you could say.

13  Q         Okay.  And when you met Ms. Hovanec, what did you

14  learn was her marital status?

15  A         That she was not married.  She was in an open

16  relationship with someone else and she made me aware that

17  she had one daughter.

18  Q         Okay.  So when you first met her, you thought she

19  was unmarried with one child?

20  A         That is correct.

21  Q         Similar to yourself?

22  A         Correct.

23  Q         All right.  At some point in time, did you learn

24  that that was, in fact, not true?

25  A         That is correct.

```
1    Q          And when was that?

2    A          That was in December of 2019.

3    Q          Okay.  When would you say -- let me back up.

4               At some point in time, it's fair to say your

5    relationship with Amanda Hovanec became more than platonic,

6    it became romantic?

7    A          Yeah, it did, around November of 2019.

8    Q          And you indicated in December of 2019, you

9    learned that she was, in fact, married?

10   A          No.

11   Q          No?

12   A          I had learned that she had more than one child in

13   December of 2019.

14   Q          Okay.  How many children did you learn she had?

15   A          Three.

16   Q          And how did you learn that?

17   A          She had told me.

18   Q          So she finally came clean about that?

19   A          Correct.

20   Q          All right.  And did she come clean about the fact

21   that she was married?

22   A          No, not until I want to say April of 20 -- must

23   have been later than that.  It was definitely 2021, 2020,

24   2021 I became aware that she was married.

25   Q          Okay.  From the time your relationship became
```

```
1   romantic to the time she left South Africa, is it fair to

2   say that you two were dating steadily and exclusively?

3               MR. FRIEDMAN:  Your Honor, I'll object.  Not

4   to be a nit-picker and understanding the timing, I would

5   ask just to -- as to form of question.

6               MS. BAEPPLER:  Fair enough.

7               THE COURT:  I guess rephrase that a little

8   bit I guess.

9               MS. BAEPPLER:  Sure.

10  Q    (By Ms. Baeppler) Let me fast-forward a little bit to

11  2020 when COVID hits.

12  A       Correct.

13  Q       Okay.  Did there come a point in time that Amanda

14  Hovanec left South Africa?

15  A       Yes.

16  Q       Okay.  And that was because of COVID?

17  A       That is correct.

18  Q       And do you know whether or not her children left

19  South Africa with her?

20  A       They did, indeed, leave with her.

21  Q       And when Amanda left South Africa, did your

22  romantic relationship with her end?

23  A       It did not.

24  Q       What happened?

25  A       We decided to carry on and wait out the pandemic
```

1    in hope that, obviously, she would return.

2    Q        And did she ever return?

3    A        She did not.

4    Q        Not permanently, correct?

5    A        Not permanently, sorry.

6    Q        Were you in love with Amanda Hovanec?

7    A        I was.

8    Q        Did you want to marry her?

9    A        I did.

10   Q        And did she know that?

11   A        I presume she did, yes.

12   Q        And were the two of you planning a future

13   together?

14   A        We were.

15   Q        And did that future include her children?

16   A        It did.

17   Q        And where was that future to take place?

18   A        In South Africa.

19   Q        And why was that?

20   A        She loved the country.  She said her kids loved

21   the country, they loved being there.  I was stable there.

22   Q        Were you willing to move to the United States to

23   be with her?

24   A        At that point in time, no.

25   Q        And why not?

```
1   A        I had family obligations.

2   Q        So the situation was she loved South Africa, you

3   had family obligations, and the plan was for the two of you

4   to settle down in South Africa?

5   A        Correct.

6   Q        All right.

7            Did you learn that, at some point in time,

8   Amanda Hovanec filed for divorce?

9   A        I did.

10  Q        And do you know approximately when that was?

11  A        April of '21, I think.

12  Q        You are not certain?

13  A        I'm sorry.  I'm uncertain of the timeframes.

14  Q        That's totally fine.

15           Did Amanda share with you how her divorce

16  with her husband was going?

17  A        She did.

18  Q        And how would you characterize how the divorce

19  proceedings were going based on what Amanda told you?

20  A        Upsetting.  Stressful.  Worrying.

21  Q        Worrying did you say?

22  A        Worrying, yeah.

23  Q        At some point in time, did you receive a phone

24  call from Amanda Hovanec asking her to do -- asking you to

25  look into something unusual?
```

```
1   A          That is correct.

2   Q          Can you share with the Court what that -- how

3   that conversation went?

4   A          I was on my way to have a lunch with my brother

5   and his friend for his birthday, and I received a phone

6   call from Amanda, and she was in a distressed state and she

7   had stated to me that --

8                   MR. FRIEDMAN:  I object, Your Honor.

9   Hearsay.

10                  THE COURT:  The Rules of Evidence don't

11  really apply here, so.

12                  MR. FRIEDMAN:  Thank you.

13  A          So she had stated to me that she wanted to kill

14  Tim, I'm sorry, Mr. Hovanec.  And I was taken aback.  I

15  didn't want anything to do with it.  But, at the same time,

16  she had asked me if I'd known of anyone that could assist,

17  and I told her that I would look into it.

18  Q          How long do you think that conversation went on?

19  A          That conversation went on for over an hour.

20  Q          And based on that conversation, did you make any

21  efforts to find someone --

22  A          I did.

23  Q          And what did you do?

24  A          I put her into contact with someone and she had

25  conversed with that person with me being the middleman.
```

```
 1   Q         Okay.  Let's back up a little bit.
 2                    How many people did you call to see if they
 3   knew somebody that could kill somebody?
 4   A         Two.
 5   Q         All right.  We've heard the name of the first guy
 6   already.  And that was a friend of yours; is that correct?
 7   A         That is correct.
 8   Q         And what did that first guy tell you about what
 9   your request was?
10   A         I'm crazy.
11   Q         And did you drop it with him at that point?
12   A         I did, immediately.
13   Q         Was that the last call?
14   A         It was not.
15   Q         Okay.  So you called person number 2?
16   A         Correct.
17   Q         And you've identified person number 2 for the
18   government; is that correct?
19   A         That is correct.
20   Q         And is it fair to say that person number 2 is a
21   South African national?
22   A         That is correct.
23   Q         All right.  I don't want to put his name on the
24   record for obvious reasons.  What did person number 2 tell
25   you?  Let's call him associate number 2.  What did he tell
```

```
1   you?

2   A          He said he might be able to find someone or he

3   might know someone.

4   Q          And was that the end of the conversation?

5   A          Pretty much.

6   Q          And did you ever hear back from associate

7   number 2?

8   A          Yeah.  After some time, yes.

9   Q          Okay.  When you say "some time," can you give us,

10  give the Court is estimate how long that was?

11  A          A few months.

12  Q          And what happened when associate number 2 came

13  back to you?

14  A          He said he found someone.

15  Q          So go ahead.  Were you going to say something?

16  A          No, sorry.

17  Q          So based on the representation that this

18  associate found somebody to kill Tim, what happened after

19  that?

20  A          He asked for information about him.

21  Q          Information about who?

22  A          About Mr. Hovanec then.

23  Q          So the hitman asked for information about Tim

24  Hovanec?

25  A          This was Amanda's providing information to him,
```

```
 1   to the associate number 1 -- or associate number 2, sorry.
 2   But to, obviously, just have a background of what is going
 3   on.
 4   Q       Okay.
 5   A       To get an idea of what everything entailed, I
 6   guess.
 7   Q       Did Amanda speak directly with the associate or
 8   did Amanda speak directly with the hitman?
 9   A       With the associate.
10   Q       Okay.  And do you know what information Amanda
11   provided to the associate that he could then pass along to
12   the hitman?
13   A       I think it was more along the lines of, I can't
14   say for certain, but it was along the lines of his career
15   (court reporter interruption for clarity) -- career and
16   path, what job he had with the government.
17              THE COURT:  Mr. Theodorou, could you just
18   angle that microphone down just a little bit.  There you
19   go.  Thank you.
20   Q       Okay.  So did hitman number 1, ultimately, agree
21   to do the job?
22   A       He did not.
23   Q       And why was that?
24   A       From what I understood, it was too complicated.
25   It was too risky I would say.
```

```
1   Q        All right.  So after hitman number 1 withdrew,
2   what happened after that?  What was next?
3   A        A second person was asked, from my understanding
4   was asked -- I can't say for certain -- through associate
5   number 2.
6   Q        Okay.  So associate number 2 is sort of the
7   facilitator of the hitmen; is that fair?
8   A        That's correct.
9            I'm sorry, is this water?  Can I have some?
10           THE COURT:  It is water.  And, yes, you may.
11  A        Thank you.
12           I'm sorry.  Go ahead.
13  Q        That's okay.
14           So tell us about hitman number 2.
15  A        It didn't seem like anything was fixed with
16  number 2.  It was more verbal and saying things were going
17  to happen, but, obviously, nothing to take place.
18  Q        Nothing took place with hitman number 2?
19  A        No.
20  Q        And why is it that hitman number 1 and number 2
21  were willing to engage in this murder?  What was in it for
22  them?
23  A        Monitary I would say.
24  Q        They were promised money?
25  A        Correct.
```

```
 1   Q        Was hitman number 1 ever paid?

 2   A        No.

 3   Q        What about 2?

 4   A        Yes.

 5   Q        How much did hitman number 2 receive?

 6   A        He received the value of 50,000 rand.

 7   Q        And in terms of U.S. dollars, can you do a

 8   conversion for us?

 9   A        I want to say it's 5, 6,000.

10   Q        All right.  And was there a promise that there

11   would be more money coming later?

12   A        Correct.

13   Q        And what -- what was that promise?  Can you

14   explain that for the Court?

15   A        Yeah, the promise was from Amanda's side to

16   utilize life insurance money to pay for it.

17   Q        That life insurance money from who?  From where?

18   A        From Mr. Hovanec.

19   Q        So Mr. Hovanec, as you understood it from what

20   Amanda told you, he had a life insurance policy that she

21   would use to pay the hitman?

22   A        That is correct.

23   Q        All right.  What happened to hitman number 2?

24   A        I'm not sure.

25   Q        Did he do the hit?
```

```
1   A        No.

2   Q        Did he ever give back the money?

3   A        No.

4   Q        Was he just gone in the wind?

5   A        Correct.

6   Q        All right.  So when hitman number 2 falls

7   through, then what?

8   A        Associate 2 was asked.

9   Q        So the facilitator?

10  A        The facilitator, that's correct.

11  Q        And who asked the facilitator to do the job?

12  A        Amanda.

13  Q        Did Amanda ever meet the associate?

14  A        She did.

15  Q        And how did that come about?

16  A        Sorry.  To go away for a weekend to the premises.

17  Q        To associate number 2's?  Associate number 2's

18  premises?

19  A        Correct.

20  Q        Okay.  So Amanda went to visit with associate

21  number 2 for a weekend?

22  A        That's correct.

23  Q        Did you go with her?

24  A        I did.

25  Q        Were there discussions there about killing Tim
```

1  Hovanec?

2  A        There were, brief.

3  Q        Were you present for those?

4  A        I was.

5  Q        Was Amanda present for those?

6  A        She was.

7  Q        And who was giving -- I mean, what did Amanda

8  say?

9  A        I'm sorry.  My recollection from, it might be a

10 little bit faint, but it was just along the lines of, if I

11 remember correctly, was from how much money she would be

12 able to -- to pay, and if it was a possibility that he

13 would take it on his own concerns to do.

14 Q        And after that meeting with the associate, the

15 facilitator, did he agree to kill Tim Hovanec?

16 A        He did.

17 Q        All right.

18          Now, at some point in time, is there a

19 discussion or conversation or text messaging with the

20 associate regarding the mechanism of death?  How was Tim

21 Hovanec supposed to die?

22 A        I was made aware that a substance that was lethal

23 could be used in order to -- to carry out the deed.

24 Q        And whose idea was it to use that substance?

25 A        Associate number 2.

```
 1   Q        All right.  So he's the one that brought up this
 2   substance, correct?
 3   A        Correct.
 4   Q        And can you identify for the Court what that
 5   substance was, is?
 6   A        M99, etorphine.
 7   Q        All right.  And do you know, Mr. Theodorou, as
 8   you sit here today, what that drug is typically used for?
 9   A        It's an animal tranquilizer.
10   Q        And it serves to stop the heart or depress heart
11   rate; is that fair?
12   A        To an animal, it is a sedative.  To the human,
13   it's lethal.
14   Q        Okay.  And you knew that, right?
15   A        I did.
16   Q        Did Amanda know that?
17   A        She did.
18   Q        So whose job was it to get the M99?
19   A        I'm sorry.  Can you --
20   Q        Who was responsible for securing this drug, this
21   lethal drug?
22   A        I would say the facilitator.
23   Q        And did he agree to take that on?
24   A        Yeah.
25   Q        And were there communications with you and the
```

```
 1   facilitator about obtaining that drug?

 2   A      Yes.

 3   Q      And was Amanda privy to these conversations?

 4   A      Yes.

 5   Q      She knew they were happening?

 6   A      Correct.

 7   Q      Did the facilitator, ultimately, provide the

 8   drug?

 9   A      He did.

10   Q      And how did that happen?

11   A      It was purchased through a veterinary clinic, as

12   I believe.

13   Q      And by whom?

14   A      I'm not too sure, but it did make his way I think

15   it was through a cousin, if I'm not mistaken.

16   Q      And did that M99 make its way to the facilitator?

17   A      It did.

18   Q      And how did that -- what happened after the

19   facilitator had that drug?

20   A      It was handed to me.

21   Q      How did that happen?

22   A      I was asked to go there and collect it.

23   Q      Who asked you to collect the drug?

24   A      Amanda.

25   Q      Did you?
```

```
1   A        I did.

2   Q        And what did you do with the drug once you had

3   it?

4   A        I had it in my possession, and Amanda had asked

5   me to send it via DHL.

6   Q        Via DHL?

7   A        That is correct.

8   Q        And DHL is a transport service; is that right?

9   A        That is correct.

10  Q        Can you explain for the Court what that drug

11  looked like in the form it was in when you received it from

12  the facilitator?

13  A        It was -- I received it through liquid that was

14  in a small vial.

15  Q        And did you make any effort to let Amanda know

16  that you had been successful in receiving the etorphine?

17  A        Yes, she knew.

18  Q        And she asked you to ship it?

19  A        Correct.

20  Q        And did you do that?

21  A        I did.

22  Q        And how did you do it?

23  A        It was concealed within a galvanized metal object

24  and it was put in a parcel with different items.

25  Q        And you indicated you sent it DHL?
```

```
1    A         That's correct.

2    Q         All right.

3              Ms. Niezgoda, could you bring up

4    Government's Exhibit 23, please.  Let's mark 5, here, but

5    we'll call it 23 for purposes of this hearing.

6              Do you recognize Government's Exhibit --

7    A         I do.

8    Q         All right.  What is this?

9    A         This is the -- how can I say it?  The delivery

10   label.

11   Q         Okay.  And does it indicate a date on here?

12   A         It does.

13   Q         And what's the date?

14   A         Twenty-second of February, 2022.

15   Q         All right.  And before you put this package in

16   the mail, did you let Amanda know that it was coming?

17   A         Yes.

18   Q         And did you tell her how you had packaged the

19   etorphine?

20   A         Yes.

21   Q         Was there anything else in this package that you

22   sent to Ms. Hovanec?

23   A         Yeah.  She told me to add a whole bunch of

24   different items such as clothes for the girls, also some

25   jewelry.  There was a hookah pipe as well.  We took a
```

1   hookah pipe and put it in there.

2   Q       Did she tell you why to add those other things?

3   A       She had previously received a DHL package from a

4   friend abroad that had sent perfume and, which, obviously,

5   was in a liquid state, and she had told me that if you add

6   different things, they'll let it through.

7   Q       They will let it through, you said?

8   A       That's correct.

9   Q       And --

10          THE COURT:  Counsel, can I see everybody at

11  side bar for just a second?

12                     -  -  -

13   (Whereupon, the following discussion is held at side bar:)

14          THE COURT:  This would have made a lot more

15  sense during Amanda's sentencing this morning.  We are

16  going a long way around the barn here to get where Mrs. --

17          MS. BAEPPLER:  My apologies, Your Honor.

18          THE COURT:  I know you are, but, my

19  goodness, we are getting in pretty fine detail here about

20  all of Amanda's bad acts.

21          MS. BAEPPLER:  Okay.

22          THE COURT:  I feel like we got to

23  fast-forward a little bit to get to Mrs. Green.  Frankly, I

24  would have appreciated a little bit of this from the

25  horse's mouth this morning.  I'm sure there is a reason why

```
1    we didn't have it, but here we are.  But I don't know there

2    is any record to be made with all of this stuff that he has

3    on Amanda at this point.  I feel like we got to get up to

4    Mrs. Green.

5                 MS. BAEPPLER:  I just wanted you to have --

6                 MR. FRIEDMAN:  I couldn't hear you,

7    Michelle.  I'm sorry.

8                 MS. BAEPPLER:  Sure.  We can certainly do

9    that, but we just wanted you to have an opportunity to --

10                THE COURT:  It's all good.  And that's fine,

11   and I understand that getting him to describe his own

12   criminal conduct is taking some of the sting out of the

13   cross-examination.  I get all of that.  I'm just -- but

14   maybe we don't have to cut quite so finally here.  But I'm,

15   again, I'm not telling you not to do it, I'm just --

16                MS. BAEPPLER:  Fair enough.

17                THE COURT:  -- hoping we can get to maybe

18   something that's actually pertinent to this proceeding at

19   some point, okay.

20                MS. BAEPPLER:  Of course.

21                THE COURT:  All right.  Thank you.

22                              - - -

23   (Whereupon, proceedings continued in open court as follows:)

24   Q    (By Ms. Baeppler) Okay.  Where were we?

25                You sent the package via DHL, correct?
```

```
1    A        That's correct.

2    Q        And you included other items in the package?

3    A        That is correct.

4    Q        All right.  And did you make any efforts to

5    document or photograph what you had put in that package?

6    A        I did.  I tried.  I sent a few photos of what was

7    in the package to Amanda.

8    Q        Why did you do that?

9    A        I had taken photos of the T-shirts I had

10   purchased for Amanda and Mackenzie.

11   Q        All right.

12            Now, you, we know that you ended up in the

13   United States in April of 2022, right?

14   A        Correct.

15   Q        And how did you book that travel?

16   A        I booked it through a travel agent.

17   Q        Okay.

18   A        From South Africa to the United Kingdom and from

19   the United Kingdom through to the U.S.

20   Q        All right.  And aside from booking yourself a

21   ticket through that travel agent for your travel to the

22   U.S. in April of '22, did you make efforts to book travel

23   for anybody else to come into the United States with you?

24   A        Yes, I did.

25   Q        And who would that -- who was that travel for?
```

Case: 3:22-cr-00274-JRK  Doc #: 160  Filed: 12/26/24  50 of 227.  PageID #: 3307

50

```
1    A          The facilitator.

2    Q          The facilitator.  All right.  And did you provide

3    the facilitator's information to your travel agent so that

4    she could book the ticket for this person?

5    A          I did.

6    Q          And, ultimately, did the facilitator travel with

7    you --

8    A          No.

9    Q          -- to the United States?

10   A          Sorry, he did not.

11   Q          All right.  And the travel that you booked, was

12   it subsequent to your mailing of the DHL package to

13   Ms. Hovanec?

14   A          I'm sorry, say that again?

15   Q          Sure.  The DHL package you told us got shipped on

16   February 22nd?

17   A          Yes.

18   Q          Do you know if Amanda Hovanec received that

19   package?

20   A          Yeah, she had already received it.

21   Q          Okay.  And that would have been when,

22   approximately?

23   A          Maybe a week after the 22nd.  So around beginning

24   of March, end of February.

25   Q          All right.  And you book your travel to come see
```

1    her, correct?

2    A        Correct.

3    Q        And you try to book travel for the facilitator,

4    correct?

5    A        Correct.

6    Q        Does the facilitator, ultimately, agree to travel

7    with you to come to the U.S. to kill Tim Hovanec?

8    A        He does not.

9    Q        All right.

10             Do you come to the United States anyway?

11   A        I do.

12   Q        All right.  And tell the Court when it is,

13   approximately, you arrived in the United States?

14   A        There was two separate occasions.  The first

15   occasion I arrived beginning of April.  I want to say

16   around the 4th of April I touched down in the U.S.  I was

17   here for in excess of three days.  Subsequent to that, I

18   had flown back to the UK to spend two weeks with my

19   daughter.

20   Q        All right.  And then did you come back to the

21   U.S.?

22   A        Two days before I had arranged to fly back to

23   South Africa, I decided to change my ticket to come back to

24   the U.S. and spend two more weeks with Amanda.

25   Q        All right.  The second time you are in the U.S.,

1   you are here to spend two more weeks with Amanda, when,

2   approximately, do you arrive?

3   A          Wednesday, the 21st, I think it was.  I'm not so

4   sure exactly of the date, but it was on the Wednesday.

5   Q          Okay.  Where did you stay the first time you were

6   here?

7   A          The first time I stayed, we stayed at Anita

8   Green's premises.

9   Q          All right.  That would be her home in Wapakoneta?

10  A          That is correct.

11  Q          Had you ever met Anita Green before?

12  A          I had not.

13  Q          Okay.  So that was your first interaction with

14  her?

15  A          Correct.

16  Q          Okay.  When you come back into the States the

17  second time, where do you stay?

18  A          At Anita Green's premises.

19  Q          Okay.  So you tell us you arrived on Wednesday of

20  that week, you said the 21st, I think it might have been

21  the 20th.  Let's --

22  A          Okay.

23  Q          -- fast-forward a little bit to that Friday, and

24  that would be April the 22nd.  Were you in the United

25  States at Anita Green's on that day?

1  A        I was.

2  Q        Okay.  And on that day, that Friday, was there a

3  court hearing?

4  A        There was.

5  Q        And what were you asked to do with respect to

6  that court hearing?

7  A        I was asked to go and pick the girls up from

8  school.

9  Q        Because nobody else would be available to pick

10 them up?

11 A        That's correct.

12 Q        And did you do that?

13 A        I did.

14 Q        All right.  And when you came home with the girls

15 after school, what did you find?

16 A        Amanda in tears with Samantha and Anita Green.

17 Q        And so when you saw Amanda in tears, what did you

18 do or say?

19 A        I asked her what happened.

20 Q        And what did she say?

21 A        I'm going to kill him.

22 Q        And what did you -- what was your response?

23 A        I said what happened.  And she said it doesn't

24 matter.  I'm going to kill him.

25 Q        Tell us what happened next.

```
 1   A          After that, she had pulled Emma aside and told
 2   her that she was going to go and stay the weekend with her
 3   dad and she would pack bags for the girls and that Tim was
 4   going to come and pick them up at around 7 p.m. that
 5   evening.
 6   Q          That evening being Friday evening?
 7   A          Being Friday, that's correct.
 8   Q          Do you recall a conversation amongst Anita,
 9   Amanda and Samantha?
10   A          Yes.
11   Q          Can you tell the Court about that conversation?
12   A          We were all in the kitchen.
13   Q          The one in the kitchen, please?
14   A          Yeah, we were all in the kitchen.  And this was
15   after the girls had left.  They were speaking about --
16   Amanda was saying how she was going to -- to kill
17   Mr. Hovanec.
18              I heard Samantha say that if they do kill
19   him, they mustn't bury his body in the same county, it must
20   be in a different county because if they find the body, it
21   would lead back to them.  It would be obvious.
22              The rest was how they were going to do it.
23   Amanda was saying that she fairly knows Tim's routine on
24   how he picks and drops the girls off, so she would follow
25   suit and act on that routine.
```

```
 1   Q        And Anita Green was present for this conversation

 2   in the kitchen?

 3   A        She was.

 4   Q        Did she contribute anything to the conversation?

 5   A        She did.

 6   Q        What did she say?

 7   A        Not that she contributed to how to do it, Amanda

 8   was explaining to her how, she was acknowledging the fact

 9   that this was going to take place and her involvement in it

10   and how she would, obviously, deter the girls away from

11   what was actually going on in the day.

12   Q        When you say deter the girls away from what was

13   actually going on, do you mean distract the girls?

14   A        That's correct.

15   Q        All right.  Did you contribute anything to the

16   conversation?

17   A        At that point, no.

18   Q        As you sat there and listened to this

19   conversation, do you recall anybody, including Anita Green,

20   saying, hey, hold on a second, this is not a good idea?

21   A        No.

22   Q        Nobody tried to dissuade her?

23   A        No.

24   Q        During the conversation by the kitchen sink, was

25   there any specific discussion about the concern that the
```

```
 1  girls, one of the girls, well, all the girls might see

 2  this?

 3  A        Yeah.

 4  Q        And so what was decided?

 5  A        That they would purchase certain things that

 6  would help them to be preoccupied to what was actually

 7  happening.

 8  Q        All right.

 9           Anything else significant happen Friday

10  evening?

11  A        No.

12  Q        All right.  Did you spend the night at Anita

13  Green's home on Friday night?

14  A        Yes.

15  Q        You wake up Saturday morning?

16  A        Correct.

17  Q        Tell us what happened Saturday morning.

18  A        Saturday morning, I had a coffee.  We decided to

19  go to Walmart after that to purchase gifts for the girls.

20  Q        And what were these gifts for?

21  A        They were for them to be occupied in what was

22  happening on Sunday.

23  Q        All right.  And you went with Amanda to purchase

24  these gifts; is that correct?

25  A        Yes.
```

1    Q        You get back from Walmart, what do you do?

2    A        Amanda had purchased items for a greenhouse and

3    we spent pretty much the rest of the morning and early

4    afternoon putting items together.

5    Q        For the greenhouse?

6    A        For the greenhouse.

7    Q        Did Anita Green help you and Amanda with the

8    greenhouse?

9    A        She did.

10   Q        At some point in time, did Anita Green approach

11   Amanda in the afternoon?

12   A        Yeah, she did.

13   Q        And what did she say to her?

14   A        Let's take a drive.

15   Q        And did you -- did she invite you to take a

16   drive?

17   A        No.

18   Q        Did you know why they were taking a drive?

19   A        Not at that time, no.

20   Q        Did you find out later why they were taking a

21   drive?

22   A        Yes.

23   Q        And how did you find that out?

24   A        Amanda had told me.

25   Q        And what did Amanda tell you about the drive her

```
 1   mother asked her to take?
 2   A          That they went to a piece of land where there was
 3   a body of water, and she knew that through work-wise that
 4   that body of water was going to be filled with soil and
 5   that that would be a place to, you know, dispose of a body,
 6   I guess.
 7   Q          Let's fast-forward into the late afternoon hours
 8   on Saturday.  You guys are done with the arbor.  Amanda and
 9   Anita have taken their drive.  At some point in time, do
10   you sit down to dinner?
11   A          Yeah.
12   Q          Who's --
13   A          I think so.
14   Q          Who's present at the dinner table?
15   A          It was myself, Amanda, and Anita.
16   Q          And during dinner, did the conversation -- any
17   conversation occur about killing Tim Hovanec?
18   A          Yes.
19   Q          Can you share with the Court what that
20   conversation was?
21   A          We decided to dig a hole that evening so that it
22   would be less time in the following evening when the event
23   took place.
24   Q          Do you recall whose idea that was to pre-dig that
25   hole?
```

1    A        It was later discussed that the body of water

2    would not be a good idea and to do it in the land which was

3    next door to that body.

4    Q        And who came up -- I mean, who made the point

5    that, hey, it's probably not a good idea to put a body in

6    water?

7    A        Yeah, it was a mixed up between mine and Amanda's

8    I would say.

9    Q        And so you guys made the decision at dinner to

10   dig that hole that night?

11   A        Yeah, I would say it was earlier than dinner, but

12   yes.

13   Q        Was Anita Green present for this conversation

14   about pre-digging this hole?

15   A        Yeah, she was.

16   Q        Was she present for the conversation about where

17   to bury Tim Hovanec?

18   A        Yeah, she was.

19   Q        After eating dinner, what did you do?

20   A        We got Amanda, got shovels, a flashlight, and

21   Anita had given us overalls with wellies, boots, Wellington

22   boots.  And we would take a drive in Amanda's car to this

23   piece of land.

24   Q        And did you do that?

25   A        Yes.

```
1    Q        And whose car was taken?

2    A        Amanda's.

3    Q        Who drove Amanda's car to dig the grave?

4    A        Anita.

5    Q        And did Anita know why you guys were going there?

6    A        No, she didn't.

7    Q        All right.  And where were you seated in the car?

8    A        I was seated in the passenger's seat.

9    Q        In the front?

10   A        In the front.

11   Q        And where was Amanda?

12   A        Behind me.

13   Q        When you guys went to pre-dig --

14            THE COURT:  I'm sorry.  You say Anita didn't

15   know why you were going to the spot of land, but she had

16   given you equipment or something?  You had shovels and

17   such, but she didn't know why you were going there?  Is

18   that what you said?

19            THE WITNESS:  No, Your Honor.  I said she

20   knew very well that we were going there for that reason.

21            THE COURT:  Okay.  I think I misheard then.

22   So you said she did know why you were going there?

23            THE WITNESS:  Yes, sir.

24            THE COURT:  Okay.  I'm sorry.  I misheard.

25            MS. BAEPPLER:  No problem, Judge.  Thank
```

1   you.

2   Q    (By Ms. Baeppler) When you were driven to dig Tim

3   Hovanec's grave by Anita Green, did you take your cell

4   phone?

5   A        No, that was purposely left behind.

6   Q        Do you know if anybody else took their cell

7   phones?

8   A        No.

9   Q        No, you don't know, or, no, they did not?

10  A        No, they did not.

11  Q        And why was that?

12  A        It was stated before that that was to leave the

13  phones in the residence so that they would not be GPS

14  located off towers and picking up beacons if they did drive

15  up.

16  Q        And who made the point about, hey, it's probably

17  not a good idea for us to take our cell phones?

18  A        I think it was mutual between me and Amanda.

19  Q        Okay.  All right.  So Anita drives you to the

20  grave site.  How long, approximately, did it take from her

21  home to Tim Hovanec's grave site by car?

22  A        I want to say less than ten minutes.

23  Q        All right.  And when you guys arrive at the place

24  that you've decided on, what happens?

25  A        She dropped us off and then drove back home.

```
1    Q        When you say she dropped us off, that would be
2    Anita Green?
3    A        Correct.
4    Q        And then she, being Anita Green, drove back home?
5    A        That's correct.
6    Q        And was there any discussion prior to the dropoff
7    about how you guys would get back home given the fact you
8    had zero -- you had no cell phones?
9    A        Correct.  She would drive past that site on the
10   hour every hour until we were done.
11   Q        So Anita was to drive by every hour until you
12   were done?
13   A        That's correct.
14   Q        And who made that call?
15   A        I think it was also mutual.  I can't remember
16   correctly if it was mine or if it was Amanda's.
17   Q        Okay.  And how long did it take you and Amanda
18   Hovanec to dig the grave?
19   A        Between one and-a-half and two hours.
20   Q        All right.  Did Anita Green, in fact, come and
21   pick you up after you dug his grave?
22   A        That's correct.
23   Q        And did you arrive back at the Green residence?
24   A        Yes.
25   Q        And when you got back to the Green residence,
```

1   what happened?

2   A        We took off the overalls that she had given to

3   us, hung them up, and then I took a shower and went to bed.

4   Q        All right.  Take us into Sunday morning.  Are you

5   still at the Green residence Sunday morning?

6   A        I am.

7   Q        What happens?

8   A        Sunday morning, we woke up.  Same routine.  I had

9   a coffee.

10  Q        Who was home when you woke up?

11  A        It was just me and Amanda.

12  Q        Do you know where Anita was?

13  A        From what I understood and been told, she had

14  gone to church that morning.

15  Q        Okay.  And did you and Amanda have any

16  conversation about Anita Green going to church?

17  A        When she had got back, yes.

18  Q        And what was that conversation?

19  A        I had actually asked her where had your mother

20  gone, and she had told me she had gone to church.  She had

21  to make peace with God with the event that was about to

22  happen.

23  Q        So what do you do on Sunday after you wake up and

24  have your coffee?

25  A        We went back to Walmart.

```
1   Q        You went back to Walmart?

2   A        Yeah.

3   Q        Why?

4   A        To purchase more items for the girls.

5   Q        Anything specific?

6   A        Amanda did another -- she did a $200 drawback

7   with cash that was to maybe purchase a burner phone.  That

8   did not take place.  But, again, we had purchased more

9   items for the girls.  We took them back, back to the house.

10  Q        And when you say you purchased more items for the

11  girls, were these more distractions or was this just stuff

12  the girls needed?

13  A        No, it was distractions.

14  Q        All right.  How are you feeling on Sunday about

15  what's about to happen?

16  A        Extremely uneasy.

17  Q        Did you think that was evident?

18  A        Definitely.

19  Q        And why do you say that?

20  A        I isolated myself.  I'm on the premises for about

21  35 to 45 minutes, on the grass outside, and Amanda had come

22  up to me and, you know, she had spoken to me and talked to

23  me about -- I can't necessarily remember exactly what it

24  was, but we made our way back into the sunroom, and I was

25  sitting.  I snapped and I said, listen, you are not -- you
```

1   are not doing this.  And I made it evident that she must

2   not do this.

3   Q        All right.  So do you know approximately what

4   time it was that this conversation in the sunroom happened?

5   A        I want to say between two and three in the

6   afternoon.

7   Q        All right.  And was anybody else in the sunroom

8   when you told Amanda this is not happening, we are not

9   doing this?

10  A        Yeah, Anita Green was in there.

11  Q        And did Anita Green say anything at that point in

12  time?

13  A        She had brought up a legal matter for the custody

14  dispute of the girls, and Amanda had interrupted quickly

15  and said that this is going to take too long.  It could

16  take up to three years for them to put that forward in

17  order to do.

18  Q        So it's -- is it, if I'm understanding you, Anita

19  Green tried to present an alternative that perhaps, aside

20  from killing Mr. Hovanec, and that was quickly shot down?

21  A        Correct.

22  Q        What did -- what happened after that?

23  A        The conversation led up to the driveway, and I

24  walked up to Amanda and I told her, I said do you trust me.

25  And she looked down.  I grabbed her hands, and I shook

1  them, looked at her in the eye, and I said, do you trust

2  me.  And she said, yes, so I said then don't do this.

3  Q        And did you think at that point in time you had

4  gotten through to her?

5  A        I did.

6  Q        But that wasn't the case?

7  A        It was not.

8  Q        Aside from Anita Green offering this legal

9  alternative, did you hear at any other point in time

10 thereafter Anita Green trying to talk Amanda out of this?

11 A        I did not.

12 Q        So let's fast-forward a little bit.  Did you know

13 what time Tim Hovanec was set to return with the girls?

14 A        7 p.m. that evening.

15 Q        And where were you at 7 p.m.?

16 A        I was laying down.

17 Q        Do you know where Amanda was?

18 A        She was somewhere in the house.  I'm not sure.  I

19 was in the room resting.

20 Q        All right.  Do you know where Anita Green was?

21 A        I was uncertain.

22 Q        Okay.

23 A        They were in the house, though.

24 Q        They were in the house.  They were home?

25 A        Correct.

```
1    Q         Okay.  At some point in time, do you realize that
2    Tim Hovanec has arrived with the children?
3    A         Correct, I have, yep.
4    Q         And how do you know that?
5    A         I could hear the kids rushing through the door
6    making noise.
7    Q         When you heard the girls outside the bedroom
8    door, what did you do?
9    A         I made my way to the kitchen.  I was already in
10   the kitchen.
11   Q         And what did you see when you got into the
12   kitchen?
13   A         I was surprised what was set up on the counter
14   for three of the girls.
15   Q         And there's like an island of sorts in the center
16   of the kitchen; is that fair?
17   A         That's correct.
18   Q         And is that where the surprises were on this
19   island?
20   A         Yes.
21   Q         Were the girls all occupied with their surprises?
22   A         Yes.
23   Q         Was Anita Green anywhere around?
24   A         Yes.
25   Q         Where was she?
```

```
 1    A         She was occupied with the girls.

 2    Q         Did she stay there with the girls?

 3    A         She did.

 4    Q         Did you ever go outside to see what was going on?

 5    A         I did not.

 6    Q         When you walked out and saw Anita Green with the

 7    girls and the surprises, what did you do?

 8    A         I was interacting with the girls as well.

 9    Q         So you stayed in the kitchen?

10    A         I stayed in the kitchen.

11    Q         At some point in time, did Amanda Hovanec come

12    in?

13    A         She did.

14    Q         And what happened?

15    A         She went to the basin and washed her hands off.

16    Q         Did she say anything?

17    A         She came up towards me and I could just see it in

18    her face, and I said I can't believe you just did that.

19    Q         So you knew?

20    A         Yeah.  Like I said, it was on her face.  You

21    could see that something had taken place like that.

22    Q         Was Anita Green present when you made that

23    statement?

24    A         She was.

25    Q         Did she say anything?
```

```
1    A          She did not.  I'm also not sure if she did hear
2    me say that statement, though.
3    Q          I'm sorry.  Say that again?
4    A          I say I'm also uncertain if she did hear me say
5    that statement.
6    Q          You are uncertain?
7    A          Yeah, because I was with the girls as well.
8    Q          Okay.  So the girls are playing with their toys.
9    What's the next thing you recall happening?
10   A          Amanda was in and out of the house with the
11   girls, going back to the driveway, back inside with the
12   girls, and she decided to run the bath for the girls so
13   that they could get them into bed.
14   Q          At some point in time, did you leave the house?
15   A          We left the house, yes, to drive Mr. Hovanec's
16   car to Dayton, if I recall.
17   Q          And when you walked outside to dispose of Tim
18   Hovanec's car, did you see his body?
19   A          I did not.
20   Q          Anywhere?
21   A          No.
22   Q          Did you know where his body was?
23   A          She had told me that it was in the garage.
24   Q          She, being who?
25   A          Amanda.
```

```
 1   Q          And, before you left, was there any conversation

 2   with Anita Green about where you were going?

 3   A          I can't distinctly remember, but she definitely

 4   didn't know we were going.

 5   Q          Okay.  And we've heard about, I'm not going to

 6   walk you through about what happened in Dayton in the

 7   interest of time, but let's go back to -- let's

 8   fast-forward a little bit to when you had dropped the car

 9   off in Dayton, you've disposed of his car, and now you are

10   back in town; is that fair?

11   A          Yeah.

12   Q          And when you got back in town, you were driving

13   whose car?

14   A          Amanda's.

15   Q          Who actually drove back from Dayton?

16   A          Amanda did.

17   Q          All right.  And do you go to Anita Green's home?

18   A          Correct.

19   Q          When you arrive back at Anita Green's home, is

20   she awake?

21   A          Yes.

22   Q          What happened at that point?

23   A          Mackenzie was sleeping on the couch.  Amanda had

24   gone in and taken her to bed, put her in bed.  And we got

25   the overalls that she had handed to us the night before and
```

```
 1   we had put Mr. Hovanec's body in the car.
 2   Q        All right.  When you say we put Mr. Hovanec's
 3   body in the car, who exactly loaded him in the car?
 4   A        Myself and Amanda.
 5   Q        And you loaded him into Amanda's Honda Pilot?
 6   A        That's correct.
 7   Q        And where was Anita Green when you were loading
 8   Tim Hovanec's body into Amanda's Honda Pilot?
 9   A        She was at the door where the sunroom was that
10   leads onto the driveway.
11   Q        Could she see that you were loading Tim Hovanec's
12   body into the car?
13   A        Yes.
14   Q        Did she say anything?
15   A        I can't distinctly remember if she did or didn't.
16   Q        Who drove Amanda's car to the pre-dug grave?
17   A        Anita Green.
18   Q        With Tim Hovanec's body in the back?
19   A        That's correct.
20   Q        And when you got to that pre-dug area, to that
21   road, what did you do?
22   A        It was the same routine as what we had done the
23   night before.  We had taken his body out and she had driven
24   off.
25   Q        Okay.  And did she come back for you?
```

```
1    A        She came in an hour.

2    Q        All right.  No cell phones again?

3    A        No cell phones.

4    Q        And Anita Green knew the routine?

5    A        Correct.

6    Q        All right.  Do you -- well, obviously, you loaded

7    Tim's body into Amanda's car.  How was -- how did he appear

8    when you saw him, when you physically loaded him in?

9    A        I'm sorry.  I don't understand the question.

10   Q        Was he in anything?

11   A        Yes, he was in a case that they used for the

12   inflatable trampoline they had on their pond.

13   Q        And do you recall that day or that weekend any

14   conversation about that bag that Tim Hovanec's body was in?

15   A        Yeah, they had said that they would utilize that

16   and that they can replace it.  It was easy to replace.

17   Q        Okay.  Who is they?

18   A        It was between Amanda and Anita.

19   Q        So you, I don't want to put words in your mouth,

20   but if I'm understanding your testimony, you overheard a

21   conversation between Amanda and Anita that Tim's body could

22   go in this water trampoline bag?

23   A        Correct.

24   Q        Who offered up that bag for use?

25   A        I can't remember, between the two of them.  I'm
```

1   not too sure if it was Amanda's idea or not.

2   Q        All right.  At any point in time that weekend, do

3   you recall any conversation about a substance?

4   A        Yes.

5   Q        Aside from the etorphine used to kill Tim?

6   A        Yes.

7   Q        Can you tell the Court about that?

8   A        There was a powdered substance that was handed to

9   Amanda by Anita in a Ziploc bag that was instructed to put

10  with Tim, Mr. Hovanec's body, to help decom --

11  decomposition of the body, to speed it up.

12  Q        So there was a substance provided that was

13  supposed to help his body decompose more quickly?

14  A        That is correct.

15  Q        Who gave that substance to whom?

16  A        Anita had given it to Amanda.

17  Q        And you saw that?

18  A        I did.

19  Q        And did Anita tell Amanda what this stuff was?

20  A        Yes.

21  Q        And what did Amanda say?

22  A        I can't remember exactly what she said, but she

23  took it with her.

24  Q        To the grave?

25  A        Correct.

```
1    Q        Did she use it when she buried Tim?

2    A        She did.

3    Q        When you guys buried Tim?

4    A        She did.

5    Q        What did she do with it?

6    A        She poured it over him.

7    Q        She poured it on top of his body?

8    A        Correct.

9    Q        All right.

10            Anita Green comes back to pick you up, yes?

11   A        Yes.

12   Q        After you are done burying the body?

13   A        Yes.

14   Q        And what happens when you get back to her home?

15   A        Took our clothes off, given it to her, she had

16   put it in a hot wash.

17   Q        You gave the clothes to whom?

18   A        I'm sorry, given it to Anita.

19   Q        So Anita put the clothes in a hot wash?

20   A        Correct.

21   Q        Whose idea was it to put your clothes in a hot

22   wash?

23   A        I can't remember if it was Amanda's or Anita's.

24   Q        Okay.

25            All right.  Anything else happen that night
```

```
1   after you buried Tim Hovanec?

2   A        No.

3   Q        Did you go to bed?

4   A        Yes.

5   Q        You wake up on Monday morning at Anita Green's

6   home?

7   A        Yes.

8   Q        Tell us about Monday morning.

9   A        I had woken up late.  The girls were at school.

10  Anita was at work.  Amanda was in the kitchen and she had

11  told me what she had done.  She had removed floor mats of

12  her Honda Pilot and she had washed down the driveway.

13  Q        Okay.  Now during -- we know that you were

14  arrested on Wednesday, I believe it was the 27th of --

15  A        April.

16  Q        -- April.  So is it fair for us to assume that

17  Monday, Tuesday, Wednesday, you are still at Anita Green's

18  house?

19  A        That is correct.

20  Q        All right.  And it's also fair to say that at

21  some point in time, law enforcement comes poking around?

22  A        Yes.

23  Q        Because they now realized Tim Hovanec is a

24  missing person?

25  A        Correct.
```

1    Q        And did you have occasion to overhear a

2    conversation between Anita Green and somebody else on the

3    other side of the phone?

4    A        Yes, she was speaking to law enforcement.

5    Q        All right.  And so you only heard what Ms. Green

6    was saying; is that correct?

7    A        Correct.

8    Q        All right.  And what -- was there something about

9    that conversation that made you uneasy?

10   A        Yeah, there was concern.

11   Q        What was your concern?

12   A        She was just rambling on about a whole bunch of

13   things that, to me, made it, I don't want to say

14   conspicuous, but I felt uneasy about the words that she was

15   saying.

16   Q        Because you didn't want to get caught?

17   A        Absolutely.

18   Q        Right.  And so when you overheard this

19   conversation, did you -- what did you do?

20   A        I pulled Amanda aside and I had told her.  I'm

21   like, your mom's speaking quite a bit.

22   Q        And what did Amanda say?

23   A        Amanda said I mustn't worry.  She's good at

24   lying.  She's been doing it her whole life.

25   Q        How do you feel about your conduct today?

1  A        Alive in prison to tell everyone here.  But on

2  the inside, I'm dead inside.  It's -- if I could trade my

3  life with Mr. Hovanec's, I'd do it in a heartbeat.

4              MS. BAEPPLER:  May I have a moment?

5              THE COURT:  Yes.

6              MS. BAEPPLER:  Just a few more questions.

7  Q    (By Ms. Baeppler) You were interviewed at the time of

8  your arrest by the Sheriff's Office, correct?

9  A        Yes.

10  Q        And once you were confronted with the dash camera

11  video, you confessed to your role in this; is that correct?

12  A        That is correct.

13  Q        And it's fair to say that you took authorities to

14  Tim Hovanec's body?

15  A        Yes.

16  Q        And it's fair to say that you identified for

17  authorities what it was that was used to kill him, the

18  substance?

19  A        That is correct.

20  Q        And during that interview, you were asked

21  questions about Anita Green, correct?

22  A        That is correct.

23  Q        And you were asked questions about Samantha

24  Green, correct?

25  A        That is correct.

```
 1   Q        And you provided -- it's accurate for me to say
 2   you provided some information about Anita and Samantha,
 3   right?
 4   A        That's correct.
 5   Q        And was there any conversation between you and
 6   Amanda before you ended up being interviewed at the
 7   Sheriff's Office about what you should and shouldn't say
 8   about Anita and Samantha?
 9   A        Yeah, I was told that you must leave Samantha out
10   of it because if she was pressed with law enforcement that
11   she would crack and she would speak about everything.
12   Q        Was anything said about her mother?
13   A        At that time, I can't remember.
14   Q        Okay.
15            MS. BAEPPLER:  I have nothing further.
16   Thank you.
17                 THE COURT:  Mr. Friedman.
18                 MR. FRIEDMAN:  Thank you, Your Honor.
19                 THE COURT:  Or Mr. Trott.  I don't want to
20   look past you, so either one of you, so.
21                 MR. FRIEDMAN:  Thank you, Your Honor.
22                      - - -
23                 CROSS-EXAMINATION
24   BY MR. FRIEDMAN:
25   Q        All right.  Mr. Theodorou, good afternoon.  My
```

1    name is Ian Friedman, and I represent Mrs. Green, okay.

2              During these questions, if, at any time, you

3    don't understand something I ask you, ask me to stop and

4    ask me to repeat the question, okay?

5    A        No problem.

6    Q        Okay, fair?  So if you give an answer to the

7    question, we can accept that as the fact that you

8    understood my question and that's what you are responding

9    to, fair?

10   A        Yes, sir.

11   Q        All right.

12             So you met Amanda in 2019 in South Africa.

13   And sometime thereafter, you learned that she lied to you

14   just about her marital status and her status as a mom; is

15   that correct?

16   A        That's correct.

17   Q        And she was being dishonest with you that early

18   on, right?

19   A        That's correct.

20   Q        All right.  But that didn't scare you off.  You

21   knew that she lied to you, but you were okay with that.

22   You stayed with her, correct?

23   A        That's correct.

24   Q        All right.  And early on, per your testimony,

25   it's stated that you were aware that Amanda wanted to kill

1   Tim, correct?

2   A          That's correct.

3   Q          All right.  When was that?  Under what

4   circumstance did you learn that?

5   A          That was in -- I can't remember exact dates or

6   exact months, but that was when I had elaborated with --

7   she had phoned me when I was in Pretoria when I was on my

8   way to lunch with my brother and his friend for his

9   birthday.

10  Q          Okay.  So Amanda says to you, Anthony, I want to

11  kill Tim, right?  In so many words, but that's the point,

12  right?

13  A          Yes.

14  Q          All right.  And did you believe that?

15  A          Yes.

16  Q          Okay.  And so this person tells you that they

17  want to murder someone, let's call it for what it is, and

18  you opt to stay with that person, didn't you?

19  A          Yes.

20  Q          Okay.  So you knew that early on, before we get

21  to all of this other conduct that we spoke to, you were

22  going to work with someone who was planning on murdering a

23  human being, correct?

24  A          Correct.

25  Q          Okay.  And at no time during this whole process

```
 1   did you take any steps to get out of that relationship

 2   because she was going to murder someone, did you?

 3   A        I did not.

 4   Q        All right.  In fact, you did just the opposite.

 5   Per your description moments ago, you decided to become a

 6   middleman, right?

 7   A        Correct.

 8   Q        All right.  And the middleman to help kill Tim

 9   Hovanec, right?

10   A        Correct.

11   Q        Because a middleman sounds good like you are a

12   broker or something like that, but you were actively

13   engaged now in trying to murder someone, weren't you?

14   A        Correct.

15   Q        Okay.  And did you tell a lot of people about

16   this, your friends, your family and so forth that you were

17   planning on killing Tim Hovanec?

18   A        Absolutely not.

19   Q        Okay.  Why not?

20   A        Because it's unorthodox.

21   Q        Because it's unorthodox?

22   A        Yes, sir.

23   Q        All right.  And if you told people, you might not

24   be able to carry it out?  People might tell on you,

25   correct?
```

```
1   A        Correct.

2   Q        All right.  So not only was it unorthodox, but

3   you didn't tell people because, A, you realize it's

4   horrendous, but you are not going to tell people that you

5   are going to go kill someone and participate in that,

6   right?

7   A        Correct.

8   Q        And you would agree with me that by concealing

9   this important purpose for which you are acting, that's a

10  dishonest act, isn't it?

11  A        It is.

12  Q        All right.  So early on, in South Africa, you are

13  already engaging in dishonest behavior, dishonest

14  concealment for this obligation that you've taken upon

15  yourself to be the middleman to kill Tim Hovanec?

16  A        Yes.

17  Q        All right.  Now, again, you continue on with the

18  relationship, right?

19  A        Yep.

20  Q        Okay.  And I can't -- I don't think that your

21  role can be understated here as simply I'm being a

22  middleman.  How many times do you think that you spoke to

23  potential hitmen or took efforts to find other hitmen in

24  this case?

25  A        Maybe about ten.
```

```
 1   Q          Okay.  At least ten times you took it upon

 2   yourself to find a hitman to kill someone?

 3   A          No, not at all.

 4   Q          Okay.

 5   A          It took -- it was two times.

 6   Q          Okay.  And the actions that it took, you called

 7   people, right?

 8   A          Yes.

 9   Q          You met with people, right?

10   A          Yes.

11   Q          You talked about how much it would be, correct?

12   A          Correct.

13   Q          You helped with the transference of money,

14   correct?

15   A          Correct.

16   Q          You talked about getting airline tickets,

17   correct?

18   A          This was all through Amanda's obligation.

19   Q          I understand --

20   A          Or voice.

21   Q          Amanda is telling you how to do this?

22   A          That's correct.

23   Q          I get it.  Amanda told you to kill someone, so

24   you just -- you decide that's okay, right?  You do

25   understand the whole bridge thing is coming up, right?
```

```
1    A         I get it, yes.

2    Q         So the transference of money, right?

3    A         Yep.

4    Q         You are involved in that.  You are involved in

5    getting an airline ticket for the hitman to the United

6    States, right?

7    A         Yep.

8    Q         You come to understand what these drugs do, you

9    testified nicely to it about it being a sedative for an

10   animal, but it kills someone if it's a human being,

11   correct?

12   A         Correct.

13   Q         All right.  So you learned all of this.  You

14   didn't know all of this before, you didn't know about the

15   chemicals beforehand, right?

16   A         I didn't.

17   Q         Okay.  And so we can go on and on if I were to

18   sit here and go over the things you did, even if it was

19   just two hitmen per your testimony --

20   A         Yes.

21   Q         -- there were a lot of steps that you took over

22   this period of time, correct?

23   A         Yes.

24   Q         And over what period of time were you doing this?

25   Just give me an estimate.  I'm not looking for specific
```

```
1   dates.  Are we talking a year, six months, what are we
2   talking about?
3   A         Maybe just over a year and-a-half.
4   Q         Okay.  So just 18?
5   A         Just under 18 months, sorry.
6   Q         Just under 18 months.  So for 18 months, you are
7   actively engaged --
8   A         Sorry, can I -- that's less than that.
9   Q         Please.  I'm not here to trick you.
10              THE COURT:  Guys, guys, you have to talk one
11  at a time --
12  A         Sorry.
13              THE COURT:  -- or her head is going to
14  explode and I don't want to see that, so.
15  Q   (By Mr. Friedman) Nor do I.
16              Go ahead, sir.
17  A         So it was around 12 months.
18  Q         Twelve months.  So for 12 months, you are working
19  with Amanda Hovanec to kill Tim Hovanec?
20  A         Yes.
21  Q         Okay.  And during those 12 months, per your
22  testimony a moment ago, your response to me moments ago,
23  you even equate that to dishonest behavior, at the very
24  least, right?
25  A         Yes.
```

```
 1   Q          Okay.  And so for an entire year, you are a
 2   dishonest person.  You are a liar.  Let's just call that
 3   for what it is, right?
 4   A          In what way?
 5   Q          Well, you are not telling people about your
 6   plans, right?
 7   A          That doesn't make me a liar.
 8   Q          No?  Okay.  So when people ask you why you were
 9   going to Ohio --
10   A          Correct.
11   Q          -- did you ever tell them that part of the reason
12   you were going to Ohio was to help facilitate a murder?
13   A          No, the part of the reason for me coming to Ohio
14   was to have a holiday with my girlfriend at the time.
15   Q          Okay.  Knowing that a murder was potentially to
16   take place?
17   A          I did not know.
18   Q          You did not know that?
19   A          The only time I had known about it was on Friday
20   that night when they had come back home from court.
21   Q          Okay.  So that's interesting that you didn't know
22   that, but yet, you were very engaged and, frankly,
23   instrumental in getting the -- this substance to the United
24   States, the purpose for which you knew what it does, but
25   it's your testimony here today that even though you did
```

```
 1  that, and even though you hired a hitman and did what you

 2  did, you didn't know that there was going to be an actual

 3  hit or an execution, as it was, when you arrived?  That's

 4  your testimony?

 5  A        Yes.

 6  Q        Okay.  All right.  So the hitman backs out,

 7  right?  Second hitman?

 8  A        Yep.

 9  Q        Okay.  And you still, you don't realize, geez,

10  even the hitman is backing out.  Maybe I should get out of

11  this.  You still stay in it, right?

12  A        Yes.

13  Q        You didn't abandon this plot, this sick plot?

14  A        Yep.

15  Q        Okay.  And yet tell me if at any point during our

16  questioning you decide to revisit your former response in

17  that, or if you are going to maintain that you didn't know

18  that there was going to be an execution when you arrived in

19  Ohio, okay?

20  A        Yeah, I did not know.  The only time I learned of

21  it was on Friday when she had stated that she was going to

22  do it.

23  Q        Okay.  And if that were truthful, when you

24  learned of it that Friday, did you take any steps at all to

25  leave the home?
```

1    A        I did not.

2    Q        Okay.  Now, all of these discussions, the hitman

3    stuff, all of this stuff before that Friday that you

4    arrived in Ohio --

5    A        Yeah.

6    Q        -- okay, can we -- I just want to make sure we

7    are on the same date, all right.  So you arrive in Ohio

8    that Friday?  All right?  Are we good on that?

9    A        No, I arrived in Ohio on the Wednesday.

10   Q        On Wednesday.  And you had known about, again,

11   you didn't know, you are saying you didn't know it was

12   going to happen in Wapakoneta, but, for that year, you had

13   stated for over 12 months, you were engaged in trying to

14   get a hitman, correct?

15   A        Yes.

16   Q        Okay.  And at no time was Anita Green involved in

17   that process, was she?

18   A        No.  Not leading up to it at that time, no.

19   Q        Okay.  And at no time did you receive any

20   information that Anita was aware of this?  In fact, you

21   weren't aware of it, as you said, until the Friday before,

22   correct?

23   A        Correct.

24   Q        All right.

25            So all of your planning that occurred dealt

1  with folks that were -- could supply material or perpetrate

2  a hit, but you were working with Amanda, right?  Amanda

3  Green?

4  A       Yeah.

5  Q       Amanda Hovanec, excuse me, I apologize.  And so

6  in working with her, you were talking about getting the

7  drug, the plan, and ultimately, as you had stated during

8  the direct examination, the execution of that plan as well

9  once you arrived in Wapakoneta, correct?

10  A       Not once I arrived.  You need to reiterate that

11  it was on a Friday.

12  Q       Until Friday.  So you got here Wednesday?

13  A       Correct.

14  Q       And so it's your testimony that Wednesday you

15  didn't know about it, right?

16  A       Correct.

17  Q       And it's your testimony that Thursday you didn't

18  know about it?

19  A       Correct.

20  Q       Did you ever ask at any time, Amanda, hey,

21  whatever happened with those chemicals I sent you to kill

22  Tim?

23  A       No.

24  Q       Okay.  Just --

25  A       Because I was there, I was here for a holiday.  I

1    changed my ticket from London to South Africa in order to

2    come and spend two more weeks with Amanda.

3    Q        Okay.  I got you.  So but it never dawned on you

4    at any point after you had gone through all of those steps,

5    even Government's Exhibit 5, you fabricated that DHL label,

6    right?  Where you shipped the drugs?

7    A        Correct, that was the label that was used.

8    Q        Right.  And you put on there that you had

9    enclosed a bookmarker, right?

10   A        Correct.

11   Q        Indeed, was there a bookmarker in there?

12   A        There was.

13   Q        Okay.  And clothes and necklaces and bracelets,

14   right?

15   A        Yes.

16   Q        You wrote all of that on there, right?

17   A        Yes.

18   Q        And also, you told us today about a hookah pipe,

19   correct?

20   A        Correct.

21   Q        The hookah pipe was not on the label, correct?

22   A        Not on the label that I seen, no.

23   Q        Okay.  And all of those things that you did to

24   get the drugs to Ohio, into the hands of Amanda --

25   A        Yes.

```
1   Q         -- was done deceptively, was it not?

2   A         It was.

3   Q         All right.  And so just so that we are utilizing

4   the same language, deception is just another way of saying

5   a lie, correct?

6   A         Correct.

7   Q         All right.  So your pattern of dishonesty was

8   advanced all the way to the time that you shipped the drugs

9   to the United States, correct?

10  A         No, I was simply told to do it in that way.

11  Q         I understand you were told again to do it.

12  A         Yeah.

13  Q         I get it.  All right.  And that person who just

14  told you to do it and you just jumped was Amanda, right?

15  A         Yeah.

16  Q         Okay.  It was not Anita, though, was it?

17  A         No, not at that time.

18  Q         Right.  Are you suggesting at any time that Anita

19  told you to do this, also?

20  A         No.

21  Q         Okay.  So whatever that Wednesday was, the 20th

22  or the 21st, doesn't matter, whatever that Wednesday was,

23  just to be clear and to foreclose upon this point, you had

24  not had any prior discussions or engaged in any planning to

25  execute Tim Hovanec with Anita Green, correct?
```

```
1   A         No.

2   Q         Okay.

3             Now the conversation today that you claimed

4   that you had overheard had between Anita, Samantha, and

5   Amanda, you had stated that you heard Amanda say I'm going

6   to kill him, and you believed that to be, obviously, of

7   Tim, correct?

8   A         Correct.

9   Q         All right.  And when was that, specifically?

10  A         It was Friday after the girls had dropped from

11  school, so around 3 p.m., 3:30 p.m.

12  Q         Okay.  And you didn't engage in that

13  conversation, correct?

14  A         I was standing in the conversation, but not

15  engaged.

16  Q         Okay.  You listened to the entire conversation?

17  A         Not the entire one, because I asked -- I had said

18  what had happened.

19  Q         I'm sorry.  Can you explain?  I apologize.  I

20  just don't understand what your response is.

21  A         Sorry.  When I walked into the house, Samantha

22  and Anita and Amanda were with each other, and I think

23  Samantha was consoling her, and I saw Amanda crying, and I

24  asked her what had happened, and her words were I'm going

25  to kill him.  And I said, again, what happened.  She said
```

```
 1  it doesn't matter.  I'm going to kill him.

 2  Q       So you were there with Amanda for two days,

 3  Wednesday and Thursday, and had no inclination that she was

 4  going to kill Tim until that Friday night?

 5  A       That's correct.

 6  Q       Okay.  And when is it that you know, not just

 7  that you speculate, but that you know that Anita Green

 8  became aware of this?

 9  A       That night.

10  Q       That Friday night?

11  A       Correct.

12  Q       Okay.  And the whole conversation you were there

13  for or you were not there for?

14  A       Which one are we referring?

15  Q       The conversation with Anita, Samantha, and

16  Amanda?

17  A       I was there.

18  Q       Okay.  The entire time?

19  A       The entire time.

20  Q       Okay.  And was there any planning of the killing

21  during that conversation?  Actual details of how it was to

22  be carried out and --

23  A       There was points that a poison would be utilized.

24  Q       Okay.

25  A       That was pretty much figuring out as to what they
```

1    were going to do, how they were going to do it.

2    Q        All right.  So, Mr. Theodorou, this conversation

3    that was had, the evidence of that conversation, it's your

4    testimony, correct?

5    A        Correct.

6    Q        All right.  You didn't record it or anything of

7    the sort, correct?

8    A        I did not.

9    Q        All right.  You just sat here in front of an

10   entire packed courtroom and you acknowledged you are a

11   liar, aren't you?

12   A        I'm afraid you can say that, yes.

13   Q        All right.  And so my question to you is do you

14   have anything at all, beyond your lying words from your

15   lying self, that would substantiate this claim?  Anything

16   beyond your testimony here today?

17   A        There's certain things in my statement that

18   cannot be fabricated.

19   Q        Okay.  But it all came from you, correct?

20   A        It all came from me, correct.

21   Q        Okay.  Now, you didn't stop anything?  You didn't

22   call the police, you didn't put in a unanimous tip,

23   correct?

24   A        How could I have done that?

25   Q        Well, some people pick up the phone and call the

```
1   police.
2   A          I didn't have a phone.  I have an international
3   number.  How would I have done that?
4   Q          Okay, so it's your testimony -- (Court reporter
5   interruption for multiple speakers.)
6               THE COURT:  One at a time, guys.  One at a
7   time.
8   Q          My question --
9               THE COURT:  You ask questions, you answer
10  questions, and they can't happen at the same time.
11  A          I didn't think of doing that because I
12  didn't think it was going to take place.
13  Q          Can you repeat that?
14  A          I'm sorry.  I didn't pick up the phone because I
15  didn't think it was going to take place.
16  Q          So you, who had engaged in 12 months of
17  preparation, didn't think it was going to take place?
18  That's your testimony here today under oath?
19  A          I did.
20  Q          Okay.  But yet, even you, who is engaged and
21  walked step-by-step-by-step with this person are sitting
22  here saying but Anita Green did?
23  A          Correct.
24  Q          Right?
25  A          Yeah.
```

```
 1   Q        All right.
 2            Did you ever go to Anita and say, hey, I
 3   don't think this is going to happen?
 4   A        No.
 5   Q        Okay.  And your testimony is that you didn't call
 6   the police because why?  You only had an international
 7   phone?
 8   A        I'm not saying that that was an excuse to use.
 9   There's a lot of things that I should have done that day
10   that I didn't.
11   Q        And my question to you is why didn't you?
12   A        I didn't think of it to do it.
13   Q        Okay.  And that's also because you didn't think
14   it was going to happen, correct?
15   A        Correct.
16   Q        All right.
17            You went shopping earlier for items
18   including that to build a greenhouse, correct?
19   A        Correct.
20   Q        All right.  And Anita was not with you, correct?
21   A        Correct.
22   Q        And you didn't engage in any conversations with
23   her when she talked about the distraction of the kids with
24   the construction of a greenhouse or items to go in a
25   greenhouse, correct?
```

```
 1   A         That conversation took place between her and

 2   Amanda.

 3   Q         Right.  And, again, the only proof of that

 4   conversation comes from your mouth, correct?

 5   A         That's correct.

 6   Q         All right.

 7             And so I want to talk about reasons that

 8   something may come out of your mouth for a moment.  So we

 9   are going to switch gears, okay?

10   A         Uh-huh.

11   Q         All right.  Now, when you were first arrested on

12   April 27th, 2022, how much of this did you tell the

13   authorities, what you're stating here before the Judge?

14   A         I told the beginning portion of it.  I didn't

15   elaborate the full amount.

16   Q         Okay.  And why didn't you?

17   A         I was told not to.

18   Q         By whom?

19   A         By Amanda.

20   Q         Okay.  So Amanda tells you to kill someone, you

21   do it.  Amanda tells you to conceal it, you do it.  Amanda

22   tells you not to make any statements, you do it.  That's

23   your testimony?

24   A         Correct.

25   Q         Okay.  And so you didn't think to tell what you
```

1  knew or what you are alleging is the truth today because

2  Amanda told you not to?

3  A        She told me not to say anything about Samantha.

4  Q        Okay.  So nothing about Anita, however, correct?

5  A        I did say stuff about Anita in the beginning

6  first interview, did I not?

7  Q        Right, you had stated that she was aware of

8  planning, correct?

9  A        Yes.

10 Q        Okay.  And your proof of that at the time was

11 just, again, your word, correct?

12 A        Correct.

13 Q        Okay.  And the details of what you are giving

14 here today, you didn't give those until this year, 2024,

15 correct?

16 A        Correct.

17 Q        All right.  And that's what I want to talk about

18 for a moment.  The government prosecutor asked you about

19 expectations and what you were promised or not promised and

20 so forth.  Do you remember that line of questioning?

21 A        Yes.

22 Q        Okay.  Now I'm not trying to get into what you

23 and your lawyer have spoken about.  That's privileged and I

24 don't want to touch on that, okay.  But you had recovered

25 the discovery in this case, had you not?  The evidence in

1    this case?

2    A        Yes.

3    Q        Okay.  And you reviewed what Anita Green had

4    stated, correct?

5    A        I did.

6    Q        In anticipation of your case?

7    A        Yes.

8    Q        Okay.  And at no point did you come forward to

9    the government and say, hey, that's not true, did you?

10   A        I did.

11   Q        You did?  And you did when?

12   A        When I got offered a -- to proffer.

13   Q        Precisely.

14   A        Yep.

15   Q        And when you got offered, let's finish that

16   sentence, you got offered what?

17   A        I got offered to proffer.  They gave me a deal if

18   I was to be a witness at this case.

19   Q        Okay.  And let's talk about what your

20   understanding of that deal was.

21   A        Can you elaborate more on that?

22   Q        What was your understanding of that deal?

23   A        That I would come and testify against Anita Green

24   and I would possibly get the best deal that I could get.

25   Q        Okay.  And what did you believe that the best

```
1   deal could be?

2   A        I have no idea.

3   Q        Okay.  But you knew that if you came in, where?

4   In here, right?

5   A        Yep.

6   Q        Because you knew that Anita, this was after Anita

7   had entered a plea.  You understood that, correct?

8   A        Yes.

9   Q        Okay.  You knew Anita Green had entered a plea of

10  guilty to accessory after the fact?

11  A        Yes.

12  Q        Okay.  And it was well after that that the

13  government came to you and you came to understand or have

14  your understanding of the deal, correct?

15  A        Yes.

16  Q        Okay.  Now I'd like to know, it would be fair to

17  say you certainly have considered what your sentence could

18  be, right?

19  A        Yes.

20  Q        Okay.  And before this deal was offered, what was

21  your understanding of what you would be facing potentially?

22  A        Twenty to life.

23  Q        Twenty to life.  And if you cooperated in this

24  case, have you heard the term 5K1 for substantial

25  assistance?
```

```
1    A         I have not.

2    Q         Okay.  And so you were told if you come in here,

3    not just to testify, but to testify against Anita, right?

4    You can't just come in here and say Anita is telling the

5    truth.  You knew that wouldn't get you any credit, right?

6    A         Yeah.

7    Q         Okay.  So you had to come in, conditioned upon

8    the fact that you would come in against Anita, and there

9    would be a benefit to you, would there not?

10   A         Yes.

11   Q         Okay.  And you may not know specific months and

12   guidelines, most lawyers don't, so I'm not going to hold

13   you to that, but you understood that potentially you could

14   shave yourself a few years off your sentence, correct?

15   A         Correct.

16   Q         Okay.  You'd like to get that time back, would

17   you not?

18   A         Who wouldn't?

19   Q         Right, of course.  You have a daughter, correct?

20   A         Correct.

21   Q         And that's probably killing you every day that

22   you are not seeing your daughter?

23   A         Two years, six months.

24   Q         What would you do for your daughter?

25   A         Anything.
```

```
1   Q        That's right.  And now by testifying, your hope,

2   and again, Judge can or cannot, but dependent upon your

3   testimony, you know that the more you say against Anita

4   Green, the more likely it is that you'll get benefit from

5   your testimony, correct?

6   A        From what I've understood, yes.

7   Q        Okay.  And so you would do anything for your

8   daughter and, obviously, that would include getting back to

9   her as quickly as you can, correct?

10  A        Yes, sir.

11  Q        All right.  You don't have any love for Anita

12  Green, do you?

13  A        I've only met her a handful of times.

14  Q        Right.  But you love your daughter, obviously?

15  A        Yes.

16  Q        Okay.  And you are not asked to do anything more

17  for this credit than just to come in and testify against

18  Anita Green?

19  A        I've been told to come in and tell the truth.

20  Q        Okay.  All right.  Your telling the truth might

21  be a little different than others, right, because you're

22  starting off by acknowledging that you are a dishonest guy?

23  A        Yes, sir.

24  Q        So my question to you is you've lied for a long

25  period of time, right?  And then, today, in front of Judge
```

1   Knepp, you come in and you say but, today, I'm telling the

2   truth, right?  In essence, right?

3   A          I've got to make up for my wrongs, don't I?

4   Q          Okay.  So now it's to make up --

5              THE COURT:  One at a time, guys.  Please say

6   what you just said again.

7   A          I said it's to make up for my wrongs.

8   Q          Okay.  So you are not here, then, for the

9   benefit, it's just here to make up for your wrongs?

10  A          I can't say that.

11  Q          What can you say?

12  A          It's probably both.

13  Q          Okay.  So you have an incentive and that is a

14  driver in your testimony here today, is it not?

15  A          Yes.

16  Q          The benefit?

17  A          Correct.

18  Q          Okay.

19             Now the property where you ultimately

20  buried, after you helped murder Tim Hovanec, were you aware

21  that that property was known to Amanda since she was a

22  child?

23  A          Yeah, she had stated it.

24  Q          Okay.  So she didn't need any direction from

25  Anita as to not only how to get there, but where to bury

```
 1   someone, because she was aware of the topography, I'm

 2   sorry, that area of land?

 3   A          Yeah, I'm unaware of what topography means, but

 4   yes, that's correct.

 5   Q          No insult intended, it's culture.

 6   A          That's fine.

 7   Q          I didn't know if you used the same --

 8   A          That's fine.

 9   Q          So the testimony today about overalls and so

10   forth, did you state that when you were first brought into

11   custody and told them the truth then?

12   A          I couldn't remember exactly.

13   Q          Okay.  All right.  Did you tell the truth when

14   you first met with the officers?

15   A          I did not.

16   Q          Okay.  So you lied up until for a year and then

17   you come to the U.S., and then you are engaged in the

18   coverup, and then you are arrested and you still continue

19   to lie, right?

20   A          Correct.

21   Q          Had anyone come to you at the law enforcement

22   office where you were and offer you some sort of benefit to

23   your testimony at that time?

24   A          I said it might work out better if I do testify.

25   Q          I'm sorry?
```

1    A       I said it might work out better if I do come

2    clean with what had happened.

3    Q       That's what they said to you then?

4    A       That's what they said to me then.  That's

5    correct.

6    Q       Okay.  But there was no specific offer,

7    consideration, or proffer of some sort, correct?

8    A       No, this was right in the beginning.

9    Q       Okay.  Nothing as specific as when the government

10    approached you here to say if you testify against Anita

11    Green, you'll get consideration from the government,

12    correct?

13    A       Correct.

14    Q       All right.

15              Let me just ask you, how much time, how many

16    years are you hoping?  What's the best case scenario for

17    you right now?

18    A       I have no idea.

19    Q       Well, how much are you hoping?  You certainly had

20    to have thought about how much time are you hoping to save?

21    A       I don't know.  I've thought about this.  It can

22    go either way.  I'm trying to prep myself for whatever it

23    may be.

24    Q       And your best case scenario is?

25    A       Again, I don't know.

```
1   Q        Okay.  Now, the aspect of the Sunday morning
2   after the murder, you had said that you spoke with Amanda,
3   Amanda stated to you that her mom went to church that
4   morning to, quote, make peace?
5   A        Sorry, you said the Sunday morning after the
6   murder?
7   Q        Correct.
8   A        No.
9   Q        I'm sorry.  Before.  I apologize.  You are
10  correct, and thank you for correcting me.
11  A        Yeah.
12  Q        Before going, I'm sorry, she went to church and
13  Amanda told you her mom went to church?
14  A        Correct.
15  Q        And that, at church, she, quote, made peace,
16  correct?
17  A        Yeah.  She said she had to make peace
18  with killing Tim.
19  Q        Did you ever text that anywhere?  Did you ever
20  memorialize it any way?
21  A        No.
22  Q        Did you ever tell the police that before the
23  government came to you with the offer to benefit?
24  A        I can't distinctly remember if I did or didn't.
25  I don't think it was on record, though.
```

1    Q       But, again, we have to accept your

2    representation, correct?

3    A       Correct.

4    Q       All right.  Now you had stated that you felt

5    uneasy.  When was that?  I wrote down Sunday, but that may

6    be incorrect.  Was I right?

7    A       Correct.

8    Q       Okay.  And you had stated that you felt uneasy?

9    A       Correct.

10   Q       Okay.  You still, however, as a -- when was it

11   that you realized that something was going to happen,

12   actually?

13   A       Not until the moment.

14   Q       Not until the moment?

15   A       Yeah.

16   Q       Okay.  So you state from the witness stand that

17   you are engaged in all of this process over the course of

18   the year, you are present during all of these

19   conversations.  You hear all of this conference between

20   Anita, between Amanda, you go to the store to get items.

21   This is from your testimony, right?

22   A       Correct.

23   Q       And even despite all of that, it's your sworn

24   testimony here today that yet you still didn't believe it

25   was going to happen until it actually happened?

```
 1   A          Correct.

 2   Q          But testifying against Anita, it's your testimony

 3   that she definitely knew?

 4   A          She did know.

 5   Q          Okay.

 6                       (Pause in the proceedings.)

 7                 Not believing that it was going to happen,

 8   let me ask you this, had you believed it was going to

 9   happen, would you have warned Tim?

10   A          I don't know.

11   Q          Okay.  So even after all this time, sitting in a

12   cell, looking back saying that you would switch places with

13   him in a second, you can't even answer that question that

14   you would have warned him to change it?

15   A          It's so difficult to try to put yourself in a

16   position of what you should and shouldn't have done in

17   that.

18   Q          It's that hard for you to reconcile with the fact

19   that you should have warned him?

20   A          I'm not saying --

21   Q          Please let me finish answer -- it was that

22   difficult for you?

23   A          Anyone would, I'm trying to say that, at that

24   point in time, there might have been a hundred different

25   things looking better from what I should or shouldn't have
```

```
1   done.  Warning him definitely would be one of the main

2   things.  Calling the police would have been another thing.

3   Q        And it's your testimony that you did not know

4   what was going outside, what was going on outside after the

5   children came in and went to the kitchen?

6   A        I couldn't see anything, no.  I didn't know

7   exactly what was going on.

8   Q        Okay.  But your testimony, for benefit, against

9   Anita Green, is that she definitely knew?

10  A        She was in the kitchen with me.  I don't know if

11  she did or didn't.

12  Q        Well, that might be the first honest thing you

13  said here today.  Thank you.

14           MS. BAEPPLER:  Objection.

15           THE COURT:  It's --

16           MR. FRIEDMAN:  I'll --

17           THE COURT:  Yeah, let's avoid the

18  editorializing.

19           MR. FRIEDMAN:  Thank you.

20           THE COURT:  And I'll sustain the objection.

21  Q   (By Mr. Friedman) Now, you didn't get a conscience

22  after you realized that there was a man who was killed

23  because of your actions right way.  In fact, you took steps

24  to conceal what had happened, correct?

25  A        Yes.
```

```
1   Q        Okay.  And you would agree, you were utilizing

2   the same logic that we started with, your concealment, and

3   now particularly after someone has died from it, is a

4   dishonest act, is it not?

5   A        Correct.

6   Q        Okay.  And so let's talk about the extent of your

7   dishonesty even after you killed a man.  You took the body,

8   right?

9   A        Yes.

10  Q        Didn't call anyone to tell them, friends, family,

11  you know, to kind of cleanse yourself, right?  Didn't share

12  it with anyone?

13  A        No.

14  Q        Okay.  Took the body, buried the body, right?

15  A        Yes.

16  Q        Tell the Judge what else you did to conceal the

17  crime?

18  A        I'm sorry.  You got to elaborate more on that.

19  Q        I wasn't there.  What else did you do to conceal

20  the crime?

21  A        Well, Amanda had set the place where we had

22  buried him in a way that didn't look like the soil had been

23  turned.  We had gone back, she had taken the mats out of

24  the car and thrown them away.  She had thrown away the

25  trampoline cover.  She had put bleach on the driveway.
```

```
1   Q        Okay.  Anita didn't put bleach on the driveway,
2   did she?
3   A        I'm uncertain.
4   Q        Okay.  Did Anita clean the mats of the car?
5   A        I'm uncertain.
6   Q        Okay.  Now you had acknowledged a moment ago that
7   her being in the kitchen, being Anita and you being in the
8   kitchen, and you didn't know -- you couldn't say what she
9   knew or didn't know at that moment, correct?
10  A        At that moment, no.  Neither of us did.
11  Q        But at some point, she became aware of it
12  because, ultimately, she did, in fact, drive you and Amanda
13  to the site where you buried Tim, correct?
14  A        Correct.
15  Q        All right.  And, obviously, I know this will
16  sound like a ridiculous question, but I have to ask it,
17  that was obviously after the fact the body -- Tim was
18  deceased at the home before getting the burial site,
19  correct?
20  A        Correct.
21  Q        So anything that Anita did from that point
22  forward, you would agree with me was after the fact, after
23  the killing had occurred?
24  A        At that point, yes.
25  Q        And in your preparation for your case, and,
```

```
 1    again, please do not get into what you and your attorney

 2    talked about, you were aware that Anita acknowledged that

 3    she engaged by way of her plea and conduct, illegal

 4    conduct, after the fact, after Tim had been deceased,

 5    correct?

 6    A        That's correct.

 7    Q        Now as to the -- and I'm going to just wrap up

 8    because I think we can go on and on.  The point of all of

 9    this is, as to many of these observations, including that

10    of the body bag, the powder, the decomposition powder and

11    so forth, that's your statement, correct?

12    A        That's correct.

13    Q        And you would agree with me or you, yeah, that

14    again, the more that you -- the more criminal activity that

15    you attribute to Anita, potentially, the greater benefit to

16    you, correct?

17    A        Correct.

18    Q        All right.

19             So the conversation that you heard Anita

20    have with someone on the other end of the phone, did you,

21    at some point, learn that that was a police officer?

22    A        Yes.

23    Q        Okay.  And that, that conversation was after the

24    murder, correct?

25    A        Correct.
```

1   Q        Okay.  And after that, you were so disturbed by

2   all of this that, as you had stated, the next day you were

3   able to sleep in, right?

4   A        Correct.

5   Q        Okay.  Did you get up and have, as you said, your

6   usual coffee?

7   A        I did not that morning, no.

8   Q        Okay.  What time did you sleep in until?

9   A        I can't remember.

10  Q        Okay.  And did the police talk to you at any

11  point?

12  A        On the Wednesday.

13  Q        Okay.  And they asked you, in essence, were

14  they -- just to sum it up, they were trying to find where

15  Tim Hovanec was, correct?

16  A        That's correct.

17  Q        And you lied to them?

18  A        At that point in time, they just asked me for a

19  number that they can contact me on.

20  Q        Okay.  You didn't tell them, you know, give them

21  a hint or anything like that that there was something

22  criminal afoot, correct?

23  A        No.

24  Q        Okay.  There was nothing to prevent you from

25  doing that, was there?

```
 1   A        No.
 2   Q        Now the statement that -- I just have two last
 3   questions for you.  You had stated that Amanda told you
 4   that her mom is good at lying, she's been doing it her
 5   whole life?
 6   A        Correct.
 7   Q        And that was something that you are stating here
 8   today that was told to you, correct?
 9   A        Correct.
10   Q        Okay.  And the only proof that we have of that is
11   your testimony, correct?
12   A        Correct.
13   Q        Okay.  And, lastly, let me just ask you a
14   question.  When you were brought into custody, you did not
15   immediately acknowledge what you had done, correct?
16   A        Correct.
17   Q        All right.  You were hiding that from the
18   officers, correct?
19   A        Correct.
20   Q        You were lying to those officers, correct?
21   A        Yes.
22   Q        Okay.  And that was a conscience decision you
23   made to lie, to fabricate, correct?
24   A        Correct, that's what I was told to do.
25   Q        That's what you were told to do?
```

```
 1    A          Correct.

 2    Q          Okay.  And so, and that was by Amanda?

 3    A          Correct.

 4    Q          Okay.  And the government has told you to testify

 5    here against Anita, and if you do, you'll get benefit,

 6    right?

 7    A          Correct.

 8    Q          Okay.  And so you seem to do a lot of what people

 9    tell you to do; is that fair?

10    A          You can say that.

11    Q          Okay.  And when you were with the police and you

12    are in custody, you would have continued to lie had you not

13    been confronted with the video, at which time, you knew the

14    gig was up, fair?

15    A          I don't know how I would have acted.

16    Q          I'm sorry?

17    A          I can't say.  I don't know.

18    Q          So you may very well have continued to lie had

19    you not been confronted with the actual tape?

20    A          Possibly.  I'm not sure.

21    Q          Okay.  Thank you very much.

22               THE COURT:  Any redirect, Ms. Baeppler?

23               MS. BAEPPLER:  Yes, Judge.

24                           - - -

25                    REDIRECT EXAMINATION
```

```
 1  BY MS. BAEPPLER:

 2  Q        Mr. Theodorou, you met with the government on

 3  several different occasions; is that correct?

 4  A        That's correct.

 5  Q        You met with me, Ms. Sterling, A.J. Eilerman?

 6  A        Yep.

 7  Q        All right.  And the first time we met, were any

 8  promises made to you about any sort of sentencing

 9  consideration?

10  A        Nothing.

11  Q        And do you understand, as you sit here today, why

12  that was?

13  A        It was to see if I was of any benefit.

14  Q        Right.  And as I indicated, we met on several

15  occasions, right?

16  A        Correct.

17  Q        Did we spend all of our time talking about Anita

18  Green?

19  A        No.

20  Q        We talked about a lot of other things and people,

21  didn't we?

22  A        We did.

23            MR. FRIEDMAN:  Objection to form, Your

24  Honor.

25            THE COURT:  What's --
```

1  Q        What --

2              THE COURT:  Stop a second.

3              What's the objection?

4              MR. FRIEDMAN:  Objection to form of

5  question, Your Honor.

6              THE COURT:  I'm going to overrule that.

7  Q   (By Ms. Baeppler) What percentage of time do you think

8  we all spent talking about Anita Green?

9  A        Five.

10 Q        Five percent?

11 A        Five percent, if that.

12 Q        At what point in time did I come to you and ask

13 you to testify at this hearing today?

14 A        About I want to say about 45 minutes ago.

15 Q        Okay.  So you didn't know until very recently

16 that you were going to be sitting in this courtroom,

17 correct?

18 A        That's correct.

19 Q        Did I ever say to you that if you give testimony

20 against Anita Green, you are going to get a sweetheart

21 deal?

22 A        No.

23 Q        All right.

24              Now a lot of the questions that Mr. Friedman

25 asked you, you've heard before; is that fair?

```
1   A          Yes.

2   Q          Who asked you those questions?

3   A          My lawyers, you.

4   Q          Okay.  Because it's sort of hard to understand

5   some of your conduct?

6   A          Correct.

7   Q          All right.  Let's help the Judge sort of put you

8   in your -- in your head when you are traveling here to the

9   United States for the second time.

10             You testified previously that you had tried

11  to purchase a ticket for this facilitator who was supposed

12  to be a hitman, correct?

13  A          Correct.

14  Q          This guy backs out, right?

15  A          Correct.

16  Q          And so you are coming to the United States now.

17  What do you think is going to happen here?

18  A          Nothing.  I'm coming for vacation.

19  Q          Okay.  Do you feel any relief?

20  A          Yes.

21  Q          Why?

22  A          Because nothing is going to take place.  I'm

23  going to have an enjoyable holiday.

24  Q          And you didn't think Tim Hovanec was going to

25  die?
```

```
 1   A          Not at all.

 2   Q          Was there any conversation with Amanda before you

 3   got to the States a second time or while you were in

 4   England or while you were on the plane that I'm going to

 5   kill Tim Hovanec?

 6   A          No.

 7   Q          All right.  And so, but you knew, I mean, it's

 8   fair, Mr. Friedman's questions are fair, you knew this had

 9   been planned, she was trying to do this for quite sometime,

10   right?

11   A          That's correct.

12   Q          You breathed a sigh of relief when the

13   facilitator drops out and you think you are coming to have

14   a good time with your girlfriend?

15   A          Correct.

16   Q          All right.

17              These questions about after Friday when you

18   heard this conversation, you still didn't think that she

19   was going to kill him?  Do you remember those questions?

20   A          Yeah, I do.

21   Q          And you said, no, I didn't.  Can you explain to

22   the Court why that is?

23   A          That was -- it was almost like it was a dream

24   that was happening, but I didn't think it would actually

25   become a reality.  It was --
```

```
 1   Q          Were you hopeful she wouldn't kill him?

 2   A          Absolutely.

 3   Q          And you tried to talk her out of it?

 4   A          On the day, yes.

 5   Q          But that, obviously, didn't work?

 6   A          Unfortunately not.

 7   Q          When did it finally occur to you that, like, oh,

 8   boy.  This is really going to happen.  This is -- this -- I

 9   don't want to use profanity, but this is real?  When did

10   that occur to you?

11   A          When she didn't come immediately back inside

12   after the girls were dropped off.

13   Q          Did it occur to you when the hole was being dug?

14   A          It did, but, to a point, I'm still hopeful that

15   it wasn't going to take place.

16   Q          Why did you do this?  Why did you go along with

17   this?

18   A          I don't even know the answer to that.

19   Q          All right.

20              Mr. Friedman asked you a series of questions

21   about being a liar.  You heard those?

22   A          Yes, ma'am.

23   Q          And it's fair, his characterization that you have

24   told some lies; is that correct?

25   A          That's correct.
```

```
 1   Q          Is everything you say a lie?

 2   A          No, ma'am.

 3   Q          Is what you said here today a lie?

 4   A          No.

 5   Q          And is it fair to say that when you were

 6   interviewed initially by authorities at the time of your

 7   arrest, you did, in fact, implicate Anita Green?

 8   A          I did.

 9   Q          All right.  And I want to talk about that for a

10   little bit.

11              Ms. Niezgoda, could you bring up

12   Government's Exhibit 1.1, please, and go to page 52.

13              Would you start at line 6 with Detective

14   Rammel.  I'll be Detective Rammel, and you can be

15   Mr. Theodorou.

16              Was -- "What was Anita's involvement?"

17   A          Sorry.  "She was also withdrawn from the idea."

18   Q          "She didn't like the idea, either?"

19   A          "She didn't like the idea from the beginning.

20   Nobody liked the idea."

21   Q          "Did she see the body at all or did she know that

22   he was dead?"

23   A          "Yeah, I think she -- I think she knew he was

24   dead.  I'm not sure if she saw the body at all."

25   Q          All right.  Go to page 53, please, line 4:
```

```
 1              "So was there a conversation with Anita

 2   about where the body was?  Would she know?  I think they're

 3   going to interview her."

 4   A          "She doesn't know specifically where it is."

 5   Q          "But she knows where it's buried?"

 6   A          "Yes, but, again, this is" -- sorry --

 7   "unintelligible.  Cause all I'm telling you, they're not

 8   going to know, so when they question her, she's going to

 9   deny it."

10   Q          Turn to page 64, please, line 16:

11              "You said you were dropped off.  Who dropped

12   you off?"

13   A          "Anita".

14   Q          "Anita?"

15   A          "Yes".

16   Q          "So she knew full well what was going on?"

17   A          "Yes".

18   Q          "What vehicle?"

19   A          "Amanda's."

20   Q          Turn to page 66, please, line 17:

21              Detective Rammel asks you, "So Anita wrapped

22   him up.  Was that at the house still?"

23   A          "No, Anita didn't wrap him up."

24   Q          "So you corrected him, right?"

25   A          "Yes."
```

```
 1   Q          Page 68, line 15:

 2              "So does Anita have any other involvement?"

 3   A          "Anything -- "

 4   Q          "She had to have known the body was in the car,

 5   right?"

 6   A          "Yeah, she picked us up after we had -- "

 7   Q          All right.  Page 69, line 15:

 8              This is Agent Eilerman:  "So Anita had a

 9   significant involvement in this?  She was involved in

10   planning, right?  I'm asking, I'm not telling.  I'm just

11   curious."

12   A          "Yes."

13   Q          Agent Eilerman:  "Prior to the kids arriving,

14   were there discussions about, all right, when he's coming

15   here, I'll rush the kids into the house?  Because we see

16   that on the camera.  They show up.  Anita's like, come on,

17   kids, get in the house, right?  So, in your opinion, from

18   conversations, everything, she knew what was going to

19   happen the whole time?  She knew it was going to happen?"

20   A          "Yes."

21   Q          "Never tried to talk Amanda out of it?"

22   A          "She did to a point.  She asked me this when she

23   saw how upset I was getting on the day because I said,

24   listen, something doesn't feel right.  Don't do anything."

25              MS. BAEPPLER:  If I may have a moment?
```

1             THE COURT:  Sure.

2  Q    (By Ms. Baeppler) So you did share with authorities

3  Anita Green's involvement when you were initially

4  interviewed; is that fair?

5  A        That's correct.

6  Q        But it's also fair to say you didn't give them

7  the full breadth of how involved she was?

8  A        Correct.

9  Q        And that wasn't until you sat down with the

10  government in a proffered setting?

11  A        That's correct.

12             MS. BAEPPLER:  I have nothing further.

13  Thank you.

14             THE COURT:  I have a couple of questions,

15  sir.  I just want to be clear I've got some chronology

16  right in my head.

17             You dug or helped dig Tim Hovanec's grave

18  before he was murdered, correct?

19             THE WITNESS:  That's correct.

20             THE COURT:  Had you heard conversations

21  between anyone about where a good place to bury him would

22  be before he was murdered?

23             THE WITNESS:  Yes.  It was decided that that

24  would be the preferable spot for him to be buried across

25  from where that body of water was.

```
 1                    THE COURT:  And who was involved in that
 2   conversation?
 3                    THE WITNESS:  Myself, Amanda, and Anita.
 4                    THE COURT:  Did someone drive you to the
 5   location where you dug the grave before Tim Hovanec was
 6   murdered?
 7                    THE WITNESS:  Yes.
 8                    THE COURT:  Who was that?
 9                    THE WITNESS:  Anita Green.
10                    THE COURT:  All right.  I don't have any
11   further questions.
12                    Do either of you have any follow-up in
13   response to my questions?
14                    MS. BAEPPLER:  None.  Thank you.
15                    MR. FRIEDMAN:  I do, Your Honor, in response
16   to the government's and to your solo question, unless I'm
17   not allowed to ask.
18                    THE COURT:  Let's be brief, okay, because --
19                    MR. FRIEDMAN:  Okay.
20                    THE COURT:  -- as my grandpa used to say,
21   the sun grows low in the western sky, but.
22                    MR. FRIEDMAN:  Sage words.
23                              - - -
24                       RECROSS-EXAMINATION
25
```

```
1    BY MR. FRIEDMAN:

2    Q        I just want to be very clear.  Those excerpts

3    that you just engaged in with the Assistant United States

4    Attorney that you were reading back and forth?

5    A        Yes.

6    Q        Particularly pages 52, 53, 64, 66, 68, and 69,

7    those all dealt with conduct after the deceased, after the

8    murder; is that correct?

9    A        That's correct.

10   Q        Okay.  None of those dealt with anything before

11   that, correct?

12   A        No.

13   Q        And as to the Judge's question a moment ago about

14   when the grave was -- it's not even a grave.  That's

15   disrespectful to it.  The place where you -- the crime

16   scene.  Let's call it a crime scene.  Let's call it for

17   what it is.  Again, your response to the Judge is, again,

18   we have to just rely upon your word for that, correct?

19   A        Yes, sir.

20   Q        Okay.

21            And the last question I have is the

22   prosecutor had asked you that you tell some lies, right?

23   And you said, yes, that's true, right?

24   A        Yes, sir.

25   Q        And today, you are telling us that no lies today?
```

1    A        Yes, sir.

2    Q        I'll bet you -- here's my last question -- if we

3    were to go back since the very beginning, since you first

4    met Amanda, you probably, if I asked you to count the

5    number of lies that you engaged in all the way up until the

6    present, let's say before you walked into this court, you

7    would not be able to give me a number, would you?

8    A        Probably not, no.

9    Q        Okay.  And as far as knowing about coming into

10   this court 45 minutes ago, that's not the conversation that

11   began this.  It was long before 45 minutes ago that you

12   realized that if you were called to testify, there could be

13   a benefit, correct?

14   A        Correct.

15                  MR. FRIEDMAN:  All right.  Thanks much.

16                  THE COURT:  Thank you.

17                  Let's take a couple minute break.  I know --

18                  MS. STERLING:  May we approach, Judge?

19                  THE COURT:  Yes, please.

20                            -  -  -

21    (Whereupon, the following discussion is held at side bar:)

22                  MS. STERLING:  I appreciate the hour.  We

23   can do whatever the Court wants to do.  Full disclosure --

24   (court reporter interruption for clarity.)

25                  THE COURT:  She said she's got another

```
 1   witness, that her direct is going to take 45 minutes plus

 2   or minus, and then we have cross-examination.

 3              So, to be clear, the reason I'm burning the

 4   midnight oil here is in consideration to the victims, okay,

 5   which I'm kind of doing this for you.  If you said to me

 6   can we shut it down and pick it up in the morning or later

 7   in the week or something, my answer would be yes.  I'm

 8   just -- I'm concerned you have to make peace with those

 9   people.

10              MR. FRIEDMAN:  May I object before you

11   answer?

12              THE COURT:  Yes.

13              MR. FRIEDMAN:  Because I think this will add

14   something to the equation.  I can't be here tomorrow

15   because of the start of Rosh Hashanah tomorrow.

16              THE COURT:  Okay.  How long does that take

17   you out of commission for?

18              MR. FRIEDMAN:  Takes me out through Friday.

19              THE COURT:  Okay.  So, I mean, I can run

20   until midnight.

21              MS. STERLING:  I'm happy to stay, too.  I

22   just wanted to make everyone aware, as it relates to this

23   hearing, and, of course, we have another one after this

24   that I could perhaps, on breaks, speak to the family about

25   that and what his counsel's availability may be tomorrow at
```

1    least to tie up that loose end.

2                    THE COURT:  What do we have tomorrow?

3           (Whereupon, a discussion is held off record.)

4                    THE COURT:  So we are all clear, nobody is

5    going to wilt on me here if we burn the midnight oil?  So

6    something weird may happen at 7:00 in this room.  It may

7    shut itself off.

8                    You are looking for a clock that's not

9    there?

10                    In 45 minutes, this room may power down

11   through powers that none of us control, at which point,

12   we'll have to power it back up, which will take about

13   five minutes.  I just don't want to weird anybody out.  And

14   perhaps you could -- I might tell everybody that that's

15   going to happen.  But I really need to take five or

16   ten minutes right now.

17                    MS. STERLING:  I'm with you.  Right now.

18                    THE COURT:  For reasons related to the Diet

19   Pepsi that I drank earlier.

20                    MS. BAEPPLER:  Too much information.

21                    THE COURT:  Well, I'm sorry.  You asked.

22                    MS. STERLING:  I did not.

23                    THE COURT:  So a ten-minute break now, and

24   we are going to steam ahead and try to get this done.

25                    MS. STERLING:  Correct.  And I will speak to

1    family and counsel about the later hearing.

2                    THE COURT:  Okay.

3                    MS. STERLING:  Thank you.

4            (Proceedings resumed in open court.)

5                    THE COURT:  Ladies and gentlemen, we are

6    going to take about a ten-minute break and we are going to

7    steam forward.

8                    Two things.  We are going to take about a

9    ten-minute break largely because you may or may not have

10   seen me throw a Diet Pepsi can in the trash can, but that

11   makes us take a ten-minute break.

12                   Secondly, there's, assuming we are steaming

13   ahead, this room, which is very computerized, might shut

14   itself down at 7:00, so don't be concerned.  It's not a

15   massive power failure or the end of the world, but this

16   room might look like it's shutting itself down at 7:00.

17   Just remain calm.  It will take us about five minutes to

18   bring it back up.  But there are much higher powers than me

19   that control some of the automation in this room, as

20   evidenced by the fact that it's warmer than I would like up

21   here, which is nothing I can do about that, either.

22                   So, with that, we'll be in break for ten

23   minutes.

24            (Whereupon, a break is taken.)

25                            -  -  -

```
 1                    (Proceedings resumed in open court.)

 2                    THE COURT:  Ms. Sterling or Ms. Baeppler,

 3     you guys are free to do whatever you want to do.

 4                    MS. STERLING:  Thank you, Your Honor.

 5                    The government would call Special Agent A.J.

 6     Eilerman.

 7                                   - - -

 8           Thereupon, the Government, in order to maintain the

 9     issues on their part to be maintained, called as a witness,

10                           ANDREW EILERMAN,

11     who, having been duly sworn as provided by law, testified and

12     said as follows:

13                                   - - -

14                           DIRECT EXAMINATION

15     BY MS. STERLING:

16     Q       Good evening, Agent Eilerman.

17     A       Good evening, Ms. Sterling.

18     Q       Could you please state your full name, spell your

19     last name for the record.

20     A       Andrew Joseph Eilerman, E-I-L-E-R-M-A-N.

21     Q       And how are you employed, sir?

22     A       I'm a special agent with the Federal Bureau of

23     Investigation.

24     Q       How long have you been employed by the Bureau?

25     A       May of 2008.  Approximately 16 and-a-half years.
```

```
1   Q       Are you familiar with the case involving Amanda

2   Hovanec, Anthony Theodorou, and Anita Green?

3   A       I am.

4   Q       How did you first become involved or where?

5   A       I received a telephone call from the Wapakoneta

6   Police Department indicating there was a missing person.

7   We went and collected some evidence and we ended up

8   coordinating with the Auglaize County Sheriff's Office to

9   work a missing person investigation jointly with them.

10  Q       When you say you coordinated with them, what did

11  you do initially in this missing person's investigation?

12  A       We contacted the Sheriff's Office.  I

13  specifically contacted Detective Brian Little, told them

14  the information that we had been relayed from the

15  Wapakoneta Police Department and that the victim was last

16  seen out in the county, which is outside the purview of the

17  Wapakoneta Police Department and inasmuch requested to work

18  it with them.

19  Q       All right.  And did they agree to that?

20  A       Yes.

21  Q       All right.  So you were working specifically with

22  Detective Little here in the preliminary stages of the

23  investigation?

24  A       We worked with several detectives to include

25  Detective Little.
```

```
1    Q        Were you present when Detective Little conducted

2    a phone interview with Anita Green on April 27th of 2022?

3    A        Yes.

4    Q        All right.  What was the purpose of that call as

5    you recall?

6    A        So, previously, earlier that day, Detective

7    Little and Deputy Foxhoven went out and made contact with

8    Amanda, and while they were with Amanda, she had mentioned

9    that she had to work at the hospital that night.

10            So at the point the phone call was made, we

11   were starting to set up interviews, and we wanted to have

12   the children brought to the Sheriff's Office to have them

13   forensically interviewed, and we believed, at the time,

14   Amanda was going to be at work, so Detective Little

15   contacted Anita.

16   Q        All right.  And was that telephone call recorded?

17   A        Yes.

18   Q        All right.

19            Let's go ahead and play Exhibit 1, please.

20            (Whereupon, exhibit played in open court.)

21   Q        Detective or Special Agent Eilerman, my

22   apologies, did you hear Anita Green ask Detective Little if

23   she should be concerned?

24   A        Yes.

25   Q        All right.  Did she raise any additional concerns
```

1    during that phone call with Detective Little?

2    A        She did.

3    Q        All right.

4             Let's go ahead and play Exhibit 2, please.

5             (Whereupon, exhibit played in open court.)

6    Q        Subsequent to that phone call, was there another

7    interview of Anita Green in relation to this case later in

8    the day on April 27th of 2022?

9    A        Yes.

10   Q        And can you kind of set that up for us?

11   A        Sure.  So at the time that phone call was made,

12   we decided that it was time to start interviewing everyone.

13   Myself, Lieutenant Burke, we traveled out to Anita Green's

14   house to interview Mr. Theodorou and, simultaneously, FBI

15   agents Kyle Fulmer and Mike Huber traveled out to Anita

16   Green's residence and interviewed her at her residence.

17   Q        And you just stated you were tasked with the

18   interview, initial interview, of Mr. Theodorou, correct?

19   A        Yes.

20   Q        And that interview occurred where?

21   A        At the Sheriff's Office.

22   Q        And so you were not present for the initial

23   interview of Anita Green in her home in person that day?

24   A        Correct.

25   Q        However, you are the case agent on this case,

1   correct?

2   A        Yes.

3   Q        Are you familiar with the totality of the

4   evidence here?

5   A        Yes.

6   Q        And, in particular, have you had the opportunity

7   to listen to all of the recorded interviews, and most

8   specifically, those involving Anita Green?

9   A        Yes.

10  Q        All right.  During that initial interview at her

11  house, did Ms. Green note any additional concerns to

12  Agents Fulmer and Huber?

13  A        She did.  She relayed information to the

14  interviewing agents that on an occasion, she had seen Tim

15  at her residence with multiple different IDs with his photo

16  on it and different people's names other than his.

17  Q        Play Exhibit 3, please.

18           (Whereupon, exhibit played in open court.)

19  Q        At some point, the interview of Ms. Green was

20  moved to the Auglaize County Sheriff's Office, correct?

21  A        Correct.

22  Q        Continuing on, on April 27th of 2022?

23  A        Correct.

24  Q        All right.  Would you agree with me that in the

25  statements that we've listened to thus far that Ms. Green

1    has indicated that she is concerned about Tim and his

2    whereabouts?  She's voiced a concern?

3    A        Yes.

4    Q        All right.  Did she continue to do that during

5    her interview at the Sheriff's Department?

6    A        Yes.

7    Q        All right.

8             Let's play Exhibit 4, please.

9             (Whereupon, exhibit played in open court.)

10   Q        Just to be clear, Special Agent Eilerman, the

11   four exhibits that we just listened to clips of, interview

12   statements by Anita Green, --

13   A        Yes.

14   Q        -- all of these occurred on April 27th of 2022?

15   A        Correct.

16   Q        And that's three days after the murder of Tim

17   Hovanec, correct?

18   A        That's correct.

19   Q        Ms. Green was interviewed for a rather lengthy

20   period of time in excess of two, two and-a-half hours

21   thereabouts; would you agree with that by Agents Fulmer and

22   Huber?

23   A        Yes.

24   Q        At some point, they confronted her with the dash

25   cam video that we are all aware of and that's referenced in

```
 1   the PSR in this case, correct?

 2   A         Correct.

 3   Q         Is it your understanding that she continued to

 4   deny awareness of the murder even in the face of that

 5   confrontation?

 6   A         Yes, she did.

 7   Q         With that, was the interview terminated?

 8   A         It was.

 9   Q         By the point the interview was terminated, had

10   you completed your initial interview of Mr. Theodorou?

11   A         I had, yes.

12   Q         All right.  Did you have occasion, late on

13   April 27th, maybe it was into the early morning hours of

14   April 28th, I don't remember precisely, but did you have

15   occasion in that timeframe at the Sheriff's Department to

16   have an additional conversation with Anita Green?

17   A         I did, yes.

18   Q         Tell us about that, please.

19   A         She had told us that she was aware of the poison

20   and that she was going to do something before Tim had

21   arrived.  She did deny knowing that Amanda had a syringe.

22   Q         Okay.

23               Let's play Exhibit 6, please.  Before you do

24   that --

25               Your conversation with Anita Green in this
```

```
 1   timeframe, was it recorded?

 2   A         It was.

 3   Q         Okay.

 4             Let's go ahead and play Exhibit 6, please.

 5             (Whereupon, exhibit played in open court.)

 6   Q         Did there come a point in time later in the

 7   interview when she, in fact, acknowledged that Amanda had

 8   told her she had a syringe?

 9   A         Yes.

10             THE COURT:  Ms. Sterling, could I ask you to

11   point the microphone at your face instead of up in the air?

12             MS. STERLING:  Sure.

13             THE COURT:  Thank you.  There you go.  Thank

14   you.  It's picking you up.  Part of the time, even if you

15   move back a little bit, you go off mic, so.

16             MS. STERLING:  Sure.  Sorry about that.

17             THE COURT:  If it's pointed at you, it would

18   pick you up.  So thank you.

19             MS. STERLING:  Let's go ahead and play

20   Exhibit 7, please.

21             (Whereupon, exhibit played in open court.)

22   Q    (By Ms. Sterling) Did Ms. Green acknowledge, during

23   her interview with you, to driving Tim Hovanec's body out

24   to the location where he was buried?

25   A         Yeah.  She denied it for a long time, and then
```

1    made a roundabout comment that I knew when we were driving

2    him out there, in the moment, I was in it.

3    Q        Can we play Exhibit 8, please.

4             (Whereupon, exhibit played in open court.)

5                 MS. STERLING:  My apologies to the Court and

6    counsel.  I believe that I skipped an exhibit that I

7    intended to play with you during a portion of her interview

8    with Special Agents Fulmer and Huber.

9    Q    (By Ms. Sterling) Do you recall Ms. Green making a

10   statement acknowledging that Ms. Hovanec had told her it

11   was done after the murder?

12   A        Yeah.

13   Q        Right --

14   A        After she had been Mirandized, she made the

15   comment to Agents Fulmer and Agent Huber that she was aware

16   of the poison before Tim had arrived, and after Amanda had

17   come in, when Tim came to drop the girls off, she made the

18   comment, "It's done."

19   Q        All right.

20               Let's play that, if we can, and that's

21   Exhibit 5.

22             (Whereupon, exhibit played in open court.)

23   Q        Subsequent to the interviews of Anita Green, on

24   April 27th and April 28th of 2022, she was arrested,

25   charged, correct?

```
 1  A         Correct.

 2  Q         After she was charged in this court, did you have

 3  the opportunity to sit down with Anita Green again?

 4  A         Yes.

 5  Q         Approximately when was that?

 6  A         September 1st of 2022.

 7  Q         What were the circumstances of that sit-down?

 8  A         It was a proffer interview.

 9  Q         Her attorneys were there?

10  A         Yes.

11  Q         During the proffer, did Ms. Green admit that

12  Amanda had told her before Tim arrived on Sunday that she

13  had to do something?

14  A         She did, yes.

15  Q         Did she say she told her she should pray that

16  there's another way?

17  A         Yeah.  She said she put her arms around her,

18  kissed her neck, and told her to pray that there's got to

19  be another way.

20  Q         Did she provide any context or explanation for

21  her statements in her interview about the use of poison?

22  A         So, in the proffer interview, she made a big deal

23  about the fact that the word poison had been put into her

24  head by the interviewing agents.  In fact, I think she

25  specifically said that she obtained the word poison from
```

1   when they were talking about it being mailed, the poison

2   being mailed to her house.

3   Q       You testified earlier that you are fully familiar

4   with all the recorded interviews of Anita Green; is that

5   correct?

6   A       Yes.

7   Q       Who first brought up the word poison?

8   A       Anita Green.

9   Q       Did Ms. Green acknowledge in her proffer

10  interview that before she drove Amanda and Mr. Theodorou

11  and Mr. Hovanec's body to the location where they were

12  going to bury it that Amanda specifically told her Tim's

13  body is in the car?

14  A       Yes.

15  Q       Did she provide any further explanation about her

16  knowledge about his body being in the car once they arrived

17  at the site where he was buried?

18  A       Yes.  She said that she saw Amanda and Anthony

19  struggling to get Tim's body out of the car and she

20  recalled seeing them with shovels.

21  Q       Did she admit that she had lied to investigators

22  during her initial statements in April of 2022?

23  A       Yes.

24  Q       You heard Mr. Theodorou's testimony here today?

25  A       I did.

1  Q       You were the agent who engaged in, frankly, all

2  of the statements that he made to law enforcement, correct?

3  A       Yes.

4  Q       Both in his initial interview at the Sheriff's

5  Department and, again, during the proffers that he

6  described?

7  A       Correct.

8  Q       Did you go with him when he showed you, or he

9  showed investigators I should say, where Tim Hovanec was

10 buried?

11 A       I did.

12 Q       Was he right about where he was buried?

13 A       Absolutely.

14 Q       Did he tell you during your interview that Amanda

15 had injected Mr. Hovanec?

16 A       Yes.

17 Q       Was that true?

18 A       Yes.

19 Q       Did he tell you what substance she had used to

20 inject him?

21 A       Yes.

22 Q       Did that turn out to be true based upon

23 subsequent testing?

24 A       Correct, it did.

25 Q       You heard him describe in some detail today about

1    plans or discussions he had with Amanda Hovanec about

2    hiring a hitman initially to murder Tim Hovanec, correct?

3    A        Correct.

4    Q        Were you able to corroborate those statements?

5    A        Yes.

6    Q        And how is that?

7    A        My going through thousands of text messages,

8    WhatsApp messages between Amanda and Anthony.

9    Q        During all of the interviews, whether it was the

10   initial interview at the Sheriff's Department or the

11   proffered interviews, has Mr. Theodorou always implicated

12   himself in the criminal acts at issue here?

13   A        Absolutely.

14   Q        You heard his testimony today -- no doubt, you

15   were in the courtroom -- that Anita Green gave Amanda a

16   substance that she told her to put on the grave that would

17   help, and I don't recall the specific verbiage, but

18   decompose the body faster; do you recall that?

19   A        I do.

20   Q        Did Mr. Theodorou ever describe that substance to

21   you in any more detail during your interviews with him?

22   A        Yeah, I think he described it as a granular,

23   blue-green substance.

24   Q        You were out at the grave site, correct?

25   A        I was.

1    Q        You have thoroughly reviewed the crime scene

2    reports and photographs, correct?

3    A        I have.

4    Q        Have you identified whether or not there was such

5    a substance located in the grave on top of Mr. Hovanec?

6    A        There was, yeah.

7    Q        Have you been able to pinpoint any particular

8    statement about the plan to commit the murder in the events

9    of the weekend of April 22nd through 24th of 2022 that

10   Mr. Theodorou provided you that indicate to you, well,

11   that's not true?

12   A        More specifically, are you referring -- I think

13   you are referring to Amanda's statement.

14   Q        No, what I'm asking you is that what

15   Mr. Theodorou told you about the planning of this crime --

16   A        I got you.

17   Q        -- and the conversations and actions that took

18   place on the weekend of April the 22nd through the 24th of

19   2022?

20   A        Yeah, we haven't been -- I have not been able to

21   find anything that says that Anthony's statements are not

22   true.  In fact, quite the opposite, proving, verifying what

23   he has told us was true.

24            MS. STERLING:  If I could just have a

25   moment, Your Honor?

1          THE COURT:  Sure.

2          (Counsel conferring off record.)

3          MS. STERLING:  Thank you.  I don't believe I

4  have any further questions for this witness, Judge.

5          THE COURT:  Mr. Friedman.

6          MR. FRIEDMAN:  Thank you, Your Honor.

7                    - - -

8                CROSS-EXAMINATION

9  BY MR. FRIEDMAN:

10 Q        It's not often I say good evening, agent.

11 A        Good evening, sir.

12 Q        So you were here when I introduced myself.

13 Again, I'm Ian Friedman.  And the same admonition that I

14 had for Mr. Theodorou, if you need me to repeat a question,

15 just ask me, okay?

16 A        Okay.

17 Q        All right.

18          The phone calls that you were addressing on

19 direct examination with law enforcement, so Anita and law

20 enforcement, those were post-murder, correct?

21 A        Correct.

22 Q        Okay.  I'll just grab a pen.

23          From any of those phone calls -- well, let

24 me rephrase that.  As the case agent, were you aware of

25 Anita's location at the time that she was speaking to the

1   officer or officers?

2   A        We believe she was at her house at that time.

3   Q        Okay.  So from the comfort of her home kind of

4   within the safety of her home and, at that point, you and

5   your team, not having confronted her with the evidence yet,

6   she did not make any claims that would have tied her to any

7   conduct prior to the murder, correct?

8   A        Correct.

9   Q        All right.  Now you -- and I apologize.  The

10  other agent that was there on the tape, I don't know who

11  that was.  I don't recall.  And so I don't know if it was

12  you or the other agent that said maybe you didn't realize;

13  do you remember that?

14  A        Are you referring to my interview?  The second

15  interview with Anita that was recorded?  I'm not sure which

16  interview.

17  Q        Yeah, I'm not sure which interview that was,

18  either.

19                MS. STERLING:  Was it a video or an audio?

20                MR. FRIEDMAN:  It was a video.

21                MS. STERLING:  Then that's him.

22                MR. FRIEDMAN:  Thank you.  All right.

23  Q   (By Mr. Friedman) So on the audio, you had stated

24  maybe you didn't realize.  And what were you thinking when

25  you stated that to Ms. Green?

```
 1   A          Can -- is there any way we can pull that back up
 2   so I can kind of read the context?
 3                    (Counsel conferring off record.)
 4   Q    (By Mr. Friedman) I can't find it, so I'm going to
 5   withdraw the question.  It's not incredibly important.
 6                    Now, we talk about poison, we talk about
 7   something to hit over the head, and all of these kind of
 8   theories and statements were being made amidst some of the
 9   interrogations, fair?
10   A          Fair.
11   Q          All right.  And you can't state with certainty
12   what Anita Green was thinking at any given time prior to
13   the murder, correct?  I mean, what's in one's head is their
14   head?
15   A          Correct.
16   Q          All right.  And so discussion of poison and so
17   forth, you heard the testimony from Mr. Theodorou here
18   today, and you were here, were you not?  I don't know if
19   you walked in or didn't walk in, but when he stated he
20   didn't believe anything was going to happen.  Those are my
21   words.
22   A          Correct.
23   Q          Do you recall that?
24   A          Yes.
25   Q          And, again, not knowing what Ms. Green was
```

1   thinking at any given time, if I were to suggest to you

2   that she, too, didn't believe something was going to

3   happen, you wouldn't be able to state one way or the other,

4   correct?

5   A        Yeah, I couldn't.  Yeah, I couldn't speculate.

6   Q        Okay.  And so said the man who engaged in over

7   12 months of preparation that he didn't know, until Amanda

8   came running back in the kitchen, one cannot sit here today

9   and state that, for certain, that -- excuse me -- that

10  Ms. Green, what she was processing at any given time, fair?

11  A        Are you asking my opinion?

12  Q        No, I'm just asking from her direct statements

13  and what you know.  So when I say what you know, our senses

14  as an investigator, what we see, what we hear, what we

15  smell?

16  A        I would tend to agree with that to a point.

17  Q        Okay.  And just to address anything that may come

18  back on redirect as to when you say "to a point," I'm sure

19  that will be picked up on, human nature is just that.  It

20  differs, and we are left to speculate oftentimes.  We have

21  our opinions.  Sometimes we are right, sometimes we are

22  wrong as to what others are doing, correct?

23  A        Sure, correct.

24  Q        All right.  Now when Anita stated that she heard

25  it was done, and she gave a lot of various kind of

```
 1  sentences with pauses and then said -- but the one thing
 2  that was consistent was she said that Amanda said it was
 3  done; is that fair?
 4  A         Fair.
 5  Q         All right.  And her hearing that would have been
 6  after the fact?  And, again, the fact being the murder.  I
 7  used that term before, I'll use it here.
 8  A         In the context of that, yes.  It's done.  I was
 9  told that that happened after the murder.
10  Q         Okay.  And there's no evidence whatsoever to
11  suggest that Amanda told Anita I'm going outside to stab
12  him with a syringe, correct?
13  A         Not specifically in those terms, no.
14  Q         Okay.  And so, again, what is -- what was stated
15  with different variations, what actually occurred, there
16  has to be some element of speculation in there for you as
17  an officer, correct?
18  A         Maybe initially speculation, but as the
19  investigation goes on and we determined people's
20  credibility as we interview them, that speculation is kind
21  of -- we determined our opinion based on that speculation.
22  Q         Sure.  And opinions, sometimes right, sometimes
23  wrong, correct?
24  A         Sure.
25  Q         Okay.  And you would agree, would you not, with
```

1    the testimony you heard today that Anita Green -- at least

2    there is no evidence to suggest that Anita Green was

3    engaged in any of the planning up to and including the

4    shipment of the drugs into the United States, correct?

5    A        I've seen no evidence of Ms. Green's involvement

6    prior to Friday, April 22nd.

7    Q        Okay.  And when it was stated thereafter by

8    Ms. Green that she didn't know kind of how the death

9    occurred, after the fact, and again, these are my words, so

10   I'm not going to try to find an excerpt, perhaps, well, how

11   she thought the crime was committed, once she learned,

12   because, obviously, she learned of it at some point, how it

13   went down, you cannot state with certainty when or exactly

14   how?  You can't pinpoint the moment, correct?

15   A        Correct.

16   Q        All right.  But she did acknowledge that she

17   helped to conceal this killing, right?

18   A        Yes.

19   Q        All right.  Now there's no question that Anita

20   was not truthful with the officers when they called, right?

21   A        Correct.

22   Q        And there is no disputing the fact that she was

23   untruthful, partially, during some of the interviews,

24   correct?

25   A        Correct.

```
1    Q         And all of that, obviously, was post-homicide,
2    correct?
3    A         Correct.
4    Q         All right.
5              Now the statement that was made during
6    direct examination -- excuse me -- that Anita stated that
7    there's another way, do you remember that a moment ago?
8    A         Yes.
9    Q         Who told you that?
10   A         Well, I believe Anita told me that.
11   Q         Okay.  And so Anita, if there was any discussion,
12   first off, she's told -- let's accept for the moment,
13   assuming arguendo for the moment, that the issue came up
14   that she, at any point, heard Amanda say, all right, I'm
15   going to kill him.  You would have to agree with me, would
16   you not, that people say things sometimes that, obviously,
17   they don't carry out?  People say, and particularly in
18   custody, they say stuff, but it doesn't come to
19   actualization, correct?
20   A         I'm a little confused on your question.
21   Q         You know why?  Because it was a terrible
22   question.  A terrible question.  So I'll start over.
23              The -- there are oftentimes lots of
24   scenarios -- I could come up with many -- where a guy says
25   I'm going to, you know, I'm going to -- I'm going to kick
```

1  that guy's ass, right?  People say that all the time,

2  right?  They don't necessarily do it, correct?

3  A          Correct.

4  Q          All right.  And like that, I could go on and on

5  and on with hypotheticals.  Some are carried out, some are

6  not, correct?

7  A          Sure.

8  Q          And just because it's said doesn't mean that it

9  necessarily need be believed, correct?

10  A          Correct.  If we are arguing hypotheticals, yes.

11  Q          All right.  And in this case here, again, what

12  was going on in Anita's mind, only Anita truly knows what

13  was going on in her mind at all relevant times, correct?

14  A          Yes.

15  Q          All right.

16              Now the statement of, about the body or,

17  excuse me, the evidence of the body and the car and whether

18  or not Anita truly knew what was in the back of the car or

19  didn't know what was in the back of the car, the fact of

20  the matter is that that was also post-homicide, correct?

21  A          Yes.

22  Q          Okay.  And would you agree that there are

23  situations that are so unfathomable, so unthinkable, and so

24  out of character and so, and are such that no -- very few

25  people in life experience situations like this one, for

```
 1    instance, that a situation becomes somewhat surreal?

 2    A         It would be speculating.

 3    Q         Of course.

 4    A         I haven't been through a situation like that to

 5    be able to answer that question.

 6    Q         Okay.  And that's fair, because my hypothetical

 7    is based upon speculation.  You would agree with me it

 8    would be speculative?

 9    A         Yes.

10    Q         All right.  Now Amanda -- excuse me -- Anita did

11    acknowledge later that she lied, correct?

12    A         Correct.

13    Q         All right.  And did tell you that?

14    A         She said it in her proffer interview to myself,

15    the prosecutors, and her attorneys.

16    Q         So she acknowledged that what she did, basically,

17    was violate the elements of the offense for which she pled

18    guilty, correct?

19    A         Can you rephrase that question?  I'm sorry.

20    Q         Sure.  You're aware that she pled guilty?

21    A         Yes.

22    Q         To accessory after the fact?

23    A         Yes.

24    Q         And you are aware of what that offense is?

25    A         Yes.
```

1    Q        All right.  And she, in fact, did that, correct?

2    You would agree with that?

3    A        She admitted her involvement, yes.

4    Q        So at a point, in an ideal world, she would have

5    told you right up front that this is exactly what happened,

6    but she didn't do that?

7    A        Correct.

8    Q        And that's a pretty common experience,

9    unfortunately, but the sad reality of your job, that's what

10   makes it difficult?  A lot of people don't tell the truth

11   at minute one, correct?

12   A        Correct.  Sometimes even in their proffer

13   interviews.

14   Q        Even in their proffer.  So, in this case, she

15   acknowledges that she did engage in conduct that

16   constitutes a violation of this offense for which we are

17   here today, correct?

18   A        Correct.

19   Q        All right.

20            And I'm going to switch gears for a moment

21   to Anthony Theodorou, who we were with a while ago, and you

22   were just asked about whether or not you -- you kind of

23   asked about his credibility, right?

24   A        Yes.

25   Q        And let's talk about that for a moment.

```
 1                    So you felt it necessary, and let's even

 2     back up from there.  As a law enforcement officer,

 3     investigation is absolutely critical in any case, correct?

 4     A         Correct.

 5     Q         All right.  And the reason that investigation is

 6     critical is because sometimes you are seeking to

 7     corroborate what is told you, correct?

 8     A         Determine the facts.  That's what we want to do.

 9     Q         And in this case here, you did corroborate a

10     number of facts that Mr. Theodorou brought to your

11     attention, correct?

12     A         Correct.

13     Q         Location of the -- of where they tried to bury

14     Mr. Hovanec, the type of drug, these sorts of things,

15     correct?

16     A         Yes.

17     Q         Okay.  And you look to phone messages.  I think

18     you had said a moment ago that you went through thousands

19     of phone messages?

20     A         Yes.

21     Q         All right.  A lot of which you stated here today,

22     you did not corroborate by way of messages or anything.

23     It's left to Mr. Theodorou's testimony, correct?

24     A         In regards to your client?

25     Q         Correct?
```

```
1    A        Yes.

2    Q        Okay.  And so law enforcement academy, day one,

3    101, is the need for critical investigation because we

4    don't want to just rely upon people's statements, we have

5    to back it up with evidence, correct?

6    A        When able to.

7    Q        When able to.  Absolutely.  And so, in your

8    search in this case, you and those that were within your

9    team looked for all evidence that would corroborate any

10   facet of these cases against Mr. Theodorou, Ms. Hovanec or

11   Ms. Green, fair?

12   A        Correct.

13   Q        And yet, with all the work that you did, you

14   didn't find anything to corroborate much of what he said

15   here today, fair?

16   A        In regards to your client.

17   Q        In regards to my client, yes?

18   A        Yeah, correct.  I would caveat that with --

19   Q        Please?

20   A        -- we were able to corroborate the fact that she

21   had driven them on the Saturday to dig the grave, and that

22   was corroborated through Amanda Hovanec's acceptance of

23   responsibility statement.  And I would also point out that

24   that was never brought up in the proffer interview.

25   Q        So, I'm sorry.  I didn't mean to cut you off if
```

```
 1    there was more?

 2    A        That's it.

 3    Q        So, again, what we are left with is you are

 4    talking about corroboration, so you probably would not feel

 5    comfortable allowing Ms. Hovanec to stay in your house with

 6    a dollar bill left out on the table, would you?

 7    A        No.

 8    Q        Right.  And so her acceptance of responsibility,

 9    you were here earlier today when she was seeking credit for

10    her acceptance of responsibility, correct?

11    A        Yes.

12    Q        You wouldn't put it past her to say and do

13    whatever necessary to get a benefit, would you?

14    A        I guess, to an extent, yes.  But when you are

15    conducting an investigation, you weigh all the facts and

16    details, and when you have two people independently

17    providing you a similar story, that gains more weight.

18    Q        Sure.  Did Amanda tell you that early on in this

19    case when you first brought her to the station in 2022?

20    A        No.

21    Q        Okay.  So it was only after much later on in 2024

22    as she was getting closer to wanting to get a benefit for

23    what she said?

24    A        Correct.

25    Q        All right.  And so the old adage, birds of the
```

1    feather, you had Ms. Hovanec and Mr. Theodorou, and you

2    wouldn't trust either of those with anything important in

3    your life, would you?

4    A          I wouldn't trust Amanda and I wouldn't let either

5    of them around my family, but, over time, I have -- the

6    information that Theodorou has provided us, I have deemed,

7    in my own opinion, to be credible, because I've been able

8    to verify it through other means.

9    Q          Right.  And, again, as it goes back to in your

10   opinion, and with all due respect, I respect my opinion,

11   but sometimes I don't get it one hundred percent right,

12   sometimes I'm off a little bit.  That's the nature of our

13   opinions, right?  Would that hold true to you as well?  You

14   are not always right?

15   A          Correct, yeah.

16                    THE COURT:  Your wife's going to want the

17   transcript of that.

18   Q          That's correct.

19                    And a lot of what Mr. Theodorou stated here

20   today, you would agree with me, which you were not able to

21   corroborate, if believed, occurred after the killing,

22   correct?

23   A          Regarding your client.

24   Q          Regarding --

25   A          Yes.

```
1   Q        This is all my client?

2   A        Yes.

3                MR. FRIEDMAN:  Okay.  All right.  Thank you

4   very much.

5                THE COURT:  Any redirect?

6                MS. STERLING:  If we can just have a moment.

7                No, Your Honor.  Thank you.

8                THE COURT:  Special agent, you can step

9   down.

10               Ms. Sterling, anything further by way of

11  evidence?

12               MS. STERLING:  I don't believe so, Your

13  Honor.

14               I would move for the admission of the

15  exhibits that were used here this evening.  I believe, by

16  my count, is Exhibits 1 through 8.

17               I would also offer an additional exhibit,

18  that being number 14.  And, for the record, that is an

19  exhibit that was offered in this case at the detention

20  hearing.  It's already part of the record, but I want to

21  make sure it's properly before the Court.  It was Exhibit 1

22  of the detention hearing of this matter.  It's a letter and

23  documentation from the United States Department of

24  Agriculture, which discusses their investigation and

25  finding that Ms. Green had been dishonest on repeated
```

1  occasions during her background checks when trying to gain

2  employment with that agency.

3            THE COURT:  Let me take a look at that if we

4  are going to be talking about it at all.  I think I've seen

5  it before, but what doc --

6            MS. STERLING:  It would have been a

7  detention hearing.  The government entered a single

8  exhibit, I believe.

9            THE COURT:  Do you know what --

10            MS. STERLING:  So it would be Exhibit 1.

11  It's a five-page document.

12            THE COURT:  No, no, do we know what the

13  minutes of that hearing was?  I'm just looking through the

14  docket, sorry.

15            MS. STERLING:  Do you have an electronic

16  copy of the document?  If that would make it easier, Judge,

17  I'm glad to print it out and just offer it.

18            THE COURT:  I'm looking for it,

19  Ms. Sterling.

20            So I think her hearing was on July 5th, if

21  I'm looking right.  So let me get down to that.  Or right

22  around then, early July.  Maybe it was before that.  I'm

23  not seeing an exhibit to the hearing.

24            MS. STERLING:  Again, happy to send it to

25  the clerk and can have a copy printed out, Judge.

```
1              THE COURT:  Yeah, please go ahead if you
2    have it, because I'm not finding it on the docket.
3              MS. STERLING:  Judge, not to trouble the
4    Court any further than I already have, but is it possibly
5    attached to the government's appeal of the detention order?
6    It may also be there.
7              THE COURT:  Let me see.
8              I don't see it there, either.
9              MS. STERLING:  Okay.  Mrs. Niezgoda is going
10   to email it to the clerk and we can print a copy.
11             THE COURT:  So I see where you admitted some
12   exhibits, but they are not -- it doesn't look like they
13   were scanned onto the thing.  At the hearing on June 9th,
14   it references Exhibits 1 and 2, but they are not -- they
15   haven't been electronically -- so that means we have them
16   somewhere, I presume, but I don't see them online here.
17        (Whereupon, a discussion is held off record.)
18             MS. STERLING:  In the meantime, Judge, while
19   we are waiting, I'll represent to the Court I believe it's
20   a five-page exhibit.
21             THE COURT:  Yeah, I think I saw it as part
22   of the -- I have a cloudy recollection, so it's not
23   critical, I just want to make sure it's part of this.  It's
24   a letter from Ms. Green's employer, which she used to put
25   her veracity in question in terms of her representing some
```

1   academic credentials that she didn't have.  And I do recall

2   seeing that as part of the appeal from Judge Clay's Order

3   putting her out on bond.  So we can backfill with the

4   actual document, but, for right now, I understand what it

5   is and I recall seeing it, so go ahead.

6                   MS. STERLING:  Thank you, Your Honor.

7                   THE COURT:  And we will -- the Rules of

8   Evidence are, shall we say, something of a rumor in cases

9   like this.

10                   Any objection to any of those exhibits,

11  otherwise?

12                   MR. FRIEDMAN:  Not -- excuse me -- not 1

13  through 8; 14, I do object to.

14                   THE COURT:  Okay.  Remind me, what is 14,

15  again?

16                   MS. STERLING:  That's what we are waiting

17  on, the exhibit from --

18                   THE COURT:  Oh, the letter from the

19  Department of Agriculture, okay.  I've already seen it.

20  I'm going to overrule the objection, and we'll get it.

21                   You've seen it, too, correct, Mr. Friedman?

22                   MR. FRIEDMAN:  To be perfectly honest with

23  you, I have no idea.  The government may say I did and they

24  may be correct; I don't know.

25                   THE COURT:  Well, I'm trying to make sure

1    you were --

2                    MS. STERLING:  I don't believe he was

3    counsel of record.

4                    THE COURT:  You probably weren't on this

5    case at that point.

6                    MR. FRIEDMAN:  No.

7                    THE COURT:  Okay.  So let's defer ruling on

8    that until Erica gets the email and prints it out and shows

9    it.  If it's what I understand it to be, I'm going to admit

10   it for purposes of what it's worth, which may not be that

11   much in terms of what we are talking about here today.

12                    Otherwise, Ms. Sterling?

13                    MS. STERLING:  Otherwise, the government

14   would rest.

15                    THE COURT:  Okay.

16                    Well, so I guess what that now means is we

17   have the evidence in that we are going to get, and I can

18   represent to everybody that the letter from the Department

19   of Agriculture isn't going to be a critical piece of

20   evidence here, but I want to get it to --

21                    MS. STERLING:  We are not there yet,

22   correct, Judge?  Once we get past this point, I assume we

23   are going to talk about the guideline?

24                    THE COURT:  Oh, yeah.  Yeah, we are going

25   to, right now, we are going to talk about Mr. Friedman's

1   objections to the report.

2              So go ahead, Mr. Friedman.

3              MR. FRIEDMAN:  Thank you, Your Honor.

4              And I understand that having or standing on

5   the briefs, we are really just talking about the acceptance

6   of responsibility at this point?

7              THE COURT:  I think that's probably

8   accurate, but I wanted to give you a chance if you wanted

9   to go back and reargue any of those, but, frankly, if you

10  are standing on the briefs, then I'll turn it back to,

11  well, let's see.  I guess Ms. Sterling is objecting to

12  the -- on the one hand, Ms. Sterling is objecting to the

13  acceptance credit; however, I think you have the burden to

14  establish that she's entitled to it.  So I guess I'll let

15  you go first to explain why she's entitled to it.

16             MR. FRIEDMAN:  I apologize.  You are asking

17  me to explain why she's entitled to the objection?

18             THE COURT:  No, why -- guys, I'm --

19             MR. FRIEDMAN:  I'm so sorry.

20             THE COURT:  No, I'm playing a little mental

21  Ping-Pong here with myself.

22             I seem to recall that the defendant has the

23  burden of establishing that she is entitled to the

24  acceptance of responsibility credit.

25             And I look to my right to probation, is that

```
 1    accurate?

 2                   PROBATION OFFICER:  Judge, ultimately, it

 3    would be the Court's decision for the two-points and the

 4    government's decision for the three-points.

 5                   THE COURT:  Right, my decision, but does

 6    anybody have the burden of proof here?

 7                   PROBATION OFFICER:  Not necessarily.

 8                   THE COURT:  All right.

 9                   Since Ms. Sterling objected, let's let her

10    go first.

11                   MS. STERLING:  Judge, I'm happy to do that.

12    I have briefed the issue extensively in the government's

13    sentencing memorandum.

14                   THE COURT:  Yes, you have.

15                   MS. STERLING:  And I don't know that I have,

16    given the hour, need to, nor want to, nor that you want me

17    to rehash that.

18                   In a nutshell, I have articulated a couple

19    of different bases why the government believes that an

20    acceptance of responsibility is not appropriate here.

21                   The primary one, of course, is that it's the

22    government's position, based upon all of the facts before

23    the Court, not only those contained in the PSR, but from

24    the testimony that was received today as well as the

25    exhibits that you've heard, that Ms. Green was
```

1  substantially more involved than what she has represented

2  to this Court.  I highlight those on page 2 of the

3  supplemental memo including the particular information or

4  knowledge that she had prior to the murder and her

5  involvement, which, again, are I believe consistent with

6  the testimony that was offered here today by Mr. Theodorou.

7           I note in there, and I'm sure we are going

8  to get into a credibility determination at some point, I'm

9  happy to do that now if that's necessary, and it may, in

10  fact, be, you know, her counsel has made a record, in his

11  opinion, to argue to this Court that Mr. Theodorou is not

12  credible because he hasn't been corroborated in any real

13  way and that he has lied by being deceptive and not fully

14  honest both with folks in South Africa related to his

15  conduct and actions there as well as to law enforcement

16  here.

17           And I guess what I would say about that,

18  Judge, is this.  The testimony before the Court is that he

19  did bring up Anita Green's knowledge and involvement at the

20  initial interview that was pointed out in the transcript.

21  Did he go into the detail that he did in later proffers?

22  He certainly did not.  Did he explain why that was?  He

23  did.  He said he was told not to talk about Samantha's

24  involvement, Anita's involvement.  Did he say she was

25  there, that she drove them and Mr. Hovanec's body to the

1  grave site in the initial interview?  Absolutely, he did.

2  It's in the transcript.  It was covered during redirect

3  with him.  Did he say that Anita was there, that she knew,

4  that she tried to talk Amanda out of it?  He did.  He said

5  that at the initial interview, he testified to that today,

6  and it's in the transcript of that interview that

7  Ms. Baeppler went back over with him on redirect.

8              At the end of the day, Judge, you are the

9  one that has to decide whether you believe him and whether

10  you believe the horrific facts of this case.  We submit to

11  you that he's credible.  You got to see him testify.  You

12  got to see his demeanor.  You got to see his affect.  You

13  got to hear from Special Agent Eilerman his opinion on his

14  credibility.  You got to hear from him that he was able to

15  corroborate quite a few things that Mr. Theodorou had told

16  him in the text messages.  You got to hear that he was also

17  corroborated in several significant respects by Amanda

18  Hovanec, herself, and her amended or revised accepted

19  statement.

20              You got to see the video.  So when

21  Mr. Theodorou tells you, hey, this is the plan that was

22  discussed and it was then Anita Green was supposed to usher

23  these kids in, and there were surprises that we had bought

24  at Walmart that were laid out on the table to distract

25  them, you got to see that for yourself.  You got to see

1    that, within a matter of seconds, literally three or four

2    seconds after Anita Green closes that screen door, you hear

3    Tim Hovanec say did you just assault me.  You saw that.

4    You got to hear Amanda Hovanec on that video say there are

5    surprises for you inside.  "What is it?  Go see."  They are

6    surprises.  These are all things that are consistent with

7    what Mr. Theodorou is telling you the plan was and was

8    discussed.

9            Mr. Theodorou told the agents where Tim

10   Hovanec was buried, and you know what, he told the truth

11   about that.  He told you, he told the agents, I'm sorry,

12   what Amanda Hovanec injected Mr. Hovanec with.  He named

13   the substance.  And you know what, he was right about that,

14   too.  He was truthful about that.  He told you she was the

15   one who committed the murder.  He was truthful about that.

16   He told you that they disposed of his car and various

17   personal affects, that they drove to Dayton after the

18   murder.  He told you the truth about that.  You know that.

19   You heard that from the agent.  You heard that from the

20   testimony in this court.

21            In some respects, some of the things he

22   tells you are not only corroborated by Ms. Hovanec, but by

23   Ms. Green, herself.  She says in her initial statement, she

24   told me something, I knew something was going to happen,

25   you know, that she tried to talk her out of it.  She told

1   her to pray on it.  She says to you in an interview that

2   she wasn't told directly, but when she went in the house,

3   she didn't hear a gunshot and she didn't see blood.  Judge,

4   if she didn't know what her daughter was doing out there,

5   why in the world would she ask herself or think to herself,

6   well, I didn't hear a gunshot, I didn't see blood.  Why

7   else would you ask yourself those things?

8           She admits in her proffered statement to

9   Special Agent Eilerman.  He testified she admitted that she

10  knew, before Tim arrived on Sunday, that something was

11  going to happen.  She admitted that she knew before she

12  drove them to the grave site that his body was in the car.

13  She admits that she lied in her initial statements.

14          We know that she lied in the phone call with

15  Detective Little with Special Agent Eilerman listening in.

16  I mean, the call starts, and I mean, they are three seconds

17  in, and she's saying should we be concerned?  What is that?

18  That's not a truthful statement.  It's three days later.

19  Do you want to talk about somebody who's not telling the

20  truth here, the government submits to you that it's Anita

21  Green.

22          She continues to try and, "look over here,"

23  deflect.  What does she say in that very first phone call,

24  you know, I wasn't going to bring this up, but, but I'm

25  concerned.  Tim has an automatic rifle of my husband's and

1    he's never brought it back.  I'm concerned.  What is there

2    to be concerned about?  She knows he's dead.  She knows her

3    daughter's done it.

4              They go out to her house to interview her,

5    she tells Special Agent Fulmer in the recording all about

6    these multiple IDs and 50 credit cards and his picture with

7    the name of Juan Sanchez.  "I'm concerned something else is

8    going on here."  She's lying.  She's not concerned.  She

9    knows what's going on here.  She knows he's dead and

10   buried.  She says, later on in the interview, are you

11   telling me -- what are you telling me?  Are you telling me

12   Tim's injured?  Really?

13             The facts of this case, Judge, are so

14   horrific.  Horrific.  It makes no sense why Mr. Theodorou

15   would put Anita Green in this if she wasn't in it, if she

16   didn't know.  If he wanted to bury her, he could have put

17   her in it much earlier; he doesn't.  He says, hey, as far

18   as I know, first time she became aware of it was Friday.

19   Very openly discusses the conversation.

20             And you know who else he puts in it?

21   Himself.  This is not a situation where he's saying it's

22   them and trying to mitigate his involvement.  He's not

23   trying to mitigate his involvement one bit.  He's part and

24   parcel.  He admits what he's done.

25             I ask you, Judge, who would know about the

1   location of where this grave was dug?  Who lived there?

2   Who lived a couple miles that we've heard the distance from

3   Ms. Green's house to where the body was buried?  Well, I'll

4   tell you who would know, and I'll tell you who doesn't live

5   there, and that's Mr. Theodorou.  The first time he met

6   Anita Green was early in April in 2022.  It's the first

7   time he's been there.  He has no idea.  But you know who's

8   lived there all her life?  Anita Green.

9              Speaking of credibility determinations, and

10  another basis for our argument that Ms. Green is not

11  entitled to an acceptance of responsibility, offered

12  statements under oath to you at the time of her change of

13  plea hearing.  And, Judge, for good reason, you were

14  painstakingly clear with her.

15             We went through those facts a couple of

16  times.  And you would say:  Did you hear her?  Did you

17  understand what she said?  And you would give her an

18  opportunity to respond, as you should.

19             And she said, and it's quoted in the memo,

20  you asked her, "Well, did you do what Ms. Sterling says you

21  did?"

22             She says, "The knowingly."

23             You said, "Say it again."

24             She says, "I said that I'm questioning the

25  knowingly, like, that there was -- I forget how you

1  started."

2          You said, "Well, what part of what she

3  said -- what are you quibbling with about knowingly?  What

4  are you saying you don't know?"

5          She said, "I don't know what they did."

6          You said, "Well, did you know that they --

7  did you know that they killed T.H.?"

8          She said, "I did, after the fact."

9          That's not what she said in her proffer.

10          You said, "Okay."

11          And she said, "I just don't know how."

12          That is categorically false from listening

13  to the recordings that were played here today.  She says,

14  at a minimum, even if you discount everything that

15  Mr. Theodorou says and testified to here today, she said,

16  her words, she told me there was poison.  Initially, she

17  didn't tell me there was a syringe, but later on in the

18  interview, she did say that.  She told me there was a

19  syringe.  This was all happening fast, minutes before, as

20  Tim's pulling into the driveway.  Her own statements belie

21  what she said to you under oath at the time of her change

22  of plea.

23          It's for those reasons that the government

24  believes an adjustment for acceptance of responsibility is

25  not appropriate here, and we ask you to deny her that.

```
 1                    THE COURT:  Mr. Friedman.

 2                    MR. FRIEDMAN:  Thank you, Your Honor.

 3                    Your Honor, I was and remain certain that

 4    Ms. Green has admitted to a crime.  We are sitting here

 5    talking about something that she has been clear on that she

 6    did.  And she acknowledged her conduct, that which has been

 7    proven by her own words and the recordings after the fact.

 8                    And I have to say that I'm -- I respect my

 9    colleagues immensely, but I'm really troubled by the fact

10    that they accept and feel that even though they knew back

11    then, if they sit here today and they say Mr. Theodorou

12    talked about planning early on back in 2022, that was known

13    when there was an agreement that the reduction was

14    warranted.  That wasn't news.

15                    These are excellent prosecutors.  They read

16    their stuff early on.  But now, all of the sudden,

17    Mr. Theodorou says something and, therefore, now somebody

18    is no longer entitled to their acceptance?  Something that

19    they already admitted to?  It makes a defense lawyer not

20    want to engage in any discussions of a resolution if that's

21    what we do.  It's the second someone who has something to

22    gain, something to benefit, gets up there and says, oh,

23    yeah, this is what happened.

24                    Anita has accepted what she did, and I have

25    plenty to say, but I'm going to ask right now, because this
```

```
 1   morning or this afternoon, when there was discussion as to
 2   Ms. Hovanec's acceptance of responsibility, the government
 3   stated that there are absolutely no sorries, there's no
 4   apologies, there's nothing, and that was part of the
 5   argument that was utilized against Ms. Hovanec to not give
 6   credit for acceptance.  And so I think we are going to
 7   check that box right now and, again, apologize, and I would
 8   ask the Court to allow Ms. Green to read her statement in
 9   this courtroom, and then I would like to pick up from there
10   with the remainder of my argument, because I think her
11   statement, obviously, is part of my argument.
12                   THE COURT:  Sure.
13                   MR. FRIEDMAN:  Thank you.
14                   THE COURT:  She's welcome to stay seated.
15   It's late in the day and I don't want --
16                   THE DEFENDANT:  Thank you.
17                   THE COURT:  -- people passing out.
18                   THE DEFENDANT:  I just want to open that I
19   don't think any parent, any mother can fathom what happened
20   in a matter, for me, getting home Sunday around 4:30 and --
21   and Theodorou, Mr. Theodorou coming in Wednesday, if that's
22   the day that he's saying that I had any background
23   knowledge.  So whatever seems rational was irrational to
24   me, and I think it is irrational, but I want to say that
25   there hasn't been a day that I don't kneel down and sob on
```

1  the floor in a pillow, that there's not someone that comes

2  to my home and I don't ache and feel with deep regret and

3  sorrow that I did not take the actions and inactions that I

4  did.

5          I had broken down and cried tears for what

6  is lost.  I cry for Tim and his life, I cry for the

7  grandchildren, who, my granddaughters that are severely and

8  permanently injured.  They lived in my home.  I loved them.

9  They came to visit.  I'm sorry.  Everyone is severely and

10  permanently injured.  I shed tears and deep sorrow for my

11  daughters, their husbands, and grandchildren.

12          I have cried for Tim's parents.  Your name

13  is on my prayer board.  I pray for you every day.  I pray

14  for Tim's family every day.  And that comes with tears.

15  That comes with humility and shame and trying to overcome

16  guilt.

17          And I cry for all our families and those

18  extended, my brothers and sisters and aunts and uncles, and

19  the tragic circumstances of their communities, their

20  church, their friendships.

21          I think about how I reacted in a surreal and

22  shocking circumstance.  And maybe you can all imagine being

23  in the same circumstance, but I could never, wishing I had

24  made the right decisions in those moments.  Regrettably, as

25  a mother, it was the worst decisions of my life.  The

1   worst.

2              I remember and know what is lost.  I kneel

3   often with a contrite and broken-hearted prayer.  The

4   tragic loss is real.  The shock, grief, and pain remain,

5   and the sorrow still sustained.

6              When awakened and with a demanding

7   insistence from my daughter, I drove the vehicle with

8   Sam's -- with Tim's body instead of refusing and dialing

9   911.  And subsequently, I was untruthful with law

10  enforcement.  I admitted to that when initially questioned

11  regarding Tim being missing.  This was -- is the horrific

12  and sad reality.

13             I want to do everything I can to help the

14  innocent victims of this senseless loss of life.  While the

15  circumstances are shocking and unthinkable, as presented to

16  me, I must be very clear that I make no excuse, none, for

17  my conduct and wrong choices.  I lapse sound judgment and

18  failed the law completely.  Never would I have thought that

19  I could conduct myself in this way.

20             In hindsight, I remain in surreal disbelief

21  that I did, in fact, act as an accessory after the fact for

22  the crimes committed by my daughter and Mr. Theodorou.  I

23  did this and cannot change the moment, no matter how

24  desperately I wish otherwise.  I can't undo what I've done,

25  and I will forever live with that.

1          I am so sorry to everyone that was hurt by

2    my actions.  It made this horrific situation worse.  I

3    would give anything for it to have been taken off my plate

4    away from me, but it was in my home.  Two people came into

5    my home, and I am so deeply sorry that I did not react

6    differently.

7          MR. FRIEDMAN:  Thank you, Your Honor, for

8    allowing Ms. Green to speak at this juncture.

9          I go further, Your Honor.  We stand here for

10   the very offense, the very offense she pled to, the very

11   offense to which she accepts responsibility for, the very

12   offense of which has been substantiated to any degree

13   beyond speculation, which I'll speak about in a moment.

14   And if that's not sufficient for acceptance of

15   responsibility, because we are going to now go back to

16   evidence that is given meaning that was known back when in

17   2022, and a murderer and an acknowledged liar takes the

18   stand and says, yeah, I would do anything for my daughter;

19   yeah, I'm hoping to get time off my sentence; yeah, I do

20   this for a benefit, that's what's going to overshadow

21   someone's clear acceptance of responsibility?  I'm not

22   accustomed to that, quite honestly.

23          And so this lying of he told the truth in

24   some instances, that's great.  That's fantastic.  There's

25   no rule that says you have to tell the truth one hundred

1    percent of the time.  If you lie some of it, how many times

2    does one have to lie to be considered a liar?  He

3    acknowledged himself, he can't even count the number of

4    lies that he has told, yet the government wants to take the

5    few things that were corroborated, only after he was

6    confronted with the evidence, and say, you see, you see,

7    he's truthful.  That means he's truthful here.  I'm sorry,

8    that's troubling.

9              And the "why."  I just heard why would he do

10   this?  Well, one need not go back far to remember what he

11   said from the stand only hours ago.  He's getting a

12   benefit.  He didn't come forward until that benefit was

13   presented him.  And we are going to sit here now and say

14   that the guy who has lied for years -- and not little lies

15   like, hey, kid, did you eat that food I left out?  This is

16   a guy who killed somebody.  But we are going to say but we

17   found a few things and we were able to corroborate.  He

18   brought us to the body.  He admitted that they did it.  But

19   you are going to disregard his own testimony that says I've

20   lied so many times, I can't tell you how many times, and

21   that's enough to get rid of someone's acceptance?  That's

22   scary.  Talk about a chilly precedent.  That changes all

23   discussions a defense lawyer has to have with the

24   government.

25              The question that was just asked, who would

1    know?  Who would know about this property that was only

2    down the road from the house?  Well, Mr. Theodorou answered

3    that question.  So if the government's going to affix such

4    veracity to him and such truthfulness, well, then, sure.

5    He said Amanda knew, also.  Because I asked him that

6    question, were you aware that Amanda knew of that property

7    since she was a kid, and he said, yeah, she told me that.

8    So that's who else would know.

9                So many times we see a situation and if five

10   people see a scenario, they affix to themselves its

11   meaning.  They assume what has happened.  And here, there

12   are so many facts and statements, some true, some not true

13   coming in, that this narrative has been accepted.  This

14   narrative of the car pulled up, Ms. Green grabbed the kids,

15   this was all planned, this was all preconceived.  All of

16   this was ready to go and she ran inside.  But what everyone

17   fails to acknowledge in the room is the fact that this is

18   what happened every time the car was there.  This was a

19   divorce case.  And can anybody really sit here and say that

20   Amanda didn't say take the kids inside because two parents,

21   who hated each other at the time, unfortunately, were going

22   to speak to each other, were going to yell at each other,

23   were going to do anything and didn't want that said in

24   front of the children?

25                Nobody knows exactly what was said except

1    for Amanda.  And yet, we sit here and we make -- we assume

2    and we speculate.  And those words are critical.  And those

3    words are critical, because I'm going to draw on, in a

4    moment, the number of times that the government tried to

5    have it the other way today during the sentencing of

6    Ms. Hovanec.

7                 The government, during the hearing today,

8    and I will read verse, each time that the government said

9    you have to have corroboration, you can't just simply

10   speculate.  And you can't have it both ways.  You can't

11   require that in one hearing, but then say but you don't

12   need it in another.

13                So a murderer was put away today.  Another

14   murderer will be put away, whatever sentence that may be.

15   This person to my right, Ms. Anita Green, is ready to face

16   the consequences for her actions.  She has always

17   acknowledged what she did after the fact.  Why didn't the

18   government -- the government's not in the business of doing

19   defendants favors.  If the -- if the -- if they could have

20   established early on that she was engaged in the planning

21   of this, why wasn't she charged with this?  Because the

22   only time they had enough evidence to really meet any

23   burden at all is when an acknowledged liar took the stand

24   and started saying what he said, while acknowledging, at

25   the same time, that, yeah, I didn't say this before and I

 1    didn't say it until I was offered potential benefit.  And

 2    yes, he acknowledged to my question he's hoping to shave

 3    years off of his sentence.

 4                    I mean, I brought up the word surreal before

 5    with Agent Eilerman.  This kind of seems to be.  I don't

 6    understand, if we are talking about the scales, I'm looking

 7    at your scales of justice on your bench, and I'm sitting

 8    here looking at what's been substantiated and that which is

 9    now being relied upon to undermine that.  It's not even in

10    the same ballpark.

11                    So when I say to you that the government

12    can't have it both ways, it was stated today during

13    Ms. Hovanec's sentencing.  It was a question of what is

14    apparent.  What is apparent is what was asked today.  And

15    it was also stated that there were no sorries anywhere.

16    Well, what's been apparent in this case, what has been

17    corroborated has also been corroborated by Ms. Green.  Did

18    it come at the start of the case?  No, it didn't.  She

19    lied.  Did she lie to the officers?  Yes, she did.  Did she

20    conceal?  Yes, she did.  She did commit a crime.  She

21    violated the statute for which she pled guilty.  So all of

22    this discussion about did she, you know, did she, in fact,

23    drive to the bury site, did she, in fact, lie to the

24    officers, we could have saved a lot of time, because we

25    would have acknowledged, yes, that's why she pled guilty.

```
 1              So there was no explanation -- this was
 2    stated, also -- there was no explanation as to why she's
 3    sorry.  Well, we just heard why this woman is sorry.  One
 4    of the things that I heard today, there was discussion,
 5    defense counsel -- is it Klucas?
 6              THE COURT:  Klucas.
 7              MR. FRIEDMAN:  Klucas, thank you, talked
 8    about it being unlikely, because people change, that this
 9    would recur.  Situations wouldn't, you know, wouldn't be
10    the same situation years down the road.  And the government
11    responded with that's speculative, at best.
12              I feel like we examined speculation today.
13    Even Agent Eilerman, and I thanked him for his service, he
14    acknowledged truthfully that part of this assessment is
15    speculative.  And we affix, to what people do, our
16    opinions.  Sometimes we are right and sometimes we are
17    wrong.  Well, it doesn't help -- it doesn't help us to
18    formulate opinions when liars are inserting equations into
19    this algorithm.  It doesn't help.  And when you want to
20    believe a certain narrative, hence, the government,
21    obviously, does, and I say that respectfully, because
22    they -- they are here asking that she not get credit for
23    what she has done, it doesn't make much sense.
24              I think, Judge, what's important here is
25    three defendants, two of them have pled recently.  This
```

1    defendant, Anita Green, pled almost a year ago.  It will be

2    a year and a week she pled guilty to this offense.  She

3    pled early on with the representation of the government

4    that she would cooperate, cooperate against her own

5    daughter, if need be.  And she pled believing that if she

6    did, the other defendants in this case would see and

7    hope -- she wasn't offered anything -- but would see and

8    hope that -- that they would see that she could, in fact,

9    testify against them.  Now she was not called for her use,

10   because they ultimately pled.  But she didn't wait, unlike

11   the others.

12              Her acceptance of responsibility, what else

13   is corroborated?  What else is corroborated is that the

14   family, God bless them, but the family in this case brought

15   a civil suit, the lawyer Jedidiah Bressman.  If he were

16   here today, what he would say is one person settled their

17   case.  One person acknowledged their conduct by settling

18   the case.  One person paid to settle this case because of

19   their conduct.  This is so outlandish that we are sitting

20   here even having a conversation about a person that I would

21   want triple locks on my door if he came to my home.

22              So the government went on and on today

23   during Ms. Hovanec's sentencing, and they said there is no

24   evidence to substantiate in response to the defendant's

25   claims.  Nothing was substantiated.  But here, it doesn't

1    have to be?

2              Amanda's -- what was corroborated?  Things

3    like Amanda's meeting with the hitmen.  There were text

4    messages.  That was corroborated.  Amanda saying that the

5    decedent broke the nose of the ex.  That was they went to

6    get evidence of that and even the government went and got

7    domestic violence reports from years ago.  Amanda traveling

8    to Africa.  The reasons these things have to be

9    corroborated is because we can't just take the word of

10   people at all times.  Particularly someone who is a coin

11   flip on what comes out of his mouth.  But here, that's not

12   necessary?

13             Amanda, earlier on.  We heard the government

14   say earlier in during Ms. Hovanec's sentencing, Amanda said

15   that the defendant drove to the burial site.  She didn't

16   say anything about planning before that.

17             Again, the government said, when talking

18   about this confluence of factors making a situation not

19   likely to recur, speculative at best.  When talking about

20   Dr. Jolie Brams' report, the response, there is nothing

21   objective to this.  The question, whether or not she had

22   gotten all of the evidence in the case.  Questioned how

23   much of it was opinion and how much was speculation because

24   the corroboration is questionable.

25             The government, during sentencing, stated

1    there has to be a question of validity because it's not

2    substantiated.  There has to be consistency in the way the

3    government presents its case and there must be consistency

4    in what follows in a court with the law.

5              Amanda Hovanec knows perfectly well what

6    happened that day.  Mr. Theodorou has his truths, whatever

7    they may be at.  I don't feel we got them all today.  And

8    Ms. Green has hers, and she told you a year ago that she

9    was guilty of what she did.  And for you now, Your Honor,

10   to discard that, respectfully, based upon what we have

11   here, I don't believe is warranted.

12             The last portion of it now, with the

13   emphasis on what was told you back in October, Ms. Green

14   was simply telling you what I'm telling you.  Maybe not as

15   artfully, maybe not as articulate.  She's not a lawyer.

16   She doesn't spend time in these rooms, and she's never been

17   in a situation where she stands as a defendant, the United

18   States of America versus Anita Green.  And she told you

19   that she admitted to everything she knew, and just because

20   that was after the fact the same thing she pled to, now the

21   government has an objection to that?  That's not just.

22             Thank you.

23             THE COURT:  Ms. Sterling.

24             MS. STERLING:  Thank you, Your Honor.  Just

25   briefly.

1           Mr. Friedman spent quite a bit of time here

2   discussing my comments at the Amanda Hovanec sentencing

3   and, particularly, when I talked about her lack of remorse

4   and lack of substantiation as it relates to her claims of

5   abuse.  Judge, in large part, my arguments there I think

6   he's mischaracterized in that one of the bases upon which I

7   was arguing that Ms. Hovanec should not receive acceptance

8   of responsibility, and one that's been recognized by this

9   Circuit, is if, at the time of sentencing, the defendant

10  has not expressed true remorse.  That is not the basis upon

11  which I am arguing that this defendant should not receive

12  an adjustment for acceptance of responsibility.  The family

13  can speak to how they feel about her level of remorse, but

14  that's not a legal argument that I'm putting forth as it

15  relates to this defendant.

16          You know, he says, you know, what's the

17  difference, that they have to be consistent, you have to

18  hold them to this standard, this level of proof, on and on

19  about things I said at the hearing with regard to

20  Ms. Hovanec.  And I'll tell you what's different.  There

21  was nothing but speculation in a report that was submitted

22  by someone who never came into this courtroom and raised

23  his or her hand for you to look at and listen to and judge

24  and determine with your own eyes and ears whether or not

25  you thought they were telling you the truth, and that is

1    the critical distinction between what was being discussed

2    at Amanda Hovanec's sentencing earlier today and the

3    testimony of Anthony Theodorou that was offered to this

4    Court this evening.

5            You know, he asks what's changed, she

6    admitted, I don't know why we are here, we wasted a lot of

7    time, she's pled to her crimes, she admitted she lied at

8    the beginning, why are we doing this.  Judge, she's

9    admitted she lied at the beginning of the investigation to

10    the officers.  Our point is that she continued to be

11    dishonest with you under oath at a change of plea hearing.

12            And what has changed and what caused the

13    government to file a supplemental sentencing memorandum,

14    because I will note, we did not initially object to the

15    adjustment for acceptance, but what has changed is this.

16    Yes, the proffer information from Anthony Theodorou, which

17    was in February, but even then, it wasn't until September,

18    just a few weeks ago, that Amanda Hovanec's counsel

19    submitted a revised acceptance statement.  And in that

20    statement, as noted in our memo and as testified to

21    generally by Special Agent Eilerman this evening, she

22    corroborated important details about the crime itself

23    including that the grave was dug in advance.

24            We believe that is the extra credence, the

25    extra reliability, the extra basis in addition to the sworn

1    testimony of a witness that you were able to listen to and

2    judge that makes this different and caused us to file the

3    sentencing memo and make the argument that we are making.

4               Judge, at the end of the day, do you believe

5    him?  And if you do, then she's not entitled to acceptance.

6               THE COURT:  Thank you.

7               Well, as it comes to, let me just unravel

8    this a little bit.  As it comes to Ms. Green's acceptance

9    at the time of her plea, she was very particular about she

10   only knew about anything after the fact.  I believe, and I

11   assessed Mr. Theodorou's credibility on the stand today, I

12   believed him when he said she drove them out to the grave

13   to dig the grave the day before.  I find that credible.  I

14   don't find any reason for him to lie about that.  I guess

15   you can paint him and say everything that he does is a lie

16   because he's trying to save his skin, and I understand

17   that, I have evaluated that, but I watched him testify.  I

18   found that credible.  I found words coming out of

19   Ms. Green's own mouth during the recorded interview about

20   knowing about poison and not syringes and then syringes.

21               So it's inescapable for me to conclude, in

22   hindsight, looking backwards, as I must, judging on what I

23   have seen and heard, that she did, in fact, know that this

24   plan was afoot, and by driving them out to dig the grave

25   the day before the murder, I'm very troubled by her parsing

1   the word "knowingly" and making a big deal about after the

2   fact at the time of her change of plea.

3              I don't believe I've ever not granted

4   acceptance of responsibility before, but I don't believe

5   I've ever seen somebody caught parsing relevant conduct

6   like this the way that she did.  I mean, I, frankly, think

7   there's room that she could well, in hindsight, have been

8   included as a potential co-conspirator here.  That's how I

9   see it looking backwards today.

10             And I suspect we disagree about the

11  credibility of Mr. Theodorou, but I believe he was

12  testifying truthfully.  And I have to make that

13  determination.  That's what I get paid to do, and that's

14  what I'm doing.  Has he been a liar?  Yes.  Is he a

15  potential murderer?  Yes.  Did he -- I think he told some

16  dishonest -- I think he was dishonest from time to time on

17  the stand today when he said he didn't know what was going

18  to happen as of Friday into Sunday.  And I don't know where

19  his motivation comes from to say it one way or another.

20  But, also, I don't know what motivation Ms. Hovanec had in

21  her acceptance of responsibility, which the government has

22  pointed out, as corroborating Mr. Theodorou's statement

23  here.  I don't see where she gained anything by

24  acknowledging that Ms. Green was aware of this.

25             So I find that she did mislead, or let's say

```
1   lie or not be candid at the time of her acceptance of the
2   factual basis for the plea.  And she was -- she was too
3   clever by one-third at that time in going back there, and
4   this might have all just blown by, but she very carefully
5   took apart the word "knowingly" because I suspect it
6   somehow was throwing her under the bus or something, but,
7   so I'm going to -- I'm going to grant the government's
8   objection, sustain the government's objection to the
9   acceptance of responsibility in this case and not include
10  those three points reduction in the calculation, which, and
11  I'm going to overrule, probably predictably, all of your
12  objections for the reasons that we've just gone through.
13              I believe she was substantially more
14  involved than I was led to believe at the time of her plea,
15  and I believe that your objections to the failure to put in
16  all of those reductions that you've asked for is not
17  warranted.
18              So that puts us at a level 30, Criminal
19  History Category I, which would be a guideline sentence of
20  97 to 121 months.
21              I guess I'd be interested to hear from
22  counsel for both sides, and I'll begin with the government
23  as to where you think -- are we done, otherwise?
24              MS. STERLING:  I believe so, Judge.
25              THE COURT:  Do you have victims that --
```

```
 1                    MS. STERLING:  I do.

 2                    THE COURT:  Okay.

 3                    MS. STERLING:  There are a number of people

 4    that want to speak.  Before we get there, however, could I

 5    just make sure that the record is clear that you are

 6    denying the remainder of defense counsel's objections as

 7    noted in the PSR?  I know he said he's relying on the

 8    briefing.  We are, too.  I just want to make that clear.

 9                    THE COURT:  For the reasons that we've just

10    plowed, and I find that she is not less involved than what

11    otherwise would be the case, but more involved.  There's no

12    basis for any of the objections that would otherwise

13    minimize her involvement in this case.

14                    MS. STERLING:  Thank you, Your Honor.

15                    With that, I would ask the Court permission

16    at this time to present any victim impact --

17                    THE COURT:  Absolutely.

18                    MS. STERLING:  -- statement?

19                    THE COURT:  Do we need a break, first?  Is

20    anybody going for fall over here?

21                    Particularly, I'm looking at Diana here.

22    Are we okay?

23          (Whereupon, a discussion is held off record.)

24                    MS. SLOAN:  Thank you, again, Your Honor.

25                    I'm huffing and puffing, because, for the
```

1    past four or five hours, I've been hyperventilating over

2    what I've been hearing.  And it tends to get me dizzy and

3    this is exactly what -- what has resulted me ending up in

4    the hospital in the emergency room a number of times.

5              THE COURT:  Would you get her a glass of

6    water?  Looks like you are doing that.

7              MS. BAEPPLER:  Yes, Judge.

8              THE COURT:  I'm not a nurse, but I can

9    prescribe --

10             MS. SLOAN:  I am.

11             THE COURT:  And I'm going to prescribe water

12   PRN, so.

13             MS. SLOAN:  Thank you.

14             This picture, while -- I'm waiting to drink

15   the water.

16             This picture, which is a still from the

17   film -- and I will show it to counsel, and I don't know who

18   else you need to show it to -- says it all.  It says that

19   Anita and Amanda stood there waiting casually for Tim to

20   come so that they could kill him.

21             It's -- the proof is here, all of the

22   testimony and everything else.  She helped.  She was there.

23   She saw.  She knew.

24             THE COURT:  Mrs. Sloan, I am just going to

25   ask you to talk to me and not her --

```
 1                    MS. SLOAN:  Thank you.

 2                    THE COURT:  -- please.

 3                    MS. SLOAN:  Sorry, I was just showing.

 4                    THE COURT:  Yeah, I understand.

 5                    MS. SLOAN:  I would -- yeah.

 6                    THE COURT:  Just take a deep breath.  Take a

 7    drink of water.  We are okay.  There's no rush.

 8                    MS. SLOAN:  And I want to say that I made a

 9    previous statement, and I felt that the prior attorney

10    dismissed that.  He said -- you know what kind of work I

11    do, Your Honor?  A hard one.  Victim's statement, you've

12    heard them all.  I hope that this won't be dismissed.  I

13    put a lot of time and effort, as Your Honor saw.

14                    THE COURT:  Well, I hope -- I hope you are

15    not left with the conviction that I dismissed --

16                    MS. SLOAN:  No.

17                    THE COURT:  -- anything that you wrote or

18    said.  And I can represent to you that I shed some real

19    tears plowing through this stuff, as did my staff.  So if

20    you've somehow been taken of the notion that this hasn't

21    affected me, I need to disabuse you of that, because that

22    is not the case.

23                    MS. SLOAN:  No, Your Honor.  I was referring

24    to a prior attorney.

25                    THE COURT:  Okay.  Well, that's then.  This
```

1    is now, okay.

2              MS. SLOAN:  When I first met, and the only

3    time, in fact, that I met Anita, was at her husband's

4    funeral.  My husband and I came up and she said to me,

5    Andrea, I don't know what we could have done without Tim.

6    He mowed the back 40.  He fixed things around the house.

7    He did all these kinds of things.  He was the son that we

8    never had.  And all through, you know, throughout that

9    period, I never heard any reason for her to dislike him.

10              But, now, look where we've come.  We've come

11   to a picture like this, where she's standing there, with

12   no -- with -- not even as a son, but just total disregard

13   for his life.

14              All -- I'm not going to repeat all of the

15   things that have been mentioned about the actions with the

16   burial site, and they are just simply cruel, unfeeling,

17   cold-blooded.

18              I hold her and, frankly, I hold her entire

19   family responsible.  I've been battling with Holly, Holly

20   Green, as I said, since June of 2022, for custody of these

21   children.  And all that Holly says is we're a close family,

22   we're so close, we are a close, extended family, we do

23   everything close.  The girls were up at our house for

24   Christmas, for New Year's, for birthdays, for Fourth of

25   July.  Yes, that's true, they were, because they were all

1    so close.  She would have us believe, as would Anita, that
2    they never talked about anything that Holly felt towards
3    Tim.  She planned for a year to kill him and she never
4    talked to her sisters?  We've heard some testimony today
5    that she did, that Samantha was, in fact, involved in -- in
6    some discussion.  I don't know where the Court has come out
7    on that, but just simply saying we've heard that, but my
8    point is this was this big, close family.  Number one, they
9    deprived Tim of his visitation by being so close and
10   isolating the children from him over the last seven months,
11   and they were all in on that, because Holly didn't have the
12   girls on Christmas and New Year's and their birthdays
13   without knowing that Tim had visitation.  She may not have
14   known the exact dates, but she knew that he had visitation.
15   And yet this family isolated and conspired and kept them
16   together.
17              And I'll tell you one of the most incredible
18   things to me is this family did not give me one syllable,
19   not one syllable of an apology.  The first thing I heard
20   from Holly Green, and I know this is not Anita -- Anita
21   never apologized, so we can just stop right there -- but
22   the first thing I heard from Holly Green came in the form
23   of a court paper, and she's filed repeated papers and
24   repeated papers, and Anita has helped her by financing her.
25              Anita has -- and she gave, what, $2,500 to

1  Caleb, which is, in effect, financing Holly.  We've also

2  heard that other family members have financed these actions

3  against us.  And I don't see that as being sorry.  And

4  Anita is the matriarch, and the matriarch, when she

5  distributes $165,000 in one month, gee, I don't see that as

6  holding back and not supporting family and doing these

7  kinds of things.  And that's exactly what she did.

8              And I bring that up because she

9  poor-mouthed.  She mentioned her attorney mentioned she's

10  the only one who paid on the wrongful death case.  True

11  enough, because she misrepresented her holdings and her

12  earnings and her income and the value of her farm to such a

13  great extent that we low-balled.  We said, okay, we'll

14  take, you know, if you've got a farm worth $236,000 and you

15  sell it, well, you know, you can't get blood from a turnip.

16  We later found out that she didn't have the whole farm

17  sold.  I looked on the records and it said she only sold

18  two acres in a sweetheart deal to a Green family member.

19              So many of these things, so much dishonesty.

20  So much.  If she felt the least bit sorry about what

21  happened to Tim, Hallmark, 99 cents.  All the other family

22  members could have gotten together.  Instead, what we got

23  was tortured by this family and it continues to this day.

24  And to the extent she's still doing it, you know, I don't

25  know.  You know, it just goes on and it just belies any

1    sorrow that she may have had towards Tim.

2                    The girls, how does a woman betray her

3    daughter?  How does she betray her grandchildren?  These

4    are beautiful little girls, and she didn't have the least

5    bit of consideration for them.  Beautiful little girls who

6    could have given her so much joy who lived with her, and

7    she betrayed them.  She -- she -- she made orphans out of

8    them just as much as Anita did -- as much as Amanda did.

9                    She keep -- well, the other thing is we have

10   talked to the girls, and the girls told us that Nona, you

11   know, was waiting out there, and she had new toys for them

12   and she snatched them in.  That doesn't quite jive with

13   what I've heard from her saying.  There is a few seconds

14   missing in there.  But the girls do seem to corroborate

15   that she was out there waiting for a while.  Tim came and

16   she got the girls and there was some time difference.

17                   Oh, and I asked the question of who was home

18   with the girls while she was off picking up the criminals

19   at the burial site?  Did she leave these three little girls

20   home alone while she went out to drive them?  I mean, it's

21   the -- it's, you know, a rural area.  Maybe it's not as

22   dangerous as Washington DC, but you don't leave three

23   little girls at home alone, and that seems to be what she

24   did.

25                   I resent the -- I just found it so funny

1    that she used all her skills that she obtained from being a

2    county -- whatever she was with the U.S.D.A., and she used

3    them to give advice on where to bury the -- and I just

4    thought that, and Amanda -- well, it's not Amanda's, but.

5               Well, the other thing is she was one of the

6    ones who continued to -- continues to try to keep the girls

7    from seeing us by -- by keeping, well, by helping Amanda to

8    keep them away from us.

9               Let me just -- oh, I find it interesting

10   that she has 18 or 20 or 30 or 50 letters of reference.  Is

11   there a one -- one-bite rule for murder?  I don't know.

12   You know, I don't care how wonderful a person she was, this

13   is such a heinous crime.  Her part in this was such a

14   heinous crime that I don't think she really should be

15   excused from that, and I really don't think the letters

16   make a whole lot of difference.

17              I have a situation, we've told you how much

18   this has impacted my family.  I won't repeat that.  My

19   92-year-old mother cannot be told what happened to Tim,

20   because it would kill her.  And we have to make excuses.

21   Where is Tim?  Where's the girls?  Oh, Tim had to travel.

22   He had to be out of town.  And all of this because she

23   couldn't step out there.  And it's just more heinous than

24   ever a crime, she couldn't step out there and say, Tim,

25   watch out.  Tim, get out of the way.  She couldn't get

```
 1   mental health treatment for her daughter, who my son
 2   provided the best possible insurance for, and she couldn't
 3   get her mental health treatment.
 4            So while we blame everybody else, I really
 5   hold her, in some ways, more responsible than Amanda
 6   because she could have prevented this and she didn't.  And
 7   now there's three little orphan girls who have lost half a
 8   family, which is regrettable.
 9            And all the other things they've suffered
10   through, all the other physical things we've suffered
11   through.  My husband had to go through chemotherapy this
12   year fighting off Holly and her court cases, and fighting
13   off all the tension that this has brought.  All because
14   Anita couldn't say, Tim, get out of the way.  She's trying
15   to hurt you.
16            Thank you.
17            THE COURT:  Thank you, Mrs. Sloan.
18            MS. SLOAN:  One more.  One more.
19            I showed this this afternoon, and I just
20   wanted Anita to see this.
21            Anita, this is what you did to us.
22            THE COURT:  Please don't talk to her,
23   Mrs. Sloan.  Just talk to me.
24            MS. SLOAN:  I need Anita to see the hopes
25   and dreams and prayers and hard work and all the things he
```

```
1    did for the family, and this is what we have ended up with.

2    We had the little girls, had to drive up the driveway and

3    hide their eyes so they couldn't see this.  This is Tim.

4    Sorry.

5                    (Pause in the proceedings.)

6                    THE COURT:  Thank you, Mrs. Sloan, and for

7    your written submission.

8                    Welcome back, Daniel.

9                    MR. DANIEL HOVANEC:  Yeah, I don't know how

10   to make it turn.

11                   THE COURT:  You are a park ranger.  You

12   should know how to do that.  Don't they teach you guys

13   that?

14                   MR. DANIEL HOVANEC:  We learn lots of other

15   skills.

16                   Hello, Your Honor.  I'm Daniel Hovanec,

17   again.

18                   I respectfully request that you sentence

19   Anita to the maximum allowable penalty.  In the interest of

20   time, I'm not going to read all of the impacts that I read

21   earlier, but I want to reiterate that Anita had the

22   opportunity before and after to do the right thing or to do

23   nothing.  Instead, she chose to take an active part in the

24   furtherance of this crime in hiding Tim's body, disposing

25   of Tim's car, and trying to help her daughter and her
```

```
 1    daughter's boyfriend get away with murder.

 2                  There are multiple opportunities.  I think

 3    that those have all been thoroughly discussed, but she

 4    chose to take an action to aid and abet and, to me, that

 5    warrants the harshest penalty allowable.

 6                  And I also, as it's been said before,

 7    everyone in here listened to the testimony, and one that's

 8    been pointed out, I find Mr. Theodorou's testimony today to

 9    be believable, as you did as well.  And so that leaves me

10    to believe that Anita continues to lie and show diminished

11    or no remorse for her involvement.

12                  Thank you.

13                  THE COURT:  Thank you, sir.  Thank you for

14    your service.

15                  MS. BARBER:  Your Honor, I would also like

16    to make a statement.

17                  THE COURT:  Well, yeah.  Come forward,

18    please.

19                  Tell us who you are, please.

20                  MS. BARBER:  Hi, my name is Jill Barber, and

21    I'm Anita's oldest daughter.  I wasn't planning on speaking

22    today, so I apologize for the extra emotion in my voice.

23                  I just wanted to say how very sad I am to be

24    here today.  So many lies were ruined by Amanda's, Anita's,

25    and Anthony's selfish actions.  On that day in April, 2022,
```

1    we lost a brother-in-law, who we had many fond memories of

2    in the early years of Tim joining our family, and it only

3    grew apart when they moved overseas.

4                    We have lost three nieces, whom we love very

5    much, and only want their safety and future happiness.

6                    For the purpose of speaking today for

7    today's sentencing hearing, I wanted to share the following

8    insight.  I have never met Anthony, and yet I find his

9    testimony to be entirely credible.  Today, I expected to

10   hear horrible and surprising things, and we have, but not

11   Anthony's description of Anita's involvement.  I actually

12   felt vindicated.  For in my heart and in my gut, I knew all

13   of those things he said to be true.  When I was notified of

14   their arrest, and we were still learning all the horrible

15   details -- there were so many -- I knew my mother's role in

16   this was planner, co-conspirator, and master manipulator.

17   And I certainly have nothing to gain by saying that.  In

18   fact, I risk hurting my grandmother and others who are

19   listening to me right now and would prefer that I rather

20   not speak.  However, those who know Anita best, that is to

21   say her daughters, we know our mother is a liar, a

22   manipulator, a narcissist.  There is a reason none of her

23   six daughters sent you a letter of support, and why three

24   of them are not even here today.

25                    I think you are about to hear from people

1    who are going to speak in support of Anita.  Many are

2    longtime family friends and even relatives, some I have

3    never even met before.  I can only say I feel sorry for

4    them all.  They have all been duped by a narcissist and a

5    serial liar, and I would challenge that they deep-down know

6    that, and perhaps they should now decline to speak to me.

7                    Your Honor, I ask that you consider Anita's

8    lifelong objective to control her life through lies and

9    manipulation.  Even today, she comes here thinking that she

10   is the victim, that this whole nightmare is happening to

11   her.  No accountability.  No remorse other than she got

12   caught.  And now, and now her lies about this tragedy, but

13   also about her entire life, can no longer stand.  People

14   found out.

15                   I hope she spends the rest of her life in

16   prison and one day is able to take true responsibility and

17   accountability for her actions in destroying two families.

18                   Thank you.

19                   THE COURT:  Thank you, ma'am.

20                   MS. HOLLY GREEN:  Your Honor, I'd like to

21   make a comment on behalf of my brother-in-law as well.

22                   THE COURT:  Any objection from -- I guess

23   not.

24                   Come forward, please.  First, tell us who

25   you are.

1              MS. HOLLY GREEN:  My name is Holly Green.

2    I'm Anita's daughter.

3              And I want to start by seconding with what I

4    agree with everything my sister, Jill, just said.  Who

5    would better to know Anita than her six daughters.  And I

6    knew as soon as I saw that video with every fiber of my

7    being that she played a big part in this.  And I beg you to

8    please give her the maximum sentence, because I also know

9    she is capable of more damage.

10             I don't think she's sorry for what she's

11   done.  I don't think she feels empathy for the pain she's

12   caused by witnessed earlier today when she was standing

13   back there so close to the Hovanec family playing the

14   victim, talking to supporters that have come to see her

15   back there, and standing so close to those she's injured

16   and not being aware of how painful that is.  She doesn't

17   get it.  She never will.  And she can't be trusted to be

18   let out.  I beg you to give her a maximum sentence.

19             The impact this has caused is immeasurable.

20   The biggest victim is Tim's family.  And she took Tim, and

21   we loved him.  And Amanda, who was sick and she should pay

22   for what she did, but so should Anita, and that continues,

23   as I do ask that the girls be given visitation to see their

24   aunts and their cousins on this side of the family, and it

25   kills me the pain that it continues to cause the whole

1   Hovanec family, and it all rolls up to Anita.  She may not

2   have provided the drug, but she provided the location.  She

3   provided transportation.  We heard she provided the tools

4   and I believe she provided outfits.

5           She is so guilty in this.  Please don't let

6   her off without the maximum sentence.

7           Thank you.

8           THE COURT:  Thank you, Ms. Green.

9           I sort of forget where we even were.  Were

10  you -- I think we were in your explanation of the 3553(a)

11  factors, Ms. Sterling.

12          Do we need a break?  Could we maybe take ten

13  minutes, because I need ten minutes, and I know it's

14  getting late, folks, but we are going to get through this.

15          We'll be in recess for ten minutes.

16          (Whereupon, a break is taken.)

17                    - - -

18          (Proceedings resumed in open court.)

19          THE COURT:  So it was my intention that you

20  all be instructed as you entered the courthouse today that

21  you are not permitted to have your cell phones out at all

22  in the courtroom.  I think we might have had a couple of

23  people that are playing a little fast and loose with that,

24  so I would -- I would implore, do not take your cell phone

25  out no matter what.  Make sure it's silenced or turned off.

```
1    Don't take it out to look at it.

2                    If one of the security officers sees your

3    cell phone out in the courtroom, they are going to take it

4    from you and then we'll talk about whether you get it back

5    and when you get it back, but it won't be any time -- it

6    probably won't be tonight.

7                    So, please, I'm putting you all on notice.

8    You are not permitted to take a cell phone out in the

9    courtroom, and if you do, it's going to be taken from you

10   and we'll proceed accordingly.

11                   Ms. Sterling, I think the ball was still in

12   your court.

13                   MS. STERLING:  Yes, Your Honor.  Thank you.

14                   With regard to the 3553(a) factors and the

15   government's position, ultimately, what the Court's

16   sentence should be in this matter I offer the following:

17                   You know, we all knew coming in here today

18   that the conduct that Anita Green did admit to at the time

19   of her change of plea hearing was bad enough.  Bad enough

20   to warrant a federal felony conviction with a 15-year

21   mandatory minimum sentence.  But, Judge, after today and

22   after what you have seen and heard in this courtroom, your

23   own assessment that she could have been charged as a

24   co-conspirator is one that, I'll be honest with you, the

25   government has thought for some time now.  The reality is
```

1  that she pled guilty before we had all of the available

2  information, and that's where we are.

3              The fact that she continues, to this moment,

4  to deny her part in it, frankly, belies the remorse that

5  she claims to have.  The reality is that Tim Hovanec was

6  her son-in-law, the father of these three beautiful little

7  girls that she claims to love.  And yet, she did absolutely

8  nothing to stop what she knew was about to happen, at a

9  minimum, by her own statements, what she felt was about to

10  happen.  And when you consider it in the context of what

11  Anthony Theodorou says she actually knew and did, it's

12  unimaginable.

13              You made reference at the outset of the

14  hearing to the multiple victim impact statements that you

15  have reviewed.  Of course, they detail the different

16  effects that Tim's death has had on them.  The impact, of

17  course, is different for everyone.  Those letters speak for

18  themselves.  His mother, his brother spoke here again

19  today.  Their hearts are clearly broken.

20              Shocking to the government, and I suspect to

21  you, were the statements that two of Anita Green's own

22  daughters came in here and gave you.  Two of her own

23  children came in here and asked you to impose the maximum

24  sentence.  There isn't anything more I can say about that.

25              Three children are going to spend a lifetime

```
 1   without their father, yes.  Always a terrible circumstance.

 2   But the reality is that they will have to live the rest of

 3   their lives knowing that their mother murdered their father

 4   and that their grandmother knew about it and helped.  How

 5   unimaginably horrible.

 6               We've asked the Court in our sentencing

 7   memo, and we ask you here again today, for all of the

 8   reasons that we've articulated, that you impose the maximum

 9   sentence upon Anita Green under the offense for which she's

10   been convicted, and that's a term of 15 years'

11   imprisonment.

12               Thank you, Your Honor.

13               THE COURT:  Thank you, Ms. Sterling.

14               Mr. Friedman.

15               MR. FRIEDMAN:  Thank you, Your Honor.

16               When I think about this case, it has

17   presented a lot of -- a lot of different aspects today

18   that, frankly, my seeing reference to daughters, daughters

19   coming up --

20               THE COURT:  Mr. Friedman, could I ask you to

21   either come to the podium or get -- we have wireless mics

22   if you want to wander around, but as a courtesy to the

23   court reporter, I think it's easier for her to hear you if

24   you are at the microphone.

25               MR. FRIEDMAN:  My apologies.
```

1              This case is, in a way, incredibly, one

2    could argue it's a simple case, one could argue it's a

3    complex case.  I have not seen some of the things that have

4    happened in this courtroom before, the daughters coming

5    forward as they just did.

6              I would, with the Court's permission, like

7    to turn and say one thing to the audience on behalf of

8    sentencing, if that would be okay?  This is part of

9    sentencing.

10             THE COURT:  Sure.

11             MR. FRIEDMAN:  Thank you.

12             THE COURT:  Yeah, that's fine.

13             MR. FRIEDMAN:  To the Hovanec family, you

14   know, say to the mom, that you heard something from defense

15   counsel that kind of minimized what you had said.  We all

16   play a role in our system, and as a defense lawyer, my role

17   in the system, regardless of what happens here, all of you

18   had to come, and thank you for coming, and I'm sorry that

19   you had to go through this.  No mother should ever have to

20   hold the remains of their son in a box.  And to all of you,

21   brother, nephew, extended family and friends, I'm sorry

22   that you need to be here, period.

23             And one of the things that I'm going to be

24   is short, because you've heard everything in two hearings,

25   so I need not rehash the facts.  The question is what is

1  sufficient at this point.  And I have to look at what is

2  known.  Truthfully, there's so much here to grasp onto, but

3  the thing we look at all the time with 3553 is the fact

4  that up until almost 62 years of age, there was nothing.

5  There was no prior history.  And Your Honor said something

6  during the Hovanec matter --

7            THE COURT:  You are welcome to stay back at

8  counsel table if you want.  There is a microphone there.

9  You are welcome to be --

10            MR. FRIEDMAN:  You know what, I'm sorry.  I

11  mean, I think because it's 9:00, I keep forgetting.

12  Really.  I'm not making a joke of it.  I'm sorry.  I'm just

13  going...

14            THE COURT:  All right.  Well, join the club.

15  But you are welcome to just position yourself either place,

16  I don't care, and if you want to walk back and forth, I'll

17  put a wireless on you.

18            MR. FRIEDMAN:  No, that's okay.  I'll stay

19  here.

20            But there was discussion at the earlier

21  hearing of Ms. Hovanec as to whether or not they would have

22  gone in certain directions.  I started to think about this

23  case, and I asked myself would Anita Green have ended up in

24  this situation.  And this is not to shift blame.  This is

25  not to minimize what she did.  She fully accepts that.  But

1 | this was something that I think about in my own life with
2 | my own children.  And the situation for which she has
3 | admitted to, would she have gone in the direction had this
4 | not come up.  And I'm lucky that I can sit up here and say
5 | that she was not a mastermind to all of this.  Again,
6 | that's not to minimize what she did do.  But I think
7 | whatever the sentence, whether it be a day or whether it be
8 | 50 years, do I think that this would happen again?  No, I
9 | don't.

10 | You know, you had stated before when we were
11 | talking about the acceptance of responsibility that we may
12 | disagree with your assessment and that's okay.  That's what
13 | happens in a courtroom.  But I -- perhaps we disagree on my
14 | thoughts on what is sufficient.  I look at some of the
15 | factors, stage of life, that which is set forth in our
16 | brief, and so I am not going to rehash what's in the brief,
17 | but the sentence, Your Honor, that I think comports with
18 | United States Code, Section 3553(a) is one that recognizes
19 | the fact that Mrs. Green has, while she has been out of
20 | custody, has still been on restriction.  And one could say,
21 | well, she's not been in a prison cell.  That's true.  But
22 | she's also not been as free as you or I.  Some would say,
23 | well, if I go back and forth, that's warranted.  Well, that
24 | may be, but the fact of the matter is she has sustained
25 | punishment to a degree in the last two years.

1              When this began from May 2nd, 2022, to

2    July 5th, 2022, a time of 64 days, Anita had served in

3    custody before then the detention requirements and

4    restrictions that were placed here, and I submit that it

5    has to mean something.  Twenty-six months and 26 days on

6    house arrest, the ankle monitor, it has to mean something

7    when fashioning a sentence that is sufficient.

8              You know, we had -- I think that the

9    sentence has to recognize the fact that Mrs. Green did

10   enter her plea a year ago.  I do always feel that that time

11   after someone pleas or the time that a case is being

12   litigated is not -- it's not easy-like time when one has

13   the anticipation of what stands before them, so I do

14   believe that a sentence has to take that into

15   consideration.

16             To circle back to what you said that we may

17   or -- that we may or may not agree, I do submit,

18   respectfully, that whatever sentence it is does have to

19   accurately reflect what is proveable in this case for what

20   she pled.  And the thought now of, well, she's, you know,

21   fortunate that she pled because we could have gone further,

22   a lot of that information was known as was in the reports,

23   and that's what we argued today back in 2022, and perhaps

24   not to the details, but again, these are excellent

25   prosecutors.  And she was afforded a plea agreement.  She

1   pled to that.  She accepted responsibility for that.  And

2   to now, again, say but she didn't accept for the other, I

3   respect Your Honor, your position, certainly.  I respect

4   the prosecutor's position, certainly, and all of those who

5   have come before you today to speak and all of those who

6   sit in the gallery behind us, but I submit that that which

7   is proveable is only that which was after the fact.  And I

8   don't believe that she intended to deceive you at the time

9   of plea.  I sat there, also.  And the term of "knowingly"

10  was not creative lawyering.  That was just her best effort

11  to say I did what I did.

12              I think that a sentence that is sufficient

13  recognizes her efforts to make amends.  The settlement that

14  I first heard today of the -- the belief of the low

15  assessment of the farm, that, I've not heard that before,

16  but the payment was made then.  And also in there is

17  important, and it wasn't noted today, but there was also a

18  relinquishment of the rights to the grandchildren.

19              And I also think, obviously, it considers

20  personal circumstance.  So the personal circumstance you

21  know because it's set forth in our memorandum and,

22  obviously, in a very thorough PSR.

23              So what is the ask?  The ask is to consider

24  the two and-a-half years that this has been going on, the

25  quality of life that is there and the quality of life that

1  is not there, and to add to that whatever you feel is

2  sufficient.

3          We talked about with our calculations what

4  we felt was a Zone B, level 9, which would have had the

5  guidelines above and beyond that, which she has done to

6  date.

7          And whatever it is, I would ask for a

8  voluntary surrender, and I understand that the Court's

9  recommendation for designation carries only so much weight,

10  but we would ask for FC Alderson in West Virginia.

11          And, with that, again, sorry that we are

12  here.  I speak that on behalf of my client.  This was -- I

13  will just simply close that this was an unnecessary, tragic

14  loss, and there is no -- there is no word.

15          Thank you.

16          THE COURT:  Thank you.

17    (Whereupon, a discussion is held off record between the

18          Court and probation officers.)

19          THE COURT:  So there's nothing about this

20  case that's not heartbreaking, and nobody involved in this

21  case that is anything other than -- it's heartbreaking that

22  this happened.  It's heartbreaking that I've been looking

23  at a picture of a guy who I had to listen to why there

24  might be -- there might well be people in the Middle East

25  dying because we are set back in our drone technology, and

1    three little girls are without their daddy.

2              And I look at the 3553(a) factors here for

3    Ms. Green, and I kind of clunk on the first, the first one,

4    the nature and circumstances of the crime.  You know, the

5    "what happened" part here.  I'm left with the inescapable

6    conclusion that Ms. Green helped, to some extent, with the

7    logistics of a murder.  And it's not just after the fact.

8    I'm left with the considered conclusion from everything

9    I've seen and heard here that not just that she could have

10   stopped it, but I think, you know, she facilitated it by

11   knowing about that -- that pond getting filled.  I mean,

12   there's just -- there are corroboration points, and I

13   understand Mr. Friedman has done a very good job.  I've

14   been, again, exposed to some fine lawyering here, but I'm

15   left with the inescapable, perhaps naive by me, but the

16   inescapable conclusion that she helped facilitate this by

17   taking them out to dig that, to dig that hole and provided

18   them with the shovels and the clothes and everything.

19             And, again, I found -- I found Mr. Theodorou

20   credible when he testified about that, despite his other

21   shortcomings, and he has plenty.  I found that credible.  I

22   found some statements by Ms. Green, herself, to the agents

23   early on about some knowledge that Amanda was possessed of

24   poison, and I see her conduct in swirling those three

25   beautiful little girls into her house.  I am left with the

1  inescapable conclusion that she knew exactly what was going

2  to happen in her driveway, and I saw the video of what did

3  happen in her driveway.

4            So the seriousness of the offense.  The

5  nature and characteristics of the defendant.  Obviously,

6  she has no criminal record.  She's a 60-something-year-old

7  woman.  I'll begin by looking at the guidelines, as I have

8  to do, and the guidelines here with the level 30, Criminal

9  History Category I suggests a recommended sentence of

10 somewhere between 97 and 121 months.

11           Frankly, I don't think it's fair to the

12 defendant to go above that here even though I think there

13 could be arguments to that effect, and there is a statutory

14 maximum out there of 15 years, but I feel like that would

15 be double counting against Ms. Green here.  I think she's

16 already been whacked by taking the acceptance points away

17 for what she didn't admit to by way of relevant conduct and

18 what she parsed out and was dishonest with me about, in my

19 opinion, at the time of the guilty plea.  But I think it

20 would be piling on to go beyond that.

21           But that said, I think she has every, every

22 day of the top of that guideline coming here under the

23 totality of the circumstances, because I'm left with the

24 inescapable conclusion that she was part of a murder.  And,

25 at that point, 121 months is a pretty good day to walk out

1    of the courthouse with.

2                 Under the totality of the 3553(a) factors, I

3    do find that that sentence at the top, the very top of the

4    guidelines is sufficient, but not excessive under the

5    totality of the circumstances here.  And if you need to

6    find some solace in the time that she's been out on

7    supervision, I would say, you know, add that onto the

8    guideline sentence, and that gets you up close to the

9    statutory maximum where I think this might have gone under

10   other circumstances.

11                So you might think there is a relatively low

12   risk of recidivism here that's keeping me down at the

13   guideline number for what would otherwise possibly warrant

14   an upward variance.  I've certainly heard a lot about the

15   crime.  I've heard a lot about the defendant.  And I'm left

16   with the inescapable conclusion that, in this instance, the

17   guideline gets it right.

18                So it is going to be -- and I trust whatever

19   allocution we were going to hear, Mr. Friedman, I've

20   already heard from your client.  I didn't really give her

21   another chance, but I thought that was it already.  Is that

22   accurate?

23                MR. FRIEDMAN:  That was it, Your Honor.

24   Yes.

25                THE COURT:  Okay.  Thank you, sir.

1              Pursuant to the Sentencing Reform Act of

2    1984 and 18, U.S.C., Section 3553(a), it is the judgment of

3    the Court that the defendant, Anita Green, is hereby

4    committed to the custody of the Bureau of Prisons for a

5    term of 121 months.

6              Upon release from imprisonment, you shall be

7    placed on supervised release for a term of two years.

8              Within 72 hours of your release from custody

9    of the Bureau of Prisons, you shall report in person to the

10   U.S. Pretrial Services and Probation Office in the

11   sentencing district or in the district to which you are

12   released.

13             Based on a review of the defendant's

14   financial condition as set forth in the Presentence Report,

15   the Court finds that the defendant does not have the

16   ability to pay a fine, however, this -- does have the

17   ability to pay a fine, but it's dramatically reduced by the

18   lengthy term of imprisonment she will be serving.

19   Therefore, I'm going to waive a fine in this case.

20             You must pay the United States a special

21   assessment of $100, which is due immediately.

22             We are going to defer restitution pending

23   some motion practice on that, so we can defer that up to,

24   I'll give -- the government has filed a motion for

25   restitution.

1              Mr. Friedman, I'll give you 30 days to

2    respond to that.  Is that enough?

3              MR. FRIEDMAN:  That's fine, Your Honor.

4              THE COURT:  Okay.  Thirty days to respond to

5    that.  And, ultimately, we'll amend the judgment to enter a

6    restitution order because there's certainly restitution

7    appropriate.  What we don't know is, if, under the law, if

8    Ms. Green is going to get credit for what she's already

9    paid or not, and if that comes at this level or if it comes

10   in some credit for payment after a restitution order is

11   entered.  So we have to get to the bottom of that.

12             While on supervision, you must comply with

13   the mandatory and standard conditions that have been

14   adopted by this court as set forth in part D of the

15   Presentence Investigation Report.  And you must comply with

16   the following additional conditions:

17             Mandatory drug testing is suspended.  The

18   periodic drug testing mandated by the Violent Crime Control

19   and Law Enforcement Act of 1994 is hereby suspended based

20   on the Court's determination that you pose a low risk of

21   future drug use.

22             There will be a search and seizure

23   condition.  The defendant shall submit her person,

24   property, house, residence, vehicle, papers, computers,

25   other electronic communications or data storage devices or

1    media or office to a search conducted by a United States

2    Probation Officer.  Failure to submit to a search may be

3    grounds for revocation of release.

4              The defendant shall warn any other occupants

5    that the premises may be subject to search pursuant to this

6    condition.

7              An officer may conduct a search pursuant to

8    this condition only when reasonable suspicion exists that

9    the defendant has violated a condition of supervision and

10   that the areas to be searched contain evidence of such a

11   violation.  Any search must be conducted at a reasonable

12   time and in a reasonable manner.

13             I will recommend to the Bureau of Prisons

14   that Ms. Green be carefully considered for classification

15   at FC Alderson pursuant to request.

16             I do come to a difficult point here, though.

17   My Pretrial and Probation Officers have recommended that

18   Ms. Green be taken into immediate custody.

19             I guess I would like to hear from the

20   government about that.

21             MS. STERLING:  Your Honor, we agree

22   wholeheartedly.  It was actually on my list of things to

23   ask you about, and that is that you order she be remanded

24   into the custody of the Marshals at this time.

25             She's 64 years old.  She now stands before

1    you not only convicted, but she's heard her fate.  She's

2    looking down the barrel of a 10-plus year sentence at her

3    age.  To us, this increases her risk of flight.

4              And, of course, we have always maintained

5    that she is a danger to the community.  As you know, we

6    objected to her release at the beginning of this case.  We

7    appealed Judge Clay's release order to you and we have

8    stood by patiently to wait for this day, and there is no

9    reason why she should not be taken into custody in this

10   courtroom today to begin serving her sentence.

11             THE COURT:  Mr. Friedman?

12             MR. FRIEDMAN:  Thank you, Your Honor.

13             Your Honor, the reason that is in place for

14   the voluntary surrender is for her classification that

15   would enable her to go to Alderson.  Actions thus far have

16   proven this is someone that will comply with terms.  She

17   has the ankle monitor on.  There has not been one

18   infraction to date.  She has been a model pretrial

19   recipient that she's been afforded the ability to have

20   lesser restrictions over the last two odd years.

21             Now, I understand the sentence is long, but

22   she knew what the potential sentences were.  She still has

23   the monitor on, and she should be afforded the opportunity.

24   She's not given any reason whatsoever in two and-a-half

25   years.  She's proven that she should be afforded the

1  opportunity to at least spend the next decade plus at a

2  camp that is fitting to her that is close to home.

3          So I can appreciate the government saying

4  that they've appealed that and they've been awaiting and so

5  forth.  She's doing this time, and with that ankle monitor

6  on, this Court has -- should have no less concerns -- no

7  more concerns, excuse me, that it once did.  The amount of

8  the sentence, she has walked in here at all stages knowing

9  what this sentence could be.

10         THE COURT:  Thank you, Mr. Friedman.

11         Well, I just feel like the circumstances

12 have changed a little bit, and I'm not dissenting from the

13 possibility that, ultimately, she may get classified down

14 to somewhere like that, but for the concerns expressed to

15 me by my Probation Office, which include, frankly, the

16 concerns raised by Ms. Sterling, but also, frankly, the

17 potential risk of self harm here, I'm just worried about

18 her, so I am going to order that she be immediately

19 remanded by the U.S. Marshals to the custody of the Bureau

20 of Prisons.

21         Ms. Green, I need to tell you that you have

22 the ability to take an appeal from my sentence here.

23 Frankly, from a lot of things about the case.  There is a

24 waiver of some of your appellate rights in the Plea

25 Agreement.  But again, I don't know how broad that is in

1    light of everything that's happened here.

2                    MR. FRIEDMAN:  Your Honor?

3                    THE COURT:  Yeah?

4                    MR. FRIEDMAN:  May I say, there was no Plea

5    Agreement.

6                    THE COURT:  Oh, I thought there was a Plea

7    Agreement.  Well, then --

8                    MR. FRIEDMAN:  No, Your Honor.

9                    THE COURT:  I take back everything I said

10   about that, and I'll say that your appellate rights are

11   even broader than I thought before.  I thought -- I'm

12   sorry, I was crossing -- I was crossing a couple of

13   synapses there, Mr. Friedman.  Thank you for calling that

14   to my attention.

15                   MR. FRIEDMAN:  You're welcome.

16                   THE COURT:  But where I was going with this

17   is you certainly have the right to take an appeal,

18   Ms. Green, from, frankly, everything that's come here.  I

19   was starting to admonish you about the Plea Agreement, but

20   that doesn't exist, so this was an open plea to the single

21   count you were charged with in the Indictment.  You have

22   the right to take an appeal.  Such an appeal would be to

23   the United States Court of Appeals for the Sixth Judicial

24   Circuit.  Although that court sits down in Cincinnati, the

25   notice of appeal is filed in the Clerk of this court.

```
 1              If you want to take an appeal, please tell
 2   Mr. Friedman you want to take an appeal.  He will do that
 3   for you.  If something happens and you can't get ahold of
 4   him or something goes wrong, do it yourself, because it's
 5   critically important that you do that within 14 days.  The
 6   procedure of the case changes after 14 days.
 7              I've said this before to everyone who is
 8   here.  This is a difficult -- it's a difficult thing that I
 9   do.
10              Ms. Green, I hope, I hope for your sake that
11   you are able to figure out what went wrong here and fix
12   yourself, and you can spend however many months that you
13   actually wind up serving in prison here hating me, putting,
14   you know, comments on the calendar every day that, you
15   know, one more day until I'm dead and in hell or whatever
16   you want to say, but I've given this case everything I can
17   in terms of my ability to wade through this stuff.  And I
18   think I'm right, but somebody told me a long time ago, part
19   of being a judge is having enough confidence to make a
20   decision and enough humility to know that you might be
21   wrong, and I certainly have never walked away from that.
22              To all the family members who have been
23   here, again, please accept my condolences for all that you
24   have lost here.  I've done my best to do right by you all.
25   I suspect that you may dissent from that, but that's okay.
```

1    I've got broad shoulders and I have to do my job and I

2    can't be unduly influenced by what you might have otherwise

3    desired to have happened here.

4              With that, is there anything further from

5    the government?

6              MS. STERLING:  We'd just ask the Court to

7    inquire of the Bostic question with regard to reasonable --

8              THE COURT:  You know what, it is 9:30 at

9    night.

10             Does the government have any substantive or

11   procedural objections to what I've done here today?

12             MS. STERLING:  We do not.  Thank you, Your

13   Honor.

14             THE COURT:  Mr. Friedman, does the defendant

15   have any substantive or procedural objections to what I

16   have done here today?

17             MR. FRIEDMAN:  To the sentence, Your Honor,

18   and the overruling of the -- well.

19             THE COURT:  Okay.

20             MR. FRIEDMAN:  That is an objection.  I'm

21   sorry.

22             THE COURT:  You've well-preserved --

23             MR. FRIEDMAN:  Right.

24             THE COURT:  -- the -- and let's be clear,

25   you are objecting to my taking back of the acceptance of

```
 1   responsibility.  I preserved your objection I suppose by

 2   your briefing to the -- to my overruling your objections to

 3   the reductions that you asked for.

 4               And you're also objecting to the length of

 5   the sentence; would that be accurate?

 6               MR. FRIEDMAN:  That is inclusive, yes, Your

 7   Honor.

 8               THE COURT:  Okay.  Because I want you to --

 9   I don't want you to not have an opportunity to appeal

10   something because you didn't talk about it right now.  So I

11   think we've covered -- I think we've exhausted the list.

12   Would that --

13               MR. FRIEDMAN:  I think we have, too, but in

14   the event that 9:30 is hitting us all, I would just note

15   the objection for the sentence in total.  Thank you.

16               THE COURT:  Thank you, sir.

17               Okay.  With that, we'll be adjourned.

18               MS. STERLING:  Thank you, Your Honor.

19          (Proceedings adjourned at 9:31 p.m.)

20                    - - -

21

22

23

24

25
```

1

2

3

4

5

6

7                        **C E R T I F I C A T E**

8

9

10              I, the undersigned, hereby certify
         that the above and foregoing is a true
         and accurate record of the proceedings
11       held in the above-entitled matter prepared
         from my stenotype notes.

12

13

         /s/ Diana M. Ziegelhofer_____12/26/2024__
14       Diana M. Ziegelhofer, RPR, RCR
         Official Court Reporter
15       United States District Court
         1716 Spielbusch Avenue, Suite 118
16       Toledo, Ohio 43604
         419-213-5538

17

18

19

20

21

22

23

24

25